UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
ROBERT ROSS, ANDREA KUNE,
WOODROW CLARK, HERVE SENEQUIER,
BYRON BALBACH, JR., MATTHEW
GRABELL, and PAUL IMPELLEZZERI,
on behalf of themselves and all others similarly
situated,

                    Plaintiffs,

vs.

BANK OF AMERICA, N.A. (USA), CAPITAL
ONE BANK, CAPITAL ONE, F.S.B., J.P.
MORGAN CHASE, CHASE BANK USA, N.A.,
CITIGROUP, INC., CITIBANK (SOUTH
DAKOTA) N.A., CITIBANK USA, N.A.,
UNIVERSAL BANK, N.A., UNIVERSAL
FINANCIAL CORP., CITICORP DINERS
CLUB, INC., NOVUS CREDIT SERVICES,
INC., DISCOVER FINANCIAL SERVICES,
DISCOVER BANK, HSBC FINANCE CORP.,
HSBC BANK, NEVADA, N.A., MBNA
AMERICA BANK, N.A., MBNA AMERICA
(DELAWARE), N.A., PROVIDIAN FINANCIAL
CORP., and PROVIDIAN NATIONAL BANK,

                    Defendants.
_____



**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
AUG 1 1 2005
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs, on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, allege, upon knowledge as to their own acts and otherwise upon knowledge, information and belief, as follows:

## INTRODUCTORY STATEMENT

1.     This is a class action brought on behalf of consumers who hold general purpose cards (i.e., credit and charge cards) issued by Bank of America, J.P. Morgan Chase (which includes both the Chase and Bank One/First USA brands), Capital One, Citibank and Diners Club (now available as a MasterCard-branded card), Discover, Household, MBNA and Providian (collectively "Defendants"). This Complaint challenges the inclusion of a specific collusive term – the arbitration clause – imposed and maintained by each of the conspirators.  Plaintiffs' action does not concern other terms or the contracts as a whole (in this case, adhesion contracts) utilized by the conspirators in their customer relationships with Plaintiffs and members of the Class.

2.     Together with co-conspirators American Express and Wells Fargo, Defendants control more than 86 percent of the United States general purpose card market.  Through their participation in numerous meetings and other communications, and as an exercise of their immense market power, Defendants combined, conspired and agreed to implement and/or maintain mandatory arbitration clauses as a term and condition of sale.  The primary purpose of Defendants' arbitration clauses is to eliminate access to judicial fora and collective remedial action, including class actions, by their cardholders.[1]  Defendants' agreement to impose or maintain collusive arbitration clauses in

---

[1]  This conspiracy is, in part, in furtherance of the conspiracies alleged in *In re Currency Conversion Fee Antitrust Litig.*, MDL 1409 (the "MDL action") and *Ross v. American Express Co.*, No. 04-cv-005723 (WHP).  The defendants in the MDL action are various entities which comprise the Visa, MasterCard, and Diners Club networks, and seven of the largest and most influential bank members of the Visa and MasterCard networks: Bank of America, Bank One/First USA, Chase,

their respective adhesion contracts with their cardholders (which Defendants refer to as "cardholder agreements") constitutes a *per se* violation of the antitrust laws, is an anti-competitive restraint on trade and serves no procompetitive purpose. As such, the arbitration clauses in the Defendants' cardholder "agreements" should be declared unlawful and the clauses voided.

3. Defendants' arbitration clauses are not the product of agreement with the cardholder in any meaningful sense. Defendants neither seek nor obtain any cardholder signature or other written evidence of an agreement by the cardholder to arbitrate. Defendants imposed and impose their arbitration clauses either by "amending" existing terms and conditions notices through change in terms announcements or other mailings, or by burying them in prolix, arcane and lengthy terms "agreements." As such, most cardholders are wholly unaware of the existence, let alone the implications, of the arbitration clauses. Consumers have no opportunity for meaningful or informed consent to any purported "agreement" to arbitrate. Having imposed their arbitration clauses on unwary consumers, Defendants may at any time compel (or mandate) arbitration of any claim of injury or wrongdoing made by a consumer, and block the assertion of any claim on a representative basis, all without the consumer ever having freely manifested his or her consent to the arbitration clause.

4. Defendants' compulsory arbitration clauses deprive cardholders of effective recourse for illegal anti-consumer and anti-competitive activity, secure an unfair advantage for Defendants

---

Citigroup, Household, MBNA and Providian ("MDL Bank Defendants"). The defendants in the *Ross* action are American Express Co., American Express Travel Related Services, Inc. and American Express Centurion Bank (collectively "American Express"). The *Ross* Complaint alleges that the MDL Bank defendants and American Express engaged in a conspiracy to include compulsory arbitration clauses prohibiting class actions in their cardholder agreements in a concerted effort to reduce or eliminate their potential liability arising from their illegal conduct. This action is being filed as a related action in the MDL 1409 proceeding.

in the dispute resolution process, and immunize Defendants from collective action by consumers. Defendants' collusion to impose arbitration clauses that ban class actions have effectively negated the deterrent effects of, and remedies provided by, our nation's consumer, antitrust and other laws aimed at preventing corporate misconduct. The arbitration clauses also enable Defendants to engage in wrongdoing free from public scrutiny. Unlike judicial proceedings, which are largely transparent, arbitration proceedings are often conducted in secret and the results are not publicly available. Moreover, the pervasiveness of these arbitration clauses and the wholesale elimination of judicial fora are rendered even more troubling by the institutional tendencies toward bias, if not outright bias in some cases, of arbitration administrators in favor of the card-issuing Defendants. By forcing cardholders to arbitrate, Defendants collectively intended to and have succeeded in reducing their legal exposure for widespread patterns of egregious and unlawful conduct.

5.    Absent these constraints, Defendants can freely engage in anti-competitive or deceptive conduct that harms individual consumers in small amounts, but results in huge aggregate revenue to Defendants (concerning, *e.g.*, late fees, overlimit fees, foreign transaction fees, APR, balance computation procedures, notice or disclosure conduct, punitive pricing, collection practices, etc.). As the U.S. Supreme Court and many other courts have repeatedly recognized, a class action frequently offers individuals with small claims their only real opportunity to receive justice. Eliminating collective litigation and remedies assures that no matter how egregious or pervasive the violation of law, such violations, weighed against the revenue to be achieved by the violations, will rarely, if ever, prove uneconomical to the Defendant banks.

6.    Cardholders are forced to adhere to the clauses as written by Defendants on a take-it-or-leave-it basis. Because Defendants and their co-conspirators American Express and Wells Fargo

-3-

dominate the general purpose card market, the conspiracy is so all-encompassing that a consumer effectively must use cards containing an arbitration clause or cannot use a card (a necessity in today's economy) at all. Defendants' collusive conduct, as alleged in this complaint, suppresses competition in the general purpose card market by, *inter alia*, depriving cardholders of any meaningful choice concerning arbitration, stripping cardholders of valuable legal rights (including recourse to courts, juries, appellate procedures, evidentiary rights and protections), and effectively negating any meaningful recourse for unlawful conduct. As a result of the collective imposition of arbitration clauses as a term and condition of sale, Defendants have been able to reap supra-competitive profits. As a result of Defendants' ongoing conduct, Plaintiffs and other members of the proposed Class (defined below) have suffered and will continue to suffer harm or threatened harm to their business or property, and threatened loss or damage.

## JURISDICTION AND VENUE

7.    This action is instituted to secure injunctive relief to prevent further threatened harm to Plaintiffs and the members of the Class (defined below) pursuant to §16 of the Clayton Act, 15 U.S.C. §26. This action also seeks to recover costs of suit, including reasonable attorneys' fees, expert fees, and out of pocket expenses, for the actual and threatened harm sustained by Plaintiffs and other members of the Class by reason of the Defendants' conduct, as alleged in this Complaint.

8.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1337, and by §16 of the Clayton Act, 15 U.S.C. §26.

9.    Venue is proper in this judicial district pursuant to §16 of the Clayton Act, 15 U.S.C. §26, and 28 U.S.C. §§1391(b), (c) & (d).

10.    Defendants are found within this judicial district. The causes of action alleged in this

-4-

Complaint arose in part within this district. Information underlying this Complaint was discovered (in part) in the related MDL proceeding pending in this district. The interstate trade and commerce described in this Complaint is and has been carried out in part within this district.

**THE PARTIES**

**THE PLAINTIFFS**

11.     Plaintiff Robert Ross is a resident of Montgomery County, Pennsylvania. Plaintiff Robert Ross has a general purpose card with a mandatory pre-dispute arbitration clause issued by one or more of the Defendants.

12.     Plaintiff Andrea Kune is a resident of Los Angeles County, California. Plaintiff Andrea Kune has a general purpose card with a mandatory pre-dispute arbitration clause issued by one or more of the Defendants.

13.     Plaintiff Woodrow Wilson Clark, Jr. is a resident of Los Angeles County, California. Plaintiff Woodrow Clark has a general purpose card with a mandatory pre-dispute arbitration clause issued by one or more of the Defendants.

14.     Plaintiff Herve Senequier is a resident of the County of New York, New York. Plaintiff Herve Senequier has a general purpose card with a mandatory pre-dispute arbitration clause issued by one or more of the Defendants.

15.     Plaintiff S. Byron Balbach, Jr. is a resident of Champaign County, Illinois. Plaintiff Byron Balbach has a general purpose card with a mandatory pre-dispute arbitration clause issued by one or more of the Defendants.

16.     Plaintiff Matthew R. Grabell is a resident of Bergen County, New Jersey. Plaintiff Matthew Grabell has a general purpose card with a mandatory pre-dispute arbitration clause issued

by one or more of the Defendants.

17.    Plaintiff Paul Impellezzeri is a resident of Los Angeles County, California. Plaintiff Paul Impellezzeri has a general purpose card with a mandatory pre-dispute arbitration clause issued by one or more of the Defendants.

**THE DEFENDANTS**

**The Bank of America Defendant**

18.    Bank of America Corporation is incorporated under Delaware law, and is a bank holding company and financial holding company organized under the laws of the United States (the Gramm-Leach-Bliley Act), with its principal place of business in Charlotte, N.C. The Corporation operates two nationally chartered credit card operations, Bank of America, N.A. (USA) and Fleet Bank (RI), N.A. Bank of America, N.A. (USA) is a national banking association organized under the laws of the United States, with its principal place of business in Phoenix, Arizona. Fleet Bank (RI), N.A. is a national banking association organized under the laws of the United States, with its principal place of business in Providence, R.I. On March 1, 2005, the Corporation consolidated these two banks into a single credit card bank under the Bank of America, N.A. (USA) charter. Bank of America, N.A. (USA) is joined as defendant in this Complaint.

19.    The bulk of Bank of America Corporation's general purpose card portfolio was obtained as the result of its merger with NationsBank Corporation. On September 30, 1998, NationsBank Corporation merged with BankAmerica Corporation, which then changed its name to Bank of America Corporation. On March 31, 1999, the credit card operations of NationsBank Corporation and BankAmerica Corporation were also fully merged.

20.    Bank of America Corporation has continued to grow in size. For example, on April 1,

-6-

2004, Bank of America Corporation merged with FleetBoston Financial. The merger was characterized, at the time, as creating the world's second largest banking company and the fourth most profitable company in the world.

21.    Bank of America, N.A. (USA) and all of its predecessors, affiliates, and subsidiaries are collectively referred to as "Bank of America."

22.    On June 30, 2005, Bank of America Corporation announced its plan to acquire MBNA Corporation, which will make Bank of America Corporation the largest card issuer in the United States and the world. As of the end of 2004, Bank of America Corporation was the nation's fifth largest issuer of general purpose cards and controlled 8.6% of the general purpose card market. For 2004, Bank of America Corporation had over 61 million cards issued to consumers. As of the end of 2004, MBNA was the nation's third largest issuer of general purpose cards, and it controlled over 11% of the general purpose card market. For 2004, MBNA had over 56 million cards issued. Combining these, Bank of America Corporation will control 19.6% of the general purpose card market and will have over 117 million cards issued – which will make Bank of America Corporation the largest issuer of general purpose cards.

**The Capital One Defendants**

23.    Capital One Financial Corporation is incorporated under Delaware law and, in 2004, became a bank holding company organized under the laws of the United States, with its principal place of business in McLean, Virginia. Capital One Financial Corporation offers consumer lending and general purpose card products through its two principal subsidiaries Capital One Bank and Capital One, F.S.B. Capital One Bank and Capital One, F.S.B. are joined as defendants in this Complaint.

24.     Capital One Bank is a Virginia state chartered bank with its principal place of business in Glen Allen, Virginia. Capital One, F.S.B. is a federally chartered savings bank with its principal place of business in McLean, Virginia.

25.     Capital One Bank, Capital One, F.S.B. and all of their predecessors, affiliates, and subsidiaries are collectively referred to as "Capital One."

26.     As of the end of 2004, Capital One Financial Corporation was the nation's sixth largest issuer of general purpose cards and controlled 7.5% of the general purpose card market. For 2004, Capital One Financial Corporation had over 53 million cards issued.

**The J. P. Morgan Chase Defendants**

27.     J.P. Morgan Chase is a financial holding company organized under Delaware law with its principal place of business located in New York, New York, and is joined as a defendant in this Complaint. J.P. Morgan Chase was formed by the merger, on July 1, 2004, of J.P. Morgan Chase & Co. and Bank One Corporation. The merger was touted as creating the second largest banking franchise in the United States.

28.     J.P. Morgan Chase & Co. was a financial holding company incorporated under Delaware law. J.P. Morgan Chase & Co. was the successor entity to the merger between The Chase Manhattan Corporation and J.P. Morgan & Co., Inc. on December 31, 2000.

29.     The principal bank subsidiaries of J.P. Morgan Chase are J.P. Morgan Chase Bank, N.A., a national banking association organized under the laws of the United States with branches in 17 states, and Chase Bank USA, N.A., a national banking association organized under the laws of the United States which is headquartered in Delaware.

30.     Chase Bank USA, N.A. issues J.P. Morgan Chase's general purpose cards and is

joined as a defendant in this Complaint. Chase Bank USA, N.A. is the successor entity to Chase

Manhattan Bank USA, N.A., and the successor entity to Bank One, Delaware, N.A. (formerly First

USA Bank, N.A.). During all or part of the course of the conspiracy, general purpose cards were

issued by Chase Bank USA, N.A. and its predecessors, affiliates and subsidiaries, including Chase

Manhattan Bank USA, N.A., Bank One Delaware, N.A. and First USA Bank, N.A.

31.     Prior to its merger with J.P. Morgan Chase & Co., Bank One Corporation was

incorporated under Delaware law and was a multibank holding company organized under the laws

of the United States, with its headquarters in Chicago, Illinois. Bank One Corporation was formed

to effect the merger of Banc One Corporation and First Chicago NBD Corporation, which became

effective on October 2, 1998. Through this merger, Banc One Corporation acquired the First Card

general purpose card brand.

32.     Before its merger with First Chicago NBD Corporation, Banc One Corporation

acquired First USA, Inc., which acquisition was completed on June 27, 1997. First USA, Inc. issued

its general purpose cards through its wholly owned subsidiary, First USA Bank, N.A., a national

banking association organized under the laws of the United States, with its principal place of

business in Wilmington, Delaware. At that time, First USA, Inc. was described as the nation's fourth

largest issuer of Visa and MasterCard branded general purpose cards. The acquisition made Banc

One Corporation the nation's third largest general purpose card operation.

33.     Bank One Corporation and all of its predecessors, affiliates, and subsidiaries,

including First USA, Inc. and First USA Bank, N.A. are collectively referred to as "Bank One/First

USA" and/or "First USA". Bank One/First USA issued general purpose cards under both the Bank

One and First USA brands.

34.     Following its merger with First USA, Inc., Bank One/First USA continued to acquire more than forty general purpose card portfolios prior to the merger with J.P. Morgan Chase & Co. The following are four examples of general purpose card portfolios acquired by Bank One Corporation. In September 1998, Bank One/First USA acquired the general purpose card operation of Chevy Chase Bank, FSB, which had approximately 3.1 million accounts. In December 1998, Bank One/First USA acquired $ 2.2 billion of GE Capital Corporation's Visa and MasterCard receivables, as well as agreeing to a joint venture concerning $ 2.6 billion in private-label credit card receivables and a co-brand partnership for Bank One/First USA to market a GE brand card. In August 1999, Bank One/First USA entered into an agreement to offer a co-brand card with BellSouth, which included 450,000 accounts. In July 2001, Bank One/First USA acquired Wachovia Corporation's $ 7.5 billion portfolio of consumer credit card receivables, which included 2.6 million accounts. Following the acquisition of the Wachovia Corporation portfolio, Bank One/First USA was described as the nation's fifth largest bank holding company.

35.     J.P. Morgan Chase and all of its predecessors, affiliates and subsidiaries are collectively referred to as "J.P. Morgan Chase." For the period prior to the merger with Bank One Corporation, J.P. Morgan Chase & Co. and all of its predecessors, affiliates and subsidiaries are collectively referred to as "Chase."

36.     As of the end of 2004, J.P. Morgan Chase was the nation's largest issuer of general purpose cards, with approximately 94 million cards in circulation, and it controlled more than 19% of the general purpose card market. J.P. Morgan Chase offers general purpose cards under both the Chase brand and the Bank One/First USA brand.

-10-

**The Citigroup/Citibank Defendants**

37.    Citigroup, Inc. is a holding company incorporated under Delaware law with its principal place of business in New York, New York, and is joined as a defendant in this Complaint. Citigroup was formed as a result of an October 8, 1998 merger of Citibank, N.A. with and into a wholly owned subsidiary of Travelers Group, Inc. After the merger, Travelers Group changed its name to Citigroup, Inc. (hereinafter "Citigroup").

38.    Citibank (South Dakota) N.A., is a national banking association organized under the laws of the United States with its principal place of business in Sioux Falls, South Dakota, and is joined as a defendant in this Complaint. Citibank (South Dakota) N.A. is a wholly owned subsidiary of Citigroup and issues Citibank Visa and MasterCard general purpose cards and Citicorp Diners Club, Inc. general purpose cards. Citibank (South Dakota) N.A. is also an indirect parent company of Citicorp Diners Club, Inc.

39.    Universal Bank, N.A. is a national banking association organized under the laws of the United States with its principal place of business in Columbus, Georgia, and is joined as a defendant in this Complaint. Universal Bank, N.A. is a wholly owned subsidiary of Citigroup and issues AT&T Universal Card general purpose cards.

40.    Universal Financial Corp. is a Utah corporation with its principal place of business in Salt Lake City, Utah, and is joined as a defendant in this Complaint. Universal Financial Corp. is a wholly owned subsidiary of Citigroup and issues AT&T Universal Card general purpose cards.

41.    Citigroup and all of its predecessors, affiliates, and subsidiaries, other than Citicorp Diners Club, Inc., are referred to collectively as "Citibank."

42.    Since the formation of Citigroup in 1997, the company has continued to grow its

general purpose card business. For example, on March 23, 1999, Citigroup acquired the credit card business of Mellon Bank Corporation, a portfolio valued at that time at $1.9 billion in receivables. On November 3, 2003, Citigroup acquired the Sears' Credit Card and Financial Products business, which at the time was the eighth largest portfolio in the United States. Also, in July 2003, Citigroup completed the acquisition of The Home Depot private label portfolio, which added $6 billion in receivables and 12 million general purpose card accounts.

43.    As of the end of 2004, Citibank was the nation's second largest general purpose card issuer and it controlled more than 16% of the general purpose card market. For 2004, Citigroup had over 104 million cards issued. Citigroup and its wholly owned subsidiary Citibank (South Dakota) N.A. also issue the Diners Club brand general purpose card.

**The Diners Club Entities**

44.    Citicorp Diners Club, Inc., a wholly owned (indirect) subsidiary of Citigroup, is a Delaware corporation with its principal place of business in Chicago, Illinois, and is joined as a defendant in this Complaint.

45.    Citicorp Diners Club, Inc. owns and operates a general purpose card network. Diners Club general purpose cards were issued, at least through November 2002, by Citibank (South Dakota) N.A., but, starting around January 2002, they are now issued by Citibank USA, N.A. Citibank USA, N.A. is a national banking association organized under the laws of the United States with its principal place of business in Sioux Falls, SD, and is joined as defendant in this Complaint. Citibank (South Dakota) N.A., Citibank USA, N.A., Citicorp Diners Club, Inc., and their parents and all of their predecessors, affiliates, and subsidiaries are collectively referred to as "Diners Club."

46.    On September 28, 2004, Diners Club announced that it had executed a final

-12-

agreement establishing an alliance with MasterCard. Diners Club cards that are issued in the United States and Canada will now function as MasterCard cards and will be accepted wherever MasterCard cards are accepted.

**The Discover Defendants**

47.    Morgan Stanley is incorporated under Delaware law and is headquartered in New York, New York. Morgan Stanley conducts its general purpose card business through its credit services business segment. This segment includes NOVUS Credit Services, Inc. ("NOVUS"), Discover Financial Services ("DFS") and Discover Bank, which together offer Discover-branded general purpose cards and other consumer finance products and services. NOVUS, DFS and Discover Bank are joined as defendants in this Complaint. Morgan Stanley is named as co-conspirator who attended, on behalf of its subsidiaries, at least one of the meetings held by the conspirators as discussed below.

48.    NOVUS is incorporated under Delaware law with its principal place of business in Riverwoods, Illinois. In October 1998, NOVUS changed its credit services unit name from NOVUS Services, Inc. to DFS. DFS is incorporated under Delaware law with its headquarters located in Riverwoods, Illinois, and is a wholly owned subsidiary of NOVUS. Discover Bank, a wholly owned subsidiary of NOVUS, is a Delaware state chartered bank with its principal place of business in Greenwood, Delaware. DFS offers a variety of Discover branded general purpose card products which are issued by Discover Bank and are processed through a general purpose card network for Discover branded cards.

49.    On April 4, 2005, Morgan Stanley announced that it had authorized management to pursue a spinoff of DFS and the Discover brand. The decision would allow DFS to pursue

relationships with other financial institutions. For example, DFS has already merged with PULSE

EFT Association, which operates the PULSE debit network, and DFS has more recently announced

a partnership with GE Consumer Credit to issue a Walmart card and a Sam's Club card on the

Discover brand network.

50.    Novus, DFS and Discover Bank, and all of their predecessors, affiliates, and

subsidiaries are collectively referred to as "Discover."

51.    As of the end of 2004, Discover was the nation's seventh largest issuer of general

purpose cards, and it controlled 6.5% of the general purpose card market. For 2004, Discover had

over 54 million cards issued.

**The Household Defendants**

52.    HSBC North America Holdings, Inc. ("HSBC North America") is a holding company

incorporated under Delaware law, with its principal place of business in Prospect Heights, Illinois.

HSBC North America is a holding company subsidiary of HSBC Holdings plc. ("HSBC"), which

is a public limited company incorporated in England and Wales. HSBC North America is the

holding company for all of HSBC's United States and Canadian businesses.

53.    On March 28, 2003, HSBC acquired Household International, Inc., a Delaware

corporation with its principal place of business in Prospect Heights, Illinois. Effective January 1,

2004, HSBC transferred its ownership interest in Household International, Inc. to HSBC North

America.

54.    Household Finance Corporation ("HFC") was a wholly owned subsidiary of

Household International, Inc. On December 15, 2004, HFC merged with its parent Household

International, Inc., with the latter the surviving entity. Household International, Inc. then changed

-14-

its name to HSBC Finance Corporation, which is joined as a defendant in this Complaint. As a result of the merger, all outstanding obligations, rights and powers of HFC continue as obligations, rights and powers of HSBC Finance Corporation.

55.    Prior to its merger into HSBC Finance Corporation, Household International, Inc. consolidated all of its credit card operations under HFC. On July 1, 2002, Household International, Inc. contributed all of the capital stock of Household Bank (SB) N.A. ("HBSB") to HFC. HBSB then purchased all of the assets of Beneficial Bank USA, a wholly owned credit card banking subsidiary of HFC. Subsequently, HBSB merged with Household Bank (Nevada) N.A., with HBSB the surviving entity. As a result, all of the credit card operations were consolidated under HBSB, which was a banking subsidiary of HFC. On March 1, 2005, HBSB became HSBC Bank Nevada, N.A. HSBC Bank, Nevada, N.A. is a national banking association organized under the laws of the United States with its principal place of business in Las Vegas, Nevada, and is joined as a defendant in this Complaint.

56.    HSBC Bank USA, N.A. is a national banking association organized under the laws of the United States with its principal place of business located in Wilmington, Delaware. HSBC Bank USA, N.A. is the principal subsidiary of HSBC USA, Inc., a Maryland corporation with its principal place of business in New York, New York, and it is an indirectly held wholly owned subsidiary of HSBC North America. On December 22, 2004, HSBC Bank USA, N.A. received regulatory approval to purchase HSBC North America's domestic private label portfolio, including the retained interests associated with securitized private label credit card receivables. The HSBC Bank USA, N.A. also holds a portfolio of approximately $1 billion in receivables and new receivables and accounts related to this portfolio are originated by HBSB and sold daily to HSBC

-15-

Bank USA, N.A.

57.    On August 4, 2005, HSBC Holdings plc. announced that it planned to buy Metris

Companies, which, in 2004, was ranked as the eleventh largest general purpose card issuer in the

United States.

58.    HSBC North America, HSBC Finance Corporation (and its predecessor Household

International, Inc.), HBSB, HSBC Bank USA, N.A., HSBC Bank, Nevada, N.A. and all their

predecessors, affiliates and subsidiaries are collectively referred to as "Household."

59.    As of the end of 2004, Household was the nation's eighth largest issuer of general

purpose cards, and it controlled more than 3% of the general purpose card market.  For 2004,

Household had over 43 million cards issued.  General purpose cards issued by Household include

the GM, Household, Orchard Bank and Union Plus brands.

**The MBNA Defendants**

60.    MBNA Corporation, a bank holding company organized under the laws of Maryland,

maintains its principal place of business in Wilmington, Delaware.  MBNA Corporation states that

it is the largest independent credit card lender in the world and a recognized leader in affinity

marketing.

61.    MBNA America Bank, N.A. ("MBNA America") is a national banking association

organized under the laws of the United States with its principal place of business in Wilmington,

Delaware, and is joined as a defendant in this Complaint.  MBNA America, is the principal

subsidiary of MBNA Corporation and it issues endorsed credit cards, which are marketed primarily

to members or customers of thousands of associations, financial institutions and other organizations.

62.    MBNA America (Delaware), N.A. ("MBNA Delaware") is a national banking

association organized under the laws of the United States with its principal place of business in Wilmington, Delaware, and is joined as a defendant in this Complaint. MBNA Delaware offers business card products, as well as mortgage loans and other commercial loans.

63.    MBNA America, MBNA Delaware, and all of their predecessors, affiliates, and subsidiaries are collectively referred to as "MBNA."

64.    As of the end of 2004, MBNA Corporation was the nation's third largest issuer of general purpose cards, and it controlled over 11% of the general purpose card market. For 2004, MBNA Corporation had over 56 million cards issued. MBNA Corporation offers general purpose cards endorsed by more than 5,000 organizations and financial institutions, including the NFL, eBay, L.L.Bean, Penn State University, Merrill Lynch and Charles Schwab, to name just a few.

**The Providian Defendants**

65.    Providian Financial Corp. ("Providian Financial"), is incorporated under Delaware law with its headquarters located in San Francisco, California, and is joined as a defendant in this Complaint. Providian Financial provides its general purpose card and deposit products through its subsidiaries.

66.    Providian National Bank is a national banking association organized under the laws of the United States with its headquarters located in Tilton, New Hampshire. Providian National Bank is a wholly owned subsidiary of Providian Financial, and is also joined as a defendant in this Complaint. Providian Financial issues general purpose cards through Providian National Bank.

67.    Prior to 2004, Providian Financial also conducted its lending and deposit activities through Providian Bank. On December 31, 2003, Providian Bank was merged into Providian National Bank.

68.    On June 6, 2005, Washington Mutual, Inc. announced that it planned to acquire Providian Financial in a stock and cash transaction valued at approximately $6.45 billion. The acquisition is expected to be completed in the fourth quarter of 2005.

69.    Providian Financial and all its predecessors, affiliates and subsidiaries are collectively referred to as "Providian."

70.    As of the end of 2004, Providian was the nation's ninth largest issuer of general purpose cards, and it controlled 2.6% of the general purpose card market. For 2004, Providian had over 12 million cards issued.

**American Express: Named Co-Conspirator**

71.    American Express Company, and its subsidiaries American Express Travel Related Services, Inc. and American Express Centurion Bank (all three together, "American Express"), offer American Express branded general purpose cards to consumers. As of the end of 2004, American Express was the nation's fourth largest issuer of general purpose cards, and it controlled 9% of the general purpose card market. For 2004, American Express had over 39 million cards.

72.    American Express has also sought to increase its presence in the general purpose card market by entering into alliances with other card issuers. Through these alliances, American Express branded cards are issued by the alliance partner and operate on the American Express card network. Since January 2004, American Express has entered into at least three alliances with U.S. issuers to offer an American Express branded card:  MBNA (Jan. 29, 2004); Citigroup (December 13, 2004); and USAA (May 31, 2005).

73.    American Express is a co-conspirator with defendants in the offenses complained of and has performed acts and made statements in furtherance of the conspiracy. American Express is

-18-

a defendant in a companion case, *Ross v. American Express Co.*, No. 04-cv-05723 (WHP), which alleges that American Express engaged in a conspiracy, with the MDL 1409 bank defendants, to include compulsory arbitration clauses prohibiting class actions in their cardholder agreements in a concerted effort to reduce or eliminate their potential liability arising from their illegal conduct. One example of such illegal conduct, also a count in the *Ross* action, is the conspiracy, by American Express and the MDL 1409 defendants, to fix and maintain prices in connection with fees charged to United States cardholders for transactions effected in foreign currencies (the "foreign transaction fee").

**Wells Fargo & Company: Named Co-Conspirator**

74.     Wells Fargo & Company is incorporated under Delaware law, and is a bank holding and financial holding company organized under the laws of the United States, with its headquarters located in San Francisco, California. Wells Fargo & Company was the product of the merger between Norwest Corporation and the former Wells Fargo & Company on November 2, 1998. After the merger, Norwest Corporation changed its name to Wells Fargo & Company. The company provides retail, commercial and corporate banking services through banking stores located in Alaska, Arizona, California, Colorado, Idaho, Illinois, Indiana, Iowa, Michigan, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, South Dakota, Texas, Utah, Washington, Wisconsin and Wyoming. As of December 31, 2004, Wells Fargo & Company stated that it was the fifth largest bank holding company in the United States, with assets of $428 billion.

75.     Wells Fargo & Company issues general purpose cards through its wholly owned subsidiary Wells Fargo Bank, N.A. ("Wells Fargo Bank"). Wells Fargo Bank is a national banking association organized under the laws of the United States with its principal place of business in

Sioux Falls, South Dakota. Prior to February 2004, Wells Fargo & Company operated nineteen separate national bank charters. In February 2004, these nineteen entities were consolidated into Wells Fargo Bank. Wells Fargo Bank is the principal subsidiary of Wells Fargo & Company, with $336 billion in assets (or 86% percent of the company's overall assets).

76.    Wells Fargo & Company and all its predecessors, affiliates and subsidiaries are collectively referred to as "Wells Fargo."

77.    As of the end of 2004, Wells Fargo was the nation's tenth largest issuer of general purpose cards, and it controlled 1.9% of the general purpose card market. For 2004, Wells Fargo had over 9 million cards issued.

78.    Together, the Defendants, American Express and Wells Fargo dominate the market for general purpose cards. As of the end of 2004, the Defendants, American Express and Wells Fargo collectively controlled over 86% of the general purpose card market and accounted for over $611.05 billion in general purpose card receivables (out of a total of $706.91 billion for all general purpose cards). In comparison, the next 40 top issuers collectively account for $64.7 billion in general purpose card receivables. As of the end of 2004, the Defendants, American Express and Wells Fargo collectively had issued 89.2% of all general purpose cards, or over 517.4 million cards issued, with the remaining next 40 issuers accounting for only 62.77 million cards issued.

79.    Various other persons, firms and corporations, not joined as defendants in this Complaint or identified as co-conspirators herein, have also participated as co-conspirators with Defendants in the offenses complained of and have performed acts and made statements in furtherance of the conspiracy.

80.    Whenever in this Complaint reference is made to any act, deed or transaction of any

corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## TRADE AND COMMERCE

81.    The trade and commerce relevant to this action is comprised of the issuance of general purpose cards to U.S. consumers.

82.    During all relevant times, the Defendants have issued and continue to issue general purpose cards throughout the United States pursuant to the terms of "use agreements" which now all contain mandatory arbitration clauses and purport to be effective upon use of the card. Defendants and their co-conspirators have imposed such arbitration clauses on cardholders without soliciting or obtaining their informed consent or any signatures evidencing such consent. Use of these general purpose cards and the related processes and communications, including customer billing, occur in states other than states in which Defendants operate their businesses and thus, cross state lines and national borders.

83.    The activities of the Defendants and their co-conspirators, as described in this Complaint, took place within interstate commerce; had and continue to have a substantial effect on interstate trade and commerce; and have unreasonably restrained, and continue to restrain, interstate trade and commerce. The acts complained of in this Complaint have harmed the business and property of Plaintiffs and the Class and present a continued threat of loss and damage to Plaintiffs and the Class.

## RELEVANT MARKET

84.    The relevant product market is general purpose cards issued to United States consumers.

85.    That U.S.-issued general purpose cards constitute a separate relevant market for antitrust purposes was recently recognized by the court in *United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001), which found that "defendants' [Visa and MasterCard] own admissions and evidence of consumer preferences support ... and demonstrate the existence of a general purpose card market separate from other forms of payment ...." The Court also explained that "consumers strongly prefer to use credit and charge cards rather than cash or checks, because they generally do not want to carry large sums of cash to make large purchases, and checks generally have much lower merchant acceptance than either cash or general purpose cards.... Also, consumers benefit from the general purpose card's credit function, which allows for the choice to purchase now and pay later." *Id.* at 336. Accordingly, the Court held that "because card consumers have very little sensitivity to price increases in the card market and because neither consumers nor the defendants view debit, cash and checks as reasonably interchangeable with credit cards, general purpose cards constitute a product market." *Id.* at 338.

86.    General purpose cards are a separate market because they differ from other forms of payment – such as cash, checks and debit cards – in a variety of dimensions, including those discussed above (e.g., they are considered safer than carrying large amounts of cash, they are more widely accepted than checks, and they offer a credit function), and other forms of payment often are not a close substitute for a general purpose card.

87.    General purpose cards occupy a unique position in today's economy in that they are

a practical necessity for most consumers to rent a car, reserve a hotel, buy airline tickets, engage in internet commerce and secure numerous other services and products. Many consumers view general purpose cards as an indispensable part of every day life.

## STATEMENT OF FACTS

### The General Purpose Card Market

88.    General purpose cards, like Visa-branded, MasterCard-branded, Discover-branded and American Express-branded cards, are payment devices that a consumer can use to make purchases: (a) from unrelated merchants; and (b) without accessing or reserving the consumer's funds at the time of the purchase. There are two principal types of general purpose cards: (a) credit cards that provide the cardholder the option of (I) paying all charges within a set period after a monthly bill is presented, or (ii) paying only a portion of the charge within that time and paying the remainder in monthly installments plus a finance or interest charge; and (b) charge cards that require the cardholder to pay all charges within a set period after a monthly bill is presented.

89.    General purpose card transactions are processed through general purpose card networks. Visa, MasterCard and American Express own and operate the three largest general purpose card networks. In 2003, these three networks accounted for more than 93% of all purchases made with general purpose cards and approximately 92% of the number of general purpose cards issued in the United States. There are only two other networks, Discover and Diners Club (which is owned and controlled by the Citi Defendants).

90.    General purpose cards are issued to cardholders in one of two ways. Some cards are issued on a network operated by a joint venture, referred to as an "association." The association networks are Visa and MasterCard, and cards on these networks are issued by the associations'

respective member banks pursuant to license agreements with the network. Their activities are principally financed through fees and assessments levied on their members, including the Defendant banks, except Discover Bank. Other cards are issued by closed networks, e.g., American Express, Discover and Diners Club (although Diners Club cards are now available on the MasterCard network). The same entities that issue the cards to consumers also own and operate the closed network.

91.      Visa and MasterCard each own and operate open general purpose card networks. Their member banks issue cards to cardholders ("issuing banks" or "issuer") and contract with merchants to accept their cards ("acquiring banks" or "acquirer"). The cardholder accounts are owned by the issuing banks and processed by the banks themselves, or by third-party processors such as First Data Resources, Inc. ("FDR") or Total System Services, Inc. ("TSYS").

92.      Among other things, Visa and MasterCard implement systems and technologies to authorize, clear, and settle general purpose card transactions; market and promote their brand names; develop and impose rules; and assess fees on their member banks.

93.      In a typical general purpose card transaction, such as a credit card, on the Visa or MasterCard networks, a merchant accepts a credit card from a customer for the provision of goods and services. The merchant then presents the card transaction data to an "acquirer," typically a bank, for verification and processing. The acquirer presents the transaction data to the association which, in turn, contacts the "issuer" to check the cardholder's credit line. The issuer then indicates to the association whether it authorizes or denies the transaction. The association relays the message to the merchant's acquirer, who then relays the message to the merchant. If the transaction is authorized, the merchant will submit a request for payment to the acquirer, which relays the

-24-

transaction detail, via the association, to the issuer. The issuer pays the acquirer; the acquirer pays the merchant and retains a percentage of the purchase price for its services which is shared with the issuer. The issuing bank bills the cardholder for the amount of the purchase. For foreign transactions, additional fees are typically added to the purchase price by the associations and issuing banks. All of the foregoing is generally accomplished electronically through the networks' clearing and processing systems or those of a third-party processor. The larger members of the two associations, including many of the Defendant banks, act as both acquirers and issuers, and they earn substantial revenue and profits from the acquiring side of their general purpose card business, as well as the "issuing" side.

94.    The operators of a closed network, e.g., American Express, Discover and Diners Club, issue cards directly to cardholders and contract directly with the merchants that accept the cards. The authorization and settlement of general purpose card transactions are done internally. American Express and Discover, for example, each own both their network and the corresponding cardholder accounts. Recently, American Express has entered into alliances with issuers, including MBNA and Citigroup, to allow those issuers to offer an American Express card.[2] The card operates on the American Express network, but the alliance partner (i.e., the issuer) owns the accounts.

95.    In a typical transaction on a closed network, e.g., the American Express network, the merchant accepts a credit card from a customer for the provision of goods or services. The merchant presents the card transaction data to American Express for verification and processing. American

---

[2] Under Visa's and MasterCard's "exclusionary rules," its member banks were restricted from issuing cards on the American Express (or Discover) network. In 2001, the Department of Justice successfully prosecuted an antitrust action against Visa and MasterCard to invalidate this policy. The decision was affirmed in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003).

Express then notifies the merchant if the transaction is authorized. If authorized, the merchant submits a request for payment to American Express. American Express pays the merchant and retains a percentage of the purchase price for its service. American Express then bills its cardholder for the amount of the purchase.

96.     By comparison, in addition to their network functions, closed networks, *e.g.*, American Express, Discover and Diners Club, act as both an "issuer" and "acquirer" because they perform all the functions performed by the issuers and acquirers on the Visa and MasterCard networks. As a result, the closed networks compete with both the Visa and MasterCard networks, and their issuing and acquiring banks (although, as discussed at ¶72, American Express is expanding its market influence by entering into alliances with card issuers).

**"The Arbitration Coalition" and the Conspiracy to Impose Mandatory Arbitration Clauses**

97.     Beginning before late 1998 or early 1999, Defendants began communicating with each other and their co-conspirators concerning the imposition and use of mandatory arbitration clauses.

98.     Immediately prior to their official launch of the group that later became known as the "Arbitration Coalition," Defendant First USA and co-conspirator American Express communicated with an attorney at Wilmer Cutler & Pickering, now known as Wilmer Cutler Pickering Hale and Dorr ("WCP"), for the purpose of organizing an "informal meeting" of senior in-house credit card counsel "representing the various segments of the U.S. credit card business," which they were to co-sponsor along with Citigroup and Sears.

99.     This meeting took place on May 25, 1999, at the Washington, D.C. offices of WCP. The meeting was attended by Defendants Capital One, Chase, Citibank, First USA, Household and

Providian, as well as co-conspirator American Express and others. Defendant MBNA was invited to the meeting and expressed an intention to attend, but apparently did not attend. The agenda for the meeting included a planned discussion about arbitration clauses. This meeting provided an opportunity for Defendants and their co-conspirators to conspire concerning the adoption and implementation of arbitration clauses on an industry-wide basis.

100.    At the time of the meeting, only two of its co-sponsors, First USA and co-conspirator American Express, had acted to impose arbitration clauses containing class action bans. American Express's clause had not yet taken affect. Bank of America employed a simple arbitration clause that was silent as to class actions. None of the other Defendants had imposed arbitration clauses, in any form, on their cardholders.

101.    Following this initial meeting and other discussions, Defendants formed an organization uniquely devoted to collectively promoting and implementing mandatory arbitration clauses, called the "Arbitration Coalition" or "Arbitration Group". The organization was initially instigated by (at least) First USA, primarily with the assistance of its consultant (a former Citibank lawyer), and by American Express, primarily through the efforts of its senior in-house counsel. The express purpose of the Arbitration Coalition was to defend and foster arbitration and promote the imposition of mandatory clauses.

102.    Following the May 25, 1999 WCP meeting, First USA endeavored to generate a list of invitees to the "inaugural" Arbitration Coalition meeting to be held in July. For example, in a June 23, 1999 e-mail, First USA informed American Express of its efforts to identify other credit card companies and organizations that would be interested in attending the inaugural meeting of the Arbitration Coalition. First USA indicated to American Express that a representative of GE Capital

Corp., planned to attend the first meeting and that First USA would contact Household, Bank of America, Norwest (which had recently merged with co-conspirator Wells Fargo & Co.), and someone from MBNA to enlist their participation. First USA also advised American Express that "rumor" had it that MBNA was "exploring" imposing an arbitration clause. Finally, First USA reported to American Express that it had reached out to Ballard Spahr Andrews & Ingersoll, LLP ("Ballard Spahr") for assistance with these efforts. At or around the same time, First USA also contacted NAF, the arbitration "forum" utilized by First USA and American Express, to assist in identifying new members to join the Arbitration Coalition. NAF did, in fact, identify and provide First USA with the names of other companies who might be willing to participate in the Arbitration Coalition.

103. In mid-July, Defendants and their co-conspirators were invited to attend the inaugural meeting of the Arbitration Coalition at the offices of WCP to be held on July 28, 1999. The invitation identified the invitees as "[l]eading companies that have adopted or *are considering* adopting arbitration to resolve disputes with their consumer customers ...." (emphasis supplied). The agenda for the meeting emphasized actions the coalition could take by working together to use and promote arbitration. The first two steps listed were "sharing best practices" and "drafting [] enforceable arbitration clauses." At the time of the meeting, many of the invitees, including most of the Defendants, did not utilize arbitration clauses in dealing with their consumers. Attendees at the July 28, 1999 meeting included: American Express, Bank of America, Chase, Citibank, Discover, First USA, and Household, as well as counsel from Ballard Spahr and WCP.

104. Defendants continued to communicate in August, 1999 as they planned for the next Arbitration Coalition meeting. On August 4, 1999, First USA's in-house counsel e-mailed WCP

concerning issues for the next Arbitration Coalition meeting and to schedule a call for later that day which would also include First USA's consultant. The suggested topics for that call included "sharing best practices," "how to set up an arbitration program," "arbitration price statistics" and "plain language vs. fine print and overkill." The e-mail reflects that the Arbitration Coalition continued to focus on methods to help its members draft and/or impose arbitration clauses.

105.    That same day, WCP sent an e-mail to members of the Arbitration Coalition, including an overwhelming majority of the Defendants, proposing that the next meeting be held in September. The e-mail emphasized that the members should continue to work together to develop arbitration clauses, stating: "We agreed to take a number of steps going forward, including sharing our thoughts and materials (including FAQ responses, customer information materials, and legal briefs) on the issues regarding arbitration that come up most frequently and pose the greatest difficulty." The e-mail also requested members to bring their arbitration-related materials to the next meeting.

106.    On September 29, 1999, Defendants Bank of America, Chase, Citibank, Discover, First USA, Household and their co-conspirator American Express, as well as First USA's consultant, Ballard Spahr and WCP, attended another Arbitration Coalition meeting. As reflected by the meeting agenda, the group continued to focus on developing and adopting arbitration clauses, and on including class bans in their arbitration clauses. The agenda for the meeting listed as a topic "discussion of the future of arbitration clauses in consumer contracts," with sub-topics, including: "adoption of arbitration clauses" and "the absence of class actions."

107.    During the September 29 meeting, the Arbitration Coalition members discussed the "need to control class action litigation." Defendants Citibank and Household also discussed their

internal plans regarding the adoption and imposition of mandatory arbitration clauses either at this meeting or during private conversations with Chase. In addition, at the meeting or during a private conversation with Chase, Defendant Bank of America reported on co-conspirator Wells Fargo's experience with and use of its arbitration clause – information which would not be publicly available.

108.    Also during the September 29 meeting, Defendants explored the possibility of all members of the coalition adopting set criteria for their arbitration clauses, which many of the Arbitration Coalition members had not yet adopted as of that date. The arbitration clauses ultimately implemented by Defendants are materially identical because they are mandatory clauses which ban class actions. Any differences in the respective clauses are immaterial to the ultimate purpose of the conspiracy: to eliminate class actions and other litigation with cardholders in an effort to harm consumers and retard competition.

109.    The September 29 meeting also included a discussion of First USA's heavy reliance on NAF to assist in its collection practices. First USA advised the group of the favorable results it obtained from NAF, and revealed that it had paid NAF over $2 million in filing fees since 1998. All but one Defendant lists NAF as an arbitration administrator in their clauses – in fact, NAF is the exclusive provider for MBNA, American Express, First USA (prior to 2003), and (as of 2005) Discover.

110.    As part of the Arbitration Coalition's concerted efforts to promote arbitration, in December 1999, Defendants paid outside counsel, including WCP and Ballard Spahr, to draft and file *amicus curiae* briefs for the purpose of persuading courts to enforce onerous and one-sided arbitration clauses. Defendants engaged in similar activities with respect to other cases, in which

the validity and enforceability of the mandatory arbitration clauses were challenged.[3]

111.     Following a meeting held on November 17, 1999, the Arbitration Coalition met again on January 12, 2000. In preparation for the January 2000 meeting, WCP sent an e-mail to Defendants requesting that they provide suggestions for the meeting agenda. In that e-mail, WCP also asked Defendants to bring a copy of their arbitration clauses to the meeting. At this time, only a few of the Defendants had adopted and implemented arbitration clauses.

112.     The Arbitration Coalition participated in at least sixteen meetings and/or conference calls following the November 17, 1999 meeting through October 2003, which were held on the following dates: January 12, 2000; March 2, 2000; April 18, 2000; June 14, 2000; October 3, 2000; January 16, 2001; April 5, 2001; May 30, 2001; October 24, 2001; November 28, 2001; January 13, 2002; January 31, 2002; June 13, 2002; April 22, 2003; June 25, 2003; and October 16, 2003. At these meetings, Defendants and their co-conspirators continued to plan the imposition and use of arbitration clauses and their use to eliminate class actions and other litigation.

113.     In addition to the Arbitration Coalition, Defendants formed and participated in two additional groups dedicated to using arbitration to eliminate class actions: the "Consumer Class Action Working Group" and the "In-House Counsel Working Group".

114.     The Consumer Class Action Working Group was spawned from the Arbitration Coalition's ongoing frustrations with class actions. Invitations to the first meeting of this group were

------

[3] While the filing of *amicus curiae* briefs and joint lobbying of legislators is protected by the Noerr-Pennington doctrine, such otherwise legal conduct may not be undertaken in furtherance of an unlawful conspiracy. The purpose of such activities, consistent with the focus of the Arbitration Coalition, was to ensure the success of industry-wide imposition of mandatory arbitration clauses in an effort to make it impossible for cardholders to avoid arbitration, and Defendants' associated prohibitions on class actions.

disseminated on January 22, 2001 to the Defendants, co-conspirator American Express and others. The group issued a "manifesto," which included filing of countersuits against class action lawyers and suits for abuse of process. The first meeting of the Consumer Class Action Working Group took place on February 14, 2001. Defendants Bank One/First USA, Capital One, Chase, Citibank, Household, Providian and co-conspirators American Express and Wells Fargo, as well as MasterCard attended the meeting. The meeting focused on tactics to combat consumer class action litigation. Arbitration Coalition members were assured that this "special meeting" did not reflect a decision to abandon the group's arbitration efforts but rather to use them as a "base" to see what could be done to help the consumer credit industry deal with class action lawsuits.

115.    The second, and last known, meeting of the Consumer Class Action Working Group was held on May 30, 2001 at the offices of J.P. Morgan Chase & Company. At this meeting, Defendants again focused on tactics to combat consumer class actions, including a discussion of the Federal Arbitration Act. Defendants Capital One, Chase, Citibank, First USA, Household, MBNA, Providian and their co-conspirator American Express, among others, attended the meeting.

116.    Shortly after the last meeting of the Consumer Class Action Working Group, Defendants Capital One, Chase and their co-conspirator American Express established another group consisting solely of in-house counsel employed by Defendants. The "In-House Counsel Working Group" was created for the purpose of discussing issues that impacted only credit card issuers. The group consisted of American Express, Bank of America, Bank One/First USA, Capital One, Chase, Citibank, Household, MBNA and Providian. Through this group, Defendants availed themselves of regular opportunities for communications and meetings to address issues relating to arbitration clauses and to share information concerning their business practices and strategies with respect to

-32-

compulsory arbitration clauses. These meetings were secret and the precise number of contacts and meetings is not yet known.

117.    The In-House Counsel Working Group continued to emphasize sharing information and "best practices" among Defendants for the purpose of developing means to collectively protect themselves from plaintiff actions. For example, the agenda for the July 9, 2001 conference call suggested "creating an informal 'information please' e-mail network" and that they should "discuss[] approaches to make the group successful," as well as "identify[] means to protect[] [Defendants] from the plaintiffs [sic] network." The passcode for the July 9 conference call was "ARBITRATION". The invitational e-mail for the August 7, 2001 conference call exhorted the group to "ask questions of the others so that we may be able to get some answers to the burning issues our business people keep raising," and to share information through discussing recent litigation, which undoubtedly included the arbitration issues, which were the subject of the ongoing meetings of the Arbitration Coalition. The agenda for a March 19, 2002 In-House Counsel Working Group call included arbitration-related issues including "methods of disclosing arbitration clauses in solicitations." Shortly after the March 19 call, Defendants exchanged advice and information on dealing with cardholders who sought to modify the arbitration administrators identified in Defendants' adhesion clauses.

118.    On information and belief, Defendants' lawyers and executives participated in many more contacts and communications in addition to the meetings discussed above that have thus far been discovered. Evidence of some of these contacts and communications has been shielded and protected from disclosure by improper or incorrect invocations of the attorney-client privilege.

-33-

**The Arbitration Administrators**

119.    The ability of arbitration administrators selected by Defendants to remain absolutely neutral is open to serious question.  Defendants' arbitration clauses do not permit cardholders to independently choose any arbitration administrator.  Some clauses require the use of a specific administrator, while others allow cardholders to choose between two or three pre-selected administrators.  These arbitration administrators have a strong incentive to favor Defendants who drafted the clause designating (and thus send business to) the administrator.  All three of the arbitration administrators selected by Defendants have enforced the conspiratorially imposed class action ban contained in the clauses.

120.    The most egregious example is NAF.  NAF is designated as an arbitration administrator for nearly every Defendant.  It is the exclusive arbitration administrator of American Express, Discover (as of 2005), MBNA, and, until 2003, First USA (now owned by Chase).  It is also designated as an arbitration administrator for Capital One, Chase, Citibank, Diners Club, Household, and Providian.  NAF's activities are funded primarily through general purpose card arbitrations.  It is the only for-profit arbitration administrator used by Defendants.  In handwritten notes of Chase's in-house counsel, written during the September 20, 1999 Coalition meeting, NAF was referred to as appearing to be a "creditor's tool."

121.    NAF's record on arbitration reveals an inordinate tendency to favor defendants.  In the case of *Bownes v. First USA Bank, N.A.*, Civil Action No. 99-2479-PR (Cir. Ct. Montgomery Cty.), First USA revealed that in arbitrations before the NAF, it prevailed in 19,618 cases, while the cardholder prevailed in only 87 cases, a success rate for First USA of 99.6%.  First USA has been a major "repeat player" for NAF.

122.    NAF stresses in its promotional materials to companies that its rules prohibit claimants from proceeding on a class action basis.  For example, NAF's Curtis Brown wrote to a prospective client in 1999 that "[a] number of courts around the country have held that a properly-drafted arbitration clause in credit applications and agreements eliminates class actions ..." (emphasis in original.) This letter also, and utterly inappropriately for a purportedly neutral dispute resolution firm, promises that NAF arbitration "will make a positive impact on the bottom line." (emphasis in original.)

123.    NAF has repeatedly claimed that it sees its role as limiting corporate liability and reducing the recoveries obtained by consumers.  These statements call into serious question NAF's neutrality:

A.    One NAF solicitation states in huge print that NAF is: "The alternative to the million dollar lawsuit."  The clear implication of this appeal to corporate clients is that arbitration through NAF will effectively eliminate any significant remedy in a consumer dispute, whatever the underlying merits.  Plaintiffs know of no court system in this country which holds itself out as pre-disposed to eliminate or diminish defendant liability no matter the underlying merits.

B.    A letter dated April 16, 1998, from Roger Haydock, NAF's Director of Arbitration, to a corporate defense lawyer warns that the "class action bar" is threatening to bring lawsuits involving the Y2K issue, and states that the "*only* thing" that will "prevent" such suits is the adoption of an NAF arbitration clause "in every contract, note and security agreement."  The approach in Mr. Haydock's letter is not that of an even-handed neutral, but of an advocate advising defense counsel how to defeat an adversary ("the class action bar").

C.    A letter dated September 23, 1996 from NAF's Director of Development,

-35-

Curtis D. Brown, to in-house counsel for a corporate lender, states: "By adding arbitration language to your contracts, the [NAF's] national system of arbitration lets you minimize lawsuits, and the threat of lender liability jury verdicts."

        D.     On January 29, 1997, Leaf Steines, a policy analyst for NAF, wrote the same lender's in-house counsel and urged that "[t]here is no reason for Saxon Mortgage, Inc. to be exposed to the costs and the risks of the jury system." An attachment to that letter offers free legal advice on how lenders can defeat class actions where common questions predominate and the class representatives' claims are typical.

        E.     In one advertisement distributed to corporate in-house counsel on NAF letterhead, NAF pronounced that its rules provide for "[v]ery little, if any, discovery." This NAF rule is also likely to disadvantage many consumers and defeat meritorious claims.

**Mandatory Arbitration Clauses**

     124.    Defendants and their co-conspirators American Express and Wells Fargo have combined, conspired and contracted to adopt, implement, maintain, and include a specific term – the mandatory arbitration clauses prohibiting class actions – in their respective cardholder agreements. Defendants' collusion to impose and maintain arbitration clauses, in violation of the Sherman Act, renders the clauses voidable and unenforceable. Accordingly, valid and binding agreements to arbitrate were never formed.

     125.    The conspiracy was facilitated by the manner in which the clauses were imposed and are maintained. While Defendants agreed between and among themselves to impose arbitration clauses, Plaintiffs and other members of the Class did not affirmatively agree to accept them. Defendants imposed the arbitration clauses on their cardholders in a manner designed to avoid

detection by cardholders. The clauses were either engrafted onto existing cardholder agreements through change in terms notices or buried in the cardholder agreements of new cardholders. By hiding the arbitration clauses in change of terms announcements or cardholder agreements, Defendants did not reasonably inform their cardholders of the arbitration clauses or their consequences. Either way, Plaintiffs and other members of the Class did not "agree" to the arbitration clauses. The clauses are <u>never</u> signed by any "party" to them.

126.    Silence on the part of cardholders is not evidence of an "agreement" to arbitrate. Defendants employ two tactics in which they can attempt to assert that a cardholder's silence constitutes a willingness to "agree" to the imposition of the arbitration clause. In one example, Defendants attempt to create a binding agreement to arbitrate based upon the mere fact that a cardholder continued to use their card after a "change in terms" announcement was purportedly mailed by the issuer. In an another effort to artificially create the appearance of an "agreement" by existing cardholders at the time the clause was first implemented, a few Defendants allowed an existing cardholder to opt-out of the clause and retain their account. In neither instance does the cardholder knowingly assent to the newly added arbitration clause.

**Effect of the Conspiracy**

127.    The purpose and effect of Defendants' unlawful concerted conduct and conspiracy is to inhibit competition and harm consumers by obtaining a non-price trade advantage, which would not be available in the absence of concerted activity, and has resulted in supra-competitive profits by shielding Defendants from liability arising from any illegal conduct or practice. The conspiracy also deprives Plaintiffs and other members of the Class of any meaningful choice concerning arbitration of disputes and severely limits their ability to obtain a general purpose card that does not

-37-

require compulsory arbitration. Defendants' conspiracy also shields their conduct from judicial and public scrutiny and accountability, thus enabling Defendants to engage in anti-competitive conduct in violation of the Sherman Act and other laws under a shroud of secrecy, effectively negating any recourse by Plaintiffs and the Class for Defendants' unlawful conduct. Any differences in the language of Defendants' respective clauses are immaterial to the purpose of the conspiracy.

128.    Without their knowledge or consent, consumers subject to the collusive mandatory arbitration clauses suffer the loss of a number of rights and procedural protections available in the judicial system. For example, unlike a judge, an arbitrator is neither publicly chosen nor publicly accountable. Arbitrators in most cases are not required to give a reasoned explanation of the result. Arbitrators need not follow the rules of evidence. The discovery available in arbitration is also severely limited, as NAF touted to its prospective credit card bank clients. For example, it would have been impossible to develop in arbitration the discovery concerning the collusion to impose arbitration clauses that was developed in MDL 1409. One of the leading corporate proponents of forced arbitration has openly stated that arbitration strips consumers of familiar protections: "Arbitration materially changes the dispute resolution rules that consumers and borrowers are accustomed to: there is no right to a jury trial, pre-hearing discovery is limited, class actions are eliminated and appeals are severely circumscribed."[4] Indeed, one of the main objectives of the conspiracy alleged herein is to eradicate class actions.

129.    As the California Supreme Court recently noted, when a class action ban is "found in a consumer contract of adhesion in a setting in which disputes between the contracting parties

---

[4] Alan S. Kaplinsky and Mark S. Levin, Anatomy of an Arbitration Clause: Drafting and Implementation Issues Which Should Be Considered By a Consumer Lender, 1113 PRAC. L. INST. CORP. L. PRAC. COURSE HANDBOOK 655, 657 (1999).

predictably involve small amounts of damages, and when it is alleged that the party with superior

bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of

small sums of money ... such waivers are unconscionable ... and should not be enforced." *Discover*

*Bank v. Superior Court*, 2005 Cal. LEXIS 6866, at *27-*28.

130.    Arbitration also largely takes place in secret. The rules of the three arbitration

administrators utilized by Defendants require that all parties to a dispute keep all facts about the

dispute and the arbitrator's resolution of the dispute "confidential." This secrecy undermines the

public function of litigation.

131.    Defendants have engaged in this unlawful concerted activity in order to insulate

themselves from any potential financial exposure for their illegal conduct. By colluding to impose

and maintain arbitration clauses, Defendants have immunized themselves from consumer protection

laws such as the Truth in Lending Act, the Electronic Funds Transfer Act, Unfair Debt Collection

Practices Act, the Unfair Deceptive Trade Practices Acts of the several states, and other state and

federal consumer protection laws. Defendants' goal of acting with impunity can only be

accomplished through eviscerating consumers' rights by such means as requiring arbitration of

claims asserted by cardholders before arbitration organizations who are subject to the economic

pressure of the Defendants. The purpose and effect of the conspiracy is to permit Defendants to

evade consumer protection, antitrust and other laws aimed at curbing corporate abuse to the

economic harm of Plaintiffs and the Class.

132.    Not only do Defendants use arbitration clauses to insulate themselves against class

actions, they also use the clauses offensively against consumers. The Office of the Comptroller of

the Currency has observed that mandatory arbitration clauses "have been associated with abusive

lending practices." Office of the Comptroller of the Currency, Administrator of National Banks, Guidelines for National Banks to Guard Against Abusive and Predatory Lending Practices, OCC Advisory Letter 2003-2, at 2, 3 (February 21, 2003). For example, some Defendants have combined with NAF to use mandatory arbitration clauses to "fast track" disputes over credit card debt into rapid arbitration. This practice is used to force cardholders to become liable for debts as a result of the cardholder's lack of knowledge of the arbitral process, e.g., default awards against victims of identity theft or fraud where these individuals are normally not held liable under applicable law. Such default awards often require the consumer to pay the costs of arbitration, including the card issuer's attorneys' fees. Curtis Brown, NAF's General Counsel, touted the advantages of utilizing arbitration clauses in collection practices to Chase, stating that a consumer's attorney has a greater ability to delay a collection action in court than in arbitration and that credit card issuers receive a favorable result in the vast majority of cases that go to arbitration.

133.    Absent the conspiracy, most, if not all, of the Defendants would not have imposed materially identical compulsory arbitration clauses, including clauses prohibiting class actions.

## CLASS ACTION ALLEGATIONS

134.    Plaintiffs bring this action, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on their own behalf and as representatives of the Class.

135.    The Class is composed of all United States holders of general purpose cards (i.e., credit and charge cards) issued by Bank of America, J.P. Morgan Chase (which includes both the Chase and Bank One/First USA brands), Capital One, Citibank and Diners Club (now available as a MasterCard-branded card), Discover, Household, MBNA and Providian.

136.    The members of the Class are so numerous and geographically dispersed that joinder

-40-

of all class members in this action is impracticable.

137.    Plaintiffs' claims are typical of the claims of the members of the Class, because plaintiffs and all Class members were damaged by the same wrongful conduct of the Defendants, and will continue to be so damaged and/or are threatened with such damage in the absence of injunctive relief, and Defendants have acted on grounds generally applicable to the class.

138.    Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. In addition, Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust and consumer litigation.

139.    Questions of law and fact are common to the members of the Class and the Defendants and their co-conspirators, including American Express and Wells Fargo, have acted on grounds generally applicable to all members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Among the questions of law and fact common to the Class are:

A.    Whether the Defendants, and their co-conspirators, including American Express and Wells Fargo, engaged in a contract, combination, or conspiracy to impose compulsory arbitration clauses on their cardholders;

B.    The duration and extent of the contract, combination or conspiracy;

C.    The mechanisms used to accomplish the contract, combination or conspiracy;

D.    Whether the Defendants and their co-conspirators, including American Express and Wells Fargo, violated §1 of the Sherman Act;

E.    Whether Class Members are threatened with continuing harm from the

-41-

violations.

140.    The Defendants have acted and continue to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

141.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy.

142.    Plaintiffs know of no unusual difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**FRAUDULENT CONCEALMENT**

143.    Plaintiffs and other members of the Class could not have discovered that Defendants were violating the antitrust laws at an earlier time by the exercise of due diligence because of Defendants' fraudulent and active concealment of the conspiracy.

144.    Defendants' successful conspiracy to impose compulsory arbitration clauses was executed in a manner that precluded detection and was inherently self-concealing.  So as to wrongfully conceal their conspiracy, Defendants (1) conducted secret discussions regarding the arbitration clauses;(2) did not disclose to Plaintiffs or other members of the Class, or the public, the existence or content of those discussions; and (3) concealed their collusion from courts asked to enforce the clauses.

145.    The facts set forth above concerning Defendants' and their co-conspirators American Express's and Wells Fargo's conspiracy were learned by Plaintiffs only during discovery in the MDL action.  As set forth in detail above, on May 25, 1999, a meeting was held between and among counsel for five of the seven MDL Bank Defendants and American Express, during which arbitration

-42-

were discussed. Only one defendant, Chase, revealed the existence of this meeting in a September 2002 amended response to the MDL action plaintiffs' discovery request. Many depositions focused on this meeting, yet none of the MDL Defendants, either through document discovery or deposition, revealed that any subsequent meetings between and among MDL Defendants and American Express were held, until, over strenuous objection, and in spite of their efforts to hide the truth, American Express in-house counsel revealed in deposition, on February 19, 2004, that a "few" more meetings had taken place.

146.    Since that deposition, Plaintiffs' counsel have vigorously sought information and documents from the defendants and third parties in the MDL action concerning the Arbitration Coalition and In-House Counsel Working Group meetings. Eventually, Plaintiffs learned of the existence of over eighteen meetings and a large number of phone calls and e-mails between and among Defendants, co-conspirator American Express and other consumer lenders, and their counsel, in which arbitration clauses were discussed, analyzed and compared, all for the purpose of harming consumer welfare by banning class actions and blocking access to the judicial system.

147.    The facts concerning these meetings and Defendants' coordinated conduct concerning arbitration were concealed from the MDL 1409 Plaintiffs, and the MDL 1409 Court, at the time the motions by MDL 1409 Defendants First USA, Bank of America and MBNA to compel arbitration were *sub judice*. Numerous other courts have been persuaded by Defendants to send consumer cases to arbitration while the Defendants have consciously withheld the degree to which they had orchestrated their actions and coordinated the material aspects of their arbitration clauses, including the implementation of the class action ban.

148.    A majority of the meetings were attended by high level in-house attorneys for

Defendants. Improperly invoking attorney-client privilege, evidence of some of these contacts and communications were cloaked by the MDL defendants with improper or incorrect claims of "privilege". Only after pressure by MDL 1409 plaintiffs were some of these claims of privilege abandoned and some relevant documents produced. However, on information and belief, additional documents continue to be shielded by assertions of privilege.

149.    The applicable statute of limitations has been tolled by Defendants' fraudulent concealment of their conspiracy. In addition, the conspiracy is ongoing and Plaintiffs have adduced evidence that the Defendants and American Express continued to meet concerning arbitration until at least 2003.

## VIOLATIONS ALLEGED

### COUNT I

**Conspiracy to Impose Mandatory Arbitration Clauses in Violation of 15 U.S.C. §1**

150.    The facts set forth in ¶¶ 1-149 above are incorporated by reference.

151.    Beginning at a time unknown to Plaintiffs and continuing to the present, Defendants participated in a contract, combination and conspiracy to impose or maintain compulsory arbitration clauses on their cardholders and the cardholders of their co-conspirators.

152.    Defendants engaged with their competitors in the following:

A)    Mutually interdependent conduct;

B)    Direct discussion of present and future plans concerning compulsory arbitration clauses;

C)    An exchange of information regarding compulsory arbitration clauses; and

D)    An understanding and/or agreement to uniformly impose materially identical

-44-

compulsory arbitration clauses.

153.    By colluding with their competitors to insert and impose compulsory arbitration clauses in their "cardholder agreements," Defendants and their co-conspirators intended to and did suppress competition.  Defendants had a common motive to collude in that they would benefit by impeding access to the court system to shield themselves from potential liability arising from their illegal conduct, including but not limited to facilitating the foreign transaction fee conspiracies alleged in the cases pending in MDL 1409.

154.    Defendants' collusion to impose and maintain arbitration clauses, in violation of the Sherman Act, renders the clauses void and unenforceable.  Accordingly, valid and binding agreements to arbitrate were never formed.  Consumers were deprived of any meaningful choice on a critical term and condition of their general purpose card accounts as a result of the conspiracy.

155.    The Defendants' conduct constitutes a *per se* violation of §1 of the Sherman Act. Alternatively, their conduct constitutes an unreasonable restraint of trade when judged against the rule of reason.

156.    As a result of Defendants' ongoing conduct, Plaintiffs and other members of the Class have suffered and will continue to suffer loss or damage, and threatened loss or damage, to their business or property and otherwise.

## COUNT II

### Group Boycott/Concerted Refusal to Deal in Violation of 15 U.S.C. §1

157.    The facts set forth in ¶¶ 1-156 above are incorporated by reference.

158.    Defendants have collectively refused to deal with any cardholder who refuses to accept arbitration clauses as a term and condition of their cardholder agreement.

159.    Defendants' collective conduct has enabled them to exact for themselves better trade terms than they could obtain if they competed with each other.

160.    Defendants' concerted activity has inhibited competition and harmed consumers because Defendants have obtained a non-price trade advantage, which would not be available in the absence of concerted activity and has resulted in supra-competitive profits by shielding Defendants from liability arising from any illegal conduct.

161.    This concerted conduct renders the arbitration clauses voidable and unenforceable. Accordingly, valid and binding agreements to arbitrate were never formed.

162.    The Defendants' conduct constitutes a *per se* violation of §1 of the Sherman Act. Alternatively, their conduct constitutes an unreasonable restraint of trade when judged against the rule of reason.

163.    As a result of Defendants' ongoing conduct, Plaintiffs and other members of the Class have suffered and will continue to suffer loss or damage, and threatened loss or damage, to their business or property and otherwise.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray:

A.    That the Court determine that this action may be maintained as a class action under the Federal Rules of Civil Procedure;

B.    That Defendants' actions alleged herein be adjudged and decreed to be in violation of §1 of the Sherman Act, 15 U.S.C. §1;

C.    That Defendants be enjoined from continuing the illegal course of conduct concerning the compulsory arbitration clauses alleged herein;

D.    That Defendants' arbitration clauses be invalidated, declared null and void and stricken from Defendants' cardholder agreements;

E.    That Defendants be required to notify all courts which have enforced their respective arbitration clauses during the course of the conspiracy as to their illegal conduct in implementing these clauses.

F.    That Defendants be required to withdraw all currently pending motions to compel arbitration.

G.    That Plaintiffs and other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law;

H.    That Plaintiffs and other members of the Class be granted such other, further and different relief that is necessary to prevent a recurrence of the conspiracy.

## JURY DEMAND

Please take notice that Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and 9 U.S.C. § 4, of all issues triable as of right by jury, including, but not limited to, issues relating to the making of any alleged arbitration "agreement" sought to be enforced or invoked in this matter, or the failure, neglect or refusal to perform the same, and whether or not any such arbitration agreement or clause is void or unenforceable for reasons of adhesion, collusion, and/or unconscionability.  This demand for jury trial includes, *inter alia*, any motion seeking to invoke or enforce the doctrine of "equitable estoppel" on the basis of a contract allegedly entered into with another person or entity.

395492

Dated:  August 11, 2005

Linda P. Nussbaum, Esquire (LN-9336)
Susan R. Schwaiger (SS-8653)
COHEN MILSTEIN HAUSFELD & TOLL, P.C.
150 East 52nd Street
30th Floor
New York, NY 10022
212-838-7797
212-838-7745 Fax

Merrill G. Davidoff, Esquire (MD-4099)
Ruthanne Gordon, Esquire
Edward W. Millstein, Esquire
Michael J. Kane, Esquire
David A. Langer, Esquire
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
215-875-3000
215-875-4673 Fax

Bonny E. Sweeney, Esquire
Christopher M. Burke, Esquire
LERACH COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS, LLP
401 B Street
Suite 1700
San Diego, CA 92101
619-231-1058
619-231-7423 Fax


Dennis Stewart, Esquire
HULETT HARPER STEWART LLP
550 West C Street
Suite 1600
San Diego, CA  92101
619-338-1133
619-338-1139 Fax

395492

Joseph C. Kohn, Esquire
Robert J. LaRocca, Esquire
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
215-238-1700
215-238-1968 Fax


R. Scott Palmer, Esquire
Manuel J. Dominguez, Esquire
BERMAN DeVALERIO PEASE TABACCO
        BURT & PUCILLO
Esperanté Building
222 Lakeview Avenue, Suite 900
West Palm Beach, FL  33401
561-835-9400
561-835-0322 Fax


Thomas F. Schrag, Esquire
James S. Baum, Esquire
Michael L. Schrag, Esquire
SCHRAG & BAUM, P.C.
280 Panoramic Way
Berkeley, CA 94704
510-849-1618
510-841-6050 Fax


Allan Steyer, Esquire
Donald Scott Macrae, Esquire
STEYER LOWENTHAL BOODROOKAS LLP
One California, Suite 300
San Francisco, CA  94111
415-421-3400
415-421-2234 Fax

-49-

Marc H. Edelson, Esquire
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA 18901
215-230-8043
215-230-8735 Fax


Brian Barry, Esquire
LAW OFFICES OF BRIAN BARRY
1801 Avenue of the Stars, Suite 307
Los Angeles, CA 90067
310-788-0831
310-788-0841 Fax

Mark Levine, Esquire
STULL STULL & BRODY
6 East 45th Street
New York, NY 10017
212-687-7230
212-490-2022 Fax


James O. Latturner, Esquire
EDELMAN, COMBS,
          LATTURNER & GOODWIN, L.L.C.
120 South LaSalle Street, 18th Floor
Chicago, IL 60603-3403
312-739-4200
312-419-0379 Fax

395492