USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/10/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

THIS DOCUMENT RELATES TO:            :

ROBERT ROSS, et al.,                 :        04 Civ. 5723 (WHP)

         Plaintiffs,               :

     - against -                     :

AMERICAN EXPRESS COMPANY, et al., :

         Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - -X

ROBERT ROSS, et al.,                 :

         Plaintiffs,               :        05 Civ. 7116 (WHP)

     - against -                     :        OPINION & ORDER

BANK OF AMERICA, N.A. (USA), et al.,  :

         Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        The Plaintiffs' class actions allege that credit card issuers collusively

adopted class-action-barring arbitration clauses in violation of the Sherman Act to

prevent cardholders from redressing their injuries collectively through the courts. They

seek injunctive relief prohibiting such clauses in cardholder agreements. Following the

denial of summary judgment, these class actions were consolidated for trial. That trial is

the latest milestone in this long-running multidistrict litigation in which all of the

Defendants settled foreign currency conversion fee claims for hundreds of millions of

dollars in damages and attorneys' fees. Thereafter, many of the Defendant banks also

agreed to eliminate class-action-barring arbitration clauses from their cardholder

agreements.  But Defendants American Express, Citibank, and Discover refused to yield

that issue.

       Counsel for the parties navigated an ocean of documents and electronic

discovery, conducted hundreds of depositions, and litigated numerous motions and

appeals. This complex dispute was distilled first in motions to dismiss, then in motions

for summary judgment, and finally, because the issues were so nuanced, at trial.  Through

the diligence and consummate professionalism of counsel, the facts and legal arguments

were marshalled to a point of equipoise, but the law does not permit a Solomon-like

resolution.  While all counsel are commended for their efforts, this Court concludes that

the Plaintiffs have not sustained their burden.

## BACKGROUND

       The first class action, Ross v. American Express, is brought on behalf of

"[a]ll VISA and MasterCard general purpose cardholders of cards issued by [Bank of

America, MBNA, Citibank, or Chase]."  See Ross v. American Express, No. 04 Civ.

5723 (WHP), 2005 WL 2364969, at *13 (S.D.N.Y. Sept. 27, 2005).

       The second class action, Ross v. Bank of America, is brought on behalf of

all persons holding a credit or charge card under a United States cardholder agreement

containing an arbitration provision during the class period with the Banks that were

defendants in the multidistrict litigation In re Currency Conversion Litigation, No. 01-

MD-1409 (WHP)[1] (the "Currency Conversion multidistrict litigation") (including cards

originally issued under the MBNA, Bank One, First USA, and Providian brands). See

Ross v. Bank of America, No. 05 Civ. 7116 (WHP), Order dated Oct. 6, 2009 (Dock. No.

158) at 11; see also In re Currency Conversion Fee Antitrust Litig., MDL No. 1409, 2009

WL 3444920, at *3 (S.D.N.Y. Oct. 6, 2009).

   These class actions were consolidated for a bench trial. This Court makes

the following findings of fact and conclusions of law pursuant to Federal Rule of Civil

Procedure 52.

FINDINGS OF FACT

I.  The Parties

   Robert Ross and Randal Wachsmuth are the Class Representatives in Ross

v. American Express. Robert Ross, Richard Mandell, Matthew Grabell, S. Byron

Balbach, Jr., Woodrow Wilson Clark, Jr., Andrea Kune, and Paul Impellezzeri are the

Class Representatives in Ross v. Bank of America. These eight representatives are

holders of Discover, Diners Club, MasterCard, and/or Visa branded general purpose

credit cards. Richard Mandell also represents a certified subclass of "all persons holding

during the class period a credit card under a United States cardholder agreement with

---

[1] These defendants are JP Morgan Chase & Co., Chase Bank USA, N.A., Bank of
America, N.A. (USA), Bank of America, N.A., MBNA America Bank, N.A., MBNA
America (Delaware), Capital One Bank, Capital One, F.S.B., Citigroup Inc., Citibank,
N.A. (as successor-in-interest to Citibank (South Dakota), N.A., for itself and as
successor in interest to Citibank U.S.A., N.A. and Universal Bank, N.A.), Universal
Financial Corp., Citicorp Diners Club Inc., HSBC Finance Corporation, HSBC Bank
Nevada, N.A., Discover Services LLC, Discover Financial Services, and Discover Bank.
See Ross v. Bank of America, No. 05 Civ. 7116 (WHP), Order dated Oct. 6, 2009 (Dock.
No. 158) at 1-2.

Discover Bank, which cardholders have not previously successfully exercised their right to opt-out of the Arbitration of Disputes provision."[2] Ross v. Bank of America, No. 05 Civ. 7116 (WHP), Order dated Oct. 6, 2009 (Dock. No. 158) at 11.

The Defendant American Express entities are American Express Company and its subsidiaries American Express Travel Related Services, Inc., American Express Centurion Bank, and American Express Bank, FSB (collectively, "American Express" or "Amex"). The Defendant Citigroup entities are Citigroup and its subsidiaries Citibank (South Dakota), N.A. and Citicorp Diners Club, Inc. (collectively "Citi"). The Defendant Discover entities are DFS Services LLC, Discover Financial Services, and Discover Bank (collectively, "Discover"). Bank of America (which merged with Defendant MBNA in 2006), Capital One, Chase (which merged with Defendant First USA/Bank One in 2004 and acquired Providian in 2008), and Household/HSBC (together with the Defendants, "the Issuing Banks"[3]) entered into court-approved settlement agreements with Plaintiffs in July 2010. Ross v. Bank of America, No. 05 Civ. 7116, Final Judgment and Order of Dismissal, dated July 22, 2010 (Dock. No. 251). The National Arbitration Forum ("NAF") was also a settling defendant. Ross v. Bank of America, No. 05 Civ. 7116, Final Judgment and Order of Dismissal, dated Apr. 30, 2012 (Dock. No. 383).

---

[2]   Members of the subclass are not included in the certified class. Ross v. Bank of America, No. 05 Civ. 7116 (WHP), Order dated Oct. 6, 2009 (Dock. No. 158) at 11.

[3]   Wells Fargo & Company and its wholly owned subsidiary Wells Fargo Bank, N.A. were named co-conspirators in Ross v. Bank of America, but were not defendants in these actions.

II.     Consumer Arbitration Agreements and Class Action Arbitration Agreements

                In the late nineties, a wide array of firms and industries explored the

prospect of using arbitration for consumer dispute resolution.  (Trial Transcript ("TT") at

4122:23-4123:1 (Elzinga).)  At that time, such clauses proliferated in the automobile,

financial services, brokerage services, cell phone, HMO, and online retailing industries.

(TT at 4124:1-16 (Elzinga).)  Consumer arbitration and class action waivers were also hot

topics of discussion in the legal community.  (See, e.g., TT at 2869:7-15 (Lipsett); TT at

3277:24-3278:5 (Heine); TT at 3607:7-10 (Nelson); PX-8661.)

III.    American Express Adopts a Consumer Arbitration Clause

                Against this backdrop, in the spring of 1998, Timothy Heine (Managing

Counsel in Amex's General Counsel's office) proposed that Amex include a mandatory

class-action-barring arbitration provision in its card member agreements.  (TT at 3270:9-

14, 3276:9-12, 3277:13-16 (Heine).)  By mid-1998, Heine assembled a team of Amex in-

house counsel to study the arbitration issue.  (TT at 3279:25-3281:9, 3286:4-8 (Heine);

AX-9054.)  In November 1998, Heine and Julia MacDermott (Group Counsel for Amex)

pitched the adoption of an arbitration clause to Alfred Kelly (Amex's U.S. Consumer

Card Services Group President).  (TT at 2621:20-2622:2 (Kelly).)  Kelly concurred with

their proposal and considered the arbitration provision an "easy call" that would benefit

Amex by "lowering litigation costs in the short term and [avoiding] very expensive class

action suits in the medium to longer term."  (TT at 2604:6-17 (Kelly).)  In late 1998,

Kelly approved adoption of the arbitration clause.  (TT at 3286:9-21, 3288:18-19,

3306:8-12 (Heine); TT at 2604:6-8, 2611:8-2612:5 (Kelly).)  Amex notified cardholders

of its arbitration provision in April 1999 and the provision became effective upon the card member's next use of the card, or no later than June 1999.  (PX-5028.)  Amex continues to maintain a class-action-barring arbitration clause.  (See, e.g., PX-8439.)

IV.    The May 25, 1999 WilmerHale Meeting of Senior In-House Credit Card Counsel

Some time before May 1999, Chris Lipsett and Ron Greene (two WilmerHale[4] partners) spoke with Heine about Amex co-sponsoring an "informal meeting of senior in-house credit card counsel representing the various segments of the U.S. credit card business" on "issues of common concern," including arbitration.  (TT at 508:1-9 (Heine); PX-0042.).  Lipsett and Greene, feeling "pressure from the firm to enlarge [their] practice" had conceived of the meeting as a marketing strategy at which they "could in substance show [their] stuff" to potential new clients.  (TT at 2824:25-2827:24 (Lipsett).)  WilmerHale hoped to enhance the meeting's credibility by having some of its sophisticated and diverse credit card firm clients serve as co-sponsors.  (TT at 2827:13-24 (Lipsett).)  A May 3, 1999 invitation sent to various credit card in-house counsel identified Amex, Citi, First USA, and Sears Roebuck & Co. as meeting co-sponsors, but neither Heine nor Joan Warrington (General Counsel to Citi Cards' North American cards business until June 1999, at which point she became Legislative and Regulatory Counsel to the Consumer Bank for Citigroup) recalled Amex or Citi playing any substantive role in meeting preparations.  (PX-0042; TT at 3320:2-3321:19 (Heine); TT at 969:10-25 (Warrington).)  The invitation noted, "[w]e recognize, of course, that the

---

[4]    At that time, the firm was known as Wilmer Cutler & Pickering LLP.  In 2004, it became Wilmer Cutler Pickering Hale and Dorr LLP.  In 2005, it became WilmerHale. This Court refers to the firm as "WilmerHale."

companies sending counsel to such a meeting are competitors, and that for legal reasons certain issues will need to remain off-limits" but that in talking to the sponsors, "a consensus quickly emerged that there was a need for a broader exchange of views and experiences." (PX-0042.)

A May 14, 1999 invitation included a proposed agenda listing "the use of arbitration clauses in card agreements" as a topic. (PX-0672.) Lipsett testified that he included arbitration as an agenda item because it was "going to be important to retail financial services firms" and that he wanted "to show these folks that this was something on which we were at the leading edge." (TT at 2833:4-22 (Lipsett).) The invitation also indicated that Chase, Discover, Household, MBNA, and Providian were likely attendees. (PX-0672.)

Lipsett and Green convened the May 25, 1999 meeting at WilmerHale's Washington, D.C. office. (PX-0032.) Heine (Amex), Warrington (Citi), and Hugh Hayden (Vice President and Associate General Counsel of Discover) attended, along with five of the Issuing Banks.[5] (PX-0032.) While Robert Birnbaum (Vice President and Associate General Counsel for Chase) believed that arbitration was discussed, the only surviving handwritten notes, from Joanne Sundheim (Senior Vice President and General Counsel for First USA) and Janet Burak (Vice President and General Counsel for Household), make no reference to arbitration. (PX-0044; PX-0045; TT at 139:10-15 (Birnbaum).)

---

[5]   The other Issuing Banks in attendance were Capital One, Chase, First USA, Household, and Providian. (PX-0032).

V.      The Creation of the Arbitration Coalition

As of the May 25, 1999 meeting, only First USA (in January and March 1998) and Amex (in April 1999) had implemented arbitration provisions. (PX-0063; PX-5028; PX-8052.) After the May 25 meeting, together with the WilmerHale and Ballard Spahr law firms, Amex and First USA organized a second meeting of in-house counsel. (PX-5068; PX-5219.) This group gave themselves the moniker, "the Arbitration Coalition." (PX-5219; PX-5068.) In 1998, First USA retained Duncan MacDonald as a consultant on arbitration issues. (TT at 1098:3-8 (MacDonald).) MacDonald, a former general counsel for Citi, was an outspoken advocate against class action lawsuits. (TT at 1087:25-1090:8 (MacDonald).) Though MacDonald had not attended the May 25, 1999 meeting, he "certainly knew about it" and was "good friends" with Lipsett. (TT at 2855:5-6, 12 (Lipsett).) Lipsett recalled that MacDonald "was interested in developing some sort of forum to talk about arbitration issues which is something that was kind of an assignment he had from [First USA]." (TT at 2855:9-12 (Lipsett).) Heine (Amex) also helped organize the inaugural meeting of the Arbitration Coalition. (PX-5219.)

MacDonald and Heine enlisted Alan Kaplinsky, (a Ballard partner) "to help us round up other businesses that might want to join a coalition to defend and foster arbitration." (PX-5219.) Kaplinsky, a well-known lawyer in consumer financial services, had already staked out a position as a "thought leader" on arbitration issues. (TT at 2858:1-6 (Lipsett).) Lipsett hoped that involving Kaplinsky would lend further credibility to the endeavor and "minimize the extent to which [Kaplinsky] . . . would get more of the attention." (TT at 2858:13-24 (Lipsett).) MacDonald also planned to reach

-8-

out to other Issuing Banks including Discover, Household, Bank of America, and MBNA, which were rumored to be considering arbitration. (PX-5219.) Together, MacDonald, Lipsett, and Kaplinsky recruited in-house counsel from various industries to participate in the inaugural meeting of the Arbitration Coalition. (See, e.g., PX-1208 (MacDonald obtaining contacts from the National Arbitration Forum).) The purpose of the meeting was to explore "efforts to protect arbitration" with a "diverse group" of companies from various industries "that have adopted or are considering adopting arbitration to resolve disputes with their consumer customers." (PX-5033; TT at 2860:17-25 (Lipsett).)

Amex and First USA (through MacDonald) were listed as co-chairs of the meeting on various invitations. (PX-5220; PX-5221; PX-6125.) On July 13, 1999, Kaplinsky invited Discover's in-house counsel. (PX-6125.) He warned that "the plaintiffs' bar is engaged in a 'take no prisoners' assault on consumer arbitration programs" and that consumer lenders must "be equally well networked if we are to ultimately prevail in establishing arbitration as the acceptable forum for resolving consumer disputes." (PX-6125.) Kaplinsky's invitation also expressed a need to do a better job in communicating with other lenders that have adopted arbitration programs." (PX-6125.)

On July 28, 1999, the Arbitration Coalition convened its first meeting at WilmerHale's New York office. (PX-6125.) Representatives from seven Issuing Banks attended, including Heine (Amex), Warrington (Citi), and Steve Daily (Discover in-house

counsel).[6]  (PX-0355; PX-5069.)  Lawyers from WilmerHale, Ballard, and other firms,

along with representatives from Sears, Toyota, GE Capital, Dollar Financial, JAMS, and

Burson-Marsteller, a public relations firm, also attended.  (PX-5069.)

      The July 28, 1999 "Arbitration Agenda" contained the heading "why we

are here," followed by the subheadings "consumer service providers with common

issue."  (PX-6125.)  Another heading titled "working together to turn the tide" contained

the subheadings "sharing best practices" and "drafting fair, enforceable arbitration

provisions."  (PX-6125.)  Other headings included "PR and Regulatory Efforts" and

"Public Relations Problem."  (PX-6125.)  With the exception of Daily (Discover), no one

kept handwritten notes of the meeting.  (PX-6127.)  Daily's notes indicate that

"legislation . . . working with trade associations, [and] obtaining research regarding

arbitration" were discussed.  (TT at 766:3-4 (Daily); PX-6127.)  He also noted "concern"

about "bad press" and "bad law" regarding arbitration.  (PX-6127.)  There were eighteen

more meetings or conference calls of the self-styled "Arbitration Coalition."

      On July 30, 1999, Wendy Hufford (GE Capital in-house counsel) sent an

email to Warrington (Citi), noting that she had enjoyed speaking with her at the "recent

meeting in New York" and that she would be interested in sharing "best practices

regarding litigation management" with Citi's litigation director.  (PX-7517.)  Warrington

forwarded the email to Julie Nelson (then responsible for Citi Card's credit card

litigation), suggesting the two "compare notes."  (PX-7517.)

---

[6]  The other Issuing Banks in attendance were Bank of America, Chase, First USA, and
Household.  (PX-5069.)

VI.    Discover Adopts an Arbitration Clause

James Swift (Discover's head of litigation) considered arbitration clauses as early as the mid-1990s.  (TT at 3936:23-24; 3945:19-25 (Swift).)  Daily researched the use of arbitration clauses and made a concrete proposal to his superiors, Swift and Hayden.  (TT at 748:21-24; 750:2-6 (Daily).)  Buoyed by his review of proliferating literature, as well as discussions with Daily on the subject, Swift recommended that Discover add a class-action-barring arbitration clause to its card member agreement in 1998.  (TT at 3948:11-15 (Swift).)  Swift believed that an arbitration provision would save Discover the significant expenses associated with litigating often "meritless" class actions.  (TT at 3947:17-3948:3 (Swift).)

In early 1999, Swift pitched the arbitration provision to Joseph Yob (Discover's Executive Vice President for Cardholder Operations).  (TT at 3954:18-3956:21 (Swift).)  Yob approved Discover's adoption of an arbitration clause and Discover began its four to six month internal process for approving changes to card member agreements before officially providing notice to its cardholders in July 1999.  (TT at 3905:9-13; 3906:5-7 (Yob).)  Also in July 1999, Discover noticed cardholders that it would be implementing a class-action-barring arbitration clause.  (TT at 4040:7-23 (Matysik); PX 6124; PX-6138; PX-6139; DX-11004; DX-11005; DX 11013.)  The clause took effect in September 1999.  (PX 6124; PX-6138; PX-6139; DX-11004; DX-11005; DX 11013.)

VII.    The September 29, 1999 Arbitration Coalition Meeting

        Only a few days after the July 1999 coalition meeting, MacDonald
emailed his supervisor at First USA and Eric Mogilnicki (a WilmerHale partner) to
organize a second Arbitration Coalition meeting.  (PX-1215.)  Additional topics
MacDonald suggested included "sharing best practices," "how to set up arbitration
program," "arbitration price statistics," and "plain language vs. fine print & overkill."
(PX-1215.)  In early September 1999, MacDonald invited Arbitration Coalition members
to a meeting at WilmerHale's office in Washington, D.C. at the end of the month.  (PX-
6134.)  The email reminded Arbitration Coalition participants that "[w]e agreed to take a
number of steps going forward, including sharing our thoughts and materials (including
FAQ responses, customer identification materials, and legal briefs) on the issues
regarding arbitration that come up most frequently and pose the greatest difficultly."
(PX-6134.)  MacDonald's email also asked Issuing Banks "if you have not already done
so, please send me the arbitration clause used by your company, any change-in-terms
notices that were involved in the adoption of the clause, and any answers to FAQs or
other explanations of the clause."  (PX-6134.)

        The September 29, 1999 meeting agenda identified impediments to using
consumer arbitration clauses in consumer contracts, such as "challenges to adoption of
arbitration clauses" and "challenges to the absence of class actions."  (PX-0358.)
Representatives of seven Issuing Banks attended, including Heine (Amex), Warrington

(Citi), and Daily (Discover).[7]  (PX-5076.)  Lipsett and Mogilnicki of WilmerHale and

Kaplinsky of Ballard attended along with individuals from Sears, GE Capital, Dollar

Financial, American Bankers Association, Consumer Bankers Association, and The

Wexler Group, a public relations firm. (PX-5076.)

    Heine (Amex), Gail Siegel (Chase in-house counsel), and Daily

(Discover) memorialized the September 29 meeting in internal memos.  (PX-0110; PX-

5034; PX-8125.)

    Heine's memo, dated October 4, 1999 warned of "the possibility of a

rogue or unsophisticated player (not necessarily in our industry) who attempts to be

heavy handed or unfair in the adoption or exercise of a clause such that it causes all

businesses using consumer arbitration to be judged in an unfavorable light." (PX-5034.)

Heine noted that the coalition planned to "[e]stablish[] a better information exchange"

through a secure internet site and that he agreed to be part of a small sub-group to

"discuss and develop initial 'response points' to counter the various arguments being

made to challenge arbitration clauses" that could ultimately be used as an industry "white

paper" if needed.  (PX-5034.)  Heine testified the sub-group would focus on developing

"a series of questions and answers that would help inform the public discourse and

ultimately assist in the enforceability of arbitration clauses."  (TT at 3355:19-24 (Heine).)

Heine also alluded to the possibility that Arbitration Coalition members would fund

amicus briefs to be submitted through trade associations "without attribution."  (PX-

---

[7]   The other Issuing Banks in attendance were Bank of America, Chase, First USA, and
Household.

5034.)  Heine recorded the fact that there were "no plans whatsoever for the group to take

any public posture or even consider itself as a formal or official group in any way."  (PX-

5034.)

Siegel's memo contained non-public information relating to three Issuing

Banks' future plans for arbitration.[8]  (PX-0110.)  Specifically, Siegel reported that Citi

had "adopted a wait and see attitude" because it "want[ed] to see the results of all the

litigation involving First USA," that Wells Fargo had adopted a "take it or leave it"

attitude, and that Household was "watching what is happening."  (PX-0110.)  Siegel also

spoke with David Carpenter (First USA in-house counsel) "regarding how First USA

might be using arbitration as a collective litigation strategy."  (TT at 863:3-5 (Siegel).)

Siegel's memo described the formation of two "subcommittees": one to "identify issues

to study to obtain research (the hat may later be passed around)" and one to "identify

talking points to incorporate into a flip book . . . to support the use of arbitration."  (PX-

0110.)  According to Siegel, the Arbitration Coalition discussed "the fact that using

arbitration for credit cards could be perceived as anti-consumer which could spawn more

bills in Congress in the future."  (PX-0110.)  In summarizing her observations and

thoughts, Siegel opined that in contrast to the July 1999 meeting, "[t]here is no longer

universal fervor for using arbitration clauses in view of the litigation it has spawned."[9]

(PX-0110.)

---

[8]   Siegel also recorded Sears' and GE Capital's positions about arbitration.  (PX-0110.)

[9]   Additionally, Siegel expressed her view that First USA had created a "catch-22 situation" by using NAF as its arbitration administrator because NAF was perceived as a "creditor's tool."  (PX-0110.)

Daily's memo, dated October 6, 1999 reported on the Coalition's desire to prepare talking points in defense of arbitration.  (PX-8125.)  Daily informed his Discover colleagues Swift and Hayden that he was "asked by the group to take a lead in preparing a short briefing paper, in the form of FAQs, on the subject of arbitration" that could be used for government relations and media relations purposes.  (PX-8125; TT at 811:9-14 (Daily).)

On October 8, 1999, Mullen (MBNA) and other MBNA attorneys spoke with Curtis Brown (NAF General Counsel) regarding arbitration.  (PX-7696; TT at 1994:3-14 (Brown).)  In addition, Mullen spoke with Larry Drexler (Vice President and Associate General Counsel for First USA) about First USA's experiences with its arbitration clause.  (PX-6005.)  On January 17, 2000, Brown told Mullen that he had asked David Carpenter (First USA) about his willingness to share information about First USA's experience with arbitration "regarding the collection/recovery side of their arbitration process."  (PX-7697.)  Carpenter had agreed to "share what he could," but "at a certain point, such information becomes proprietary and competitive."  (PX-7697.)

The Arbitration Coalition's November 17, 1999 meeting at Ballard's Philadelphia office featured a discussion of Daily's "FAQ's Project."  (PX-5078; PX-8140.)  Representatives from eight Issuing Banks, including Heine (Amex), Warrington (Citi), and Daily (Discover) were invited.[10]  (PX-8140.)  Additional participants included MacDonald, Lipsett and Mogilnicki from WilmerHale, Kaplinsky from Ballard, and

---

[10]  The other Issuing Banks invited were Bank of America, Chase, First USA, Household, and MBNA.

representatives from Ugly Duckling, Sears, GE Capital, Toyota, Dollar Financial, Delta Funding, TCF Financial, and Balch & Bingham. (PX-8140.) After working on draft FAQs and Talking Points for three weeks, Daily circulated them the day before the meeting. (PX-6140; TT at 811:24-25 (Daily).)

Following the meeting, Daily circulated revisions to the FAQs and Talking Points to Arbitration Coalition members. (PX-6143.) The revisions reflected "comments received from the group at our last meeting, as well as comments [Daily] received internally [at Discover]." (PX-6143.) Daily encouraged Arbitration Coalition members to "tailor these documents as you see fit" and elaborated on how Discover customized its own version. (PX-6143.)

Daily also offered to work on a "self regulation" project for the Coalition in November 1999. (PX-6010.) To fulfill that promise, he circulated draft fairness guidelines and convened at least two conference calls regarding self-regulation in December 1999 with Heine (Amex), Regina Mullen (MBNA in-house counsel), MacDonald (First USA), Mogilnicki (WilmerHale), and Kaplinsky (Ballard). (PX-6010; PX-6142; PX-6144.) In arranging one of the conference calls Daily opined that "all of the banks using arbitration feel it is important to convince customers, courts, the media, legislators, regulators, and the general public that arbitration is being used by banks in a way that is fundamentally fair, and that will not deprive customers of their rights." (PX-6144.)

In December 1999, MacDonald solicited $5,000 contributions for the preparation of amicus briefs in the Eleventh Circuit by the WilmerHale and Ballard firms

in <u>Baron v. Best Buy Co.</u>, 260 F.3d 625 (11th Cir. 2001). (PX-1222.) <u>Baron</u> involved the enforcement of mandatory arbitration clauses in a retailer's private-label credit card agreement, where the district judge concluded that NAF was not a neutral arbitrator. WilmerHale's amicus brief was filed on behalf of Fed Net, a group of former judges acting as arbitrators. (PX-1222.) Ballard's brief was on behalf of three trade associations, the American Bankers Association, the Consumer Bankers Association, and the American Financial Services Association. (PX-1222.) In soliciting financial support from the Issuing Banks, MacDonald noted that "<u>Baron</u> must be reversed. If not, class action lawyers across the US will create absolute hell for the business community." (PX-1222.)

At the same time MacDonald was soliciting contributions, settling Defendant MBNA notified cardholders it was adopting an arbitration clause effective February 1, 2000. (PX-6000; PX-8347.) Mullen (MBNA) attended the November 1999 meeting of the Arbitration Coalition, but there is no record of any MBNA representative attending prior meetings. (PX-6009; TT at 2302:1-15 (Mullen).)

VIII.    <u>Subsequent Meetings of the Arbitration Coalition in 2000</u>

The Arbitration Coalition met throughout 2000. WilmerHale hosted the first meeting on January 12, 2000 at its Washington, D.C. office. (PX-5081.) An email reminder encouraged invitees to "bring a copy of your arbitration agreement." (PX-5081.) Topics on the agenda included "best practices protocol" and "public relations/consumer education." (PX-5084.) Daily (Discover) and Julie Lepri (Bank One in-house counsel) took notes at the meeting. (PX-6146; PX-6147; PX-7591.) Their notes

indicate that arbitration-related litigation was a major topic of discussion but do not

discuss any specific arbitration clauses.  (PX-6146; PX-6147; PX-7591.)  Daily did not

recall whether he brought a copy of Discover's clause and didn't "believe [he] saw

anyone handing over arbitration agreements" at the meeting.  (TT at 832:10-11 (Daily).)

Five Issuing Banks attended the January 12 meeting, including Heine (Amex), Harry

Silverwood (Citi in-house counsel), and Daily (Discover).[11]  (PX-5082; PX-5083; PX-

7591.)  Additional participants included MacDonald, Kaplinsky from Ballard, and

representatives from GE Capital, Dollar Financial, American Bankers Association,

American General Finance, National Retail Federation, American Financial Services

Association, TransAmerica, Consumer Bankers Association, Lynn Stodghill, Burr &

Forman, Balch & Bingham, and Bradley Arant Rose & White.  (PX-5082; PX-5083; PX-

7591.)

      After the January 12, 2000 meeting, MacDonald solicited contributions for

another amicus brief to be filed in support of a petition for a writ of certiorari in Green

Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000), a case regarding the

arbitrability of class claims.  (PX-1226.)  MacDonald importuned the Issuing Banks to

contribute because the consensus of attendees at the January 12 meeting was that "getting

the Supreme Court to hear the case and decide it in our favor is of utmost importance."

(PX-1226.)  While MacDonald sought $2,500 contributions from ten institutions, he

---

[11]  The other Issuing Banks in attendance were First USA/Bank One and Household.
(PX-5082; PX-5083; PX-7591.)

noted that "[t]he signatories on the masthead would be trade associations, not individual companies." (PX-1226.)

In February 2000, Bank of America and Household noticed their cardholders that they were adopting a class-action-barring arbitration clause. (PX-8024; PX-8150; PX-8344; PX-8369). Both banks implemented their clauses in April 2000. (PX-8150; PX-8344; PX-8369.) Household and Bank of America representatives attended the July and September 1999 Arbitration Coalition meetings. (PX-5069; PX-5076.) Household also had a representative at the January 2000 meeting. (PX-5082.)

On March 2, 2000, Amex hosted an Arbitration Coalition meeting at its New York headquarters. (PX-8149.) Again, the "Arbitration Group Meeting" agenda listed "public relations" and "formalization of [the] group" as topics. (PX-5088.) A public relations expert from Burson-Marsteller made a presentation on "some of the ways in which a public relations effort could alter perceptions about consumer arbitration." (PX-5228.) Heine (Amex) and MacDonald were designated as contact persons for a small group to formulate "a concrete proposal on how a more organized public relations effort might benefit us all." (PX-5228.) Seven Issuing Banks attended the meeting, including Amex (Heine) and Citi (Karla Bergeson (Citi Cards in-house counsel)). [12] (PX-5087; PX-7594; TT at 335 (Bergeson).) Additional attendees included MacDonald, Lipsett and Mogilnicki from WilmerHale, Kaplinsky from Ballard, lawyers from Pepper Hamilton, Bradley Arant Rose & White, and Lynn Stodghill, and representatives from

---

[12]  The other Issuing Banks in attendance were Bank of America, Chase, First USA/Bank One, Household, and MBNA. (PX-5087.)

GE Capital, Dollar Financial, Delta Funding Company, and Burson-Marsteller.  (PX-5087.)

On April 18, 2000, the Arbitration Coalition met again at Ballard's Philadelphia office.  (PX-0089.)  "Public relations" was on the agenda.  (PX-0089.)  Eight Issuing Banks attended, including Amex (Heine), Citi (Nelson), and Discover (Daily).[13]  (PX-0117; PX-8030.)  Additional attendees included MacDonald, Lipsett and Mogilnicki from WilmerHale, Kaplinsky from Ballard, and representatives from Sears, GE Capital, Dollar Financial, Transamerica, American Bankers Association, GMAC, Burr & Forman, Bradley Arant Rose & White, and Lynn Stodghill.  (PX-0117.)

On April 30, 2000, after the Supreme Court granted certiorari, MacDonald again solicited donations for amicus briefs in Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79.  (PX-5229.)  MacDonald informed the Arbitration Coalition that the cost of another wave of amicus briefs from the WilmerHale and Ballard firms would be significant, noting that such an investment "was modest next to the possibilities." (PX-5229.)  MacDonald warned: "it is important in the extreme for us to try to influence the outcome of this very important case" and that if "Greentree loses, arbitration could suffer a grave, perhaps fatal setback."  (PX-5229.)  A victory, on the other hand, "could send many class action lawyers to where they belong—to the employment lines."  (PX-5229.)

---

[13]  The other Issuing Banks in attendance were Bank of America, Chase, Household, First USA/Bank One, and MBNA.  (PX-0117.)

Also in April 2000, Mogilnicki invited nine Issuing Banks, including Amex (Heine), Citi (Silverwood), and Discover (Daily) to an Arbitration Coalition meeting scheduled for June 14 at WilmerHale's Washington, D.C. office.[14]  (PX-0090; PX-0093.)  Other past attendees of Arbitration Coalition meetings were also invited. (PX-0093.)  The agenda included litigation and regulatory updates.  (PX-0094.)

On October 3, WilmerHale hosted the last Arbitration Coalition meeting of 2000.  (PX-8054.)  Amex (Heine), MacDonald, Lipsett and Mogilnicki from WilmerHale, Kaplinsky from Ballard, and representatives from Pepper Hamilton, Sears, American Bankers Association, Burr & Forman, Bradley Arant, and Hangley Aronchick attended that meeting at WilmerHale's Washington, D.C. office.  (PX-8054; PX-8234.) Issuing Banks First USA/Bank One, MBNA, and Household sent representatives.  (PX-8234.)

IX.    MacDonald Conceptualizes and Forms the Class Action Working Group

In September 2000, MacDonald conceived an idea for a group separate from the Arbitration Coalition to counter "class action mania."  (PX-1235.)  Specifically, MacDonald proposed to Kaplinsky, Lipsett, Mogilnicki, and First USA that they convene a "one day, roundtable brainstorming session that will focus exclusively on the growing epidemic of class actions and new, out-of-the-box ways that industry might adopt in responding to them."  (PX-1235.)  MacDonald contemplated inviting "companies and

---

[14]  The other Issuing Banks invited were Bank of America, Capital One, Chase, First USA/Bank One, Household, and MBNA.  (PX-0093.)

their lawyers that are not in our [arbitration] coalition" from industries such as "big auto, manufacturing, pharmaceutical, brokerage, healthcare [and] retail." (PX-1235.)

MacDonald presented his idea to the Arbitration Coalition at its October 3, 2000 meeting. (AX-9065.) In an email later that month, MacDonald explained that "[t]his special meeting does not reflect a decision to abandon our arbitration efforts, but instead to use them as a base . . . to help industry deal with the larger issue of the proliferation of class action law suits." (AX-9065.)

In addition to their direct communications at Arbitration Coalition meetings, the Issuing Banks also exchanged information indirectly. Before the September 29, 1999 meeting, Siegel (Chase) sought information during a telephone conversation with Curtis Brown (NAF) regarding how other Issuing Banks had dealt with issues related to arbitration. (PX-5300.) On September 18, 1999, Siegel told her colleagues Birnbaum and James Condren (Chase in-house counsel) about her conversation with Brown. (PX-5300.) Specifically, Siegel reported that Brown informed her that First USA, Discover, American Express, Sears, Household, GE Capital, and MBNA had implemented arbitration provisions through change-in-terms notices sent to cardholders. (PX-5300.) The fact that MBNA was implementing an arbitration clause was not publicly known at that time. (PX-8347.)

Additionally, on January 9, 2001, John Culhane (a Ballard lawyer) emailed Nelson (Citi) on behalf of "a client considering using arbitration clauses in credit card agreements." (PX-7533.) The client had asked Culhane to "confirm that Universal and Citibank (South Dakota) [were] not currently using arbitration." (PX-7533.)

Culhane explained that if "this information is available, the client would like to know if the use of arbitration clauses is still under consideration and what the major concerns are." (PX-7533.)

On January 16, 2001, the Arbitration Coalition met again in Philadelphia, this time at Pepper Hamilton's offices. (PX-8251.) The agenda identified "Education/Public Information" and "need for white papers" as discussion points. (PX-8214.) Nine Issuing Banks were invited, including Amex (Heine), Citi (Silverwood and Wendy Kleinbaum (General Counsel for the North American credit card business)), and Discover (Daily).[15] (PX-8251.) No attendance list exists, though Lepri (Bank One) took notes indicating that the Arbitration Coalition discussed arbitration-related case law, legislative developments, and potential market research. (PX-7607; TT at 1797:7-13 (Lepri).)

Days later, MacDonald, Kaplinsky, Mogilnicki, Lipsett, and others announced the inaugural meeting of the "Consumer Companies' Class Action Working Group" and attached a "manifesto" championing the "fight" against "abusive class actions." (PX-5102.) Employing flamboyant language, the "manifesto" declared: "In the class actions wars, it's not class members versus the companies, it's the plaintiffs' lawyers versus the companies. Suing companies is their business." (PX-5102.)

The Consumer Companies' Class Action Working Group met for the first time on February 14, 2001 at the National Retail Federation in Washington, D.C. (PX-

---

[15] The other Issuing Banks invited were Bank of America, Capital One, Chase, First USA/Bank One, Household, and MBNA. (PX-8251.)

5102.)  Seven Issuing Banks attended, including Amex (Heine and MacDermott) and Citi (Nelson and Petra "Tedde" Tasheff (Citigroup in-house counsel)).[16]  (PX-7555.)  A number of large corporations and trade associations sent representatives, including Fleet, GE Capital, Federal Express, Ford, Monsanto, Dollar Financial Group, Primerica, Chrysler Financial, Dow Chemical, Daimler Chrysler, TCF Financial, Master Card, American Bankers Association, National Retail Federation, and the United States Chamber of Commerce.  (PX-7555.)  Nearly twenty law firms sent attorneys, including WilmerHale, Ballard, Pepper Hamilton, Hangley Aronchick, Morrison & Foerster, O'Melveny & Myers, Bradley Arant, McGuire Woods, Heller Ehrman, Sidley Austin, Piper Marbury, Skadden Arps, Forman Perry, Nixon Peabody, Alston & Bird, Burr & Forman, Crowell & Moring, and Stroock & Stroock & Lavan.  (PX-7555.)

       MacDonald exhorted the group that "class actions are getting out of hand" and have become "a gaming business" and a "shakedown racket," but that the group could "beat" the problem "by working together."  (PX-1244.)  His prepared remarks suggested that the trial bar was more organized than large consumer companies because "[a]s competitors we are conditioned to go it alone" due to a "Century + of [the] Sherman [Act]."  (PX-1244.)  MacDonald also cited "embarrassment about charges; fear of competitor exploitation or that elevation will risk media exposure [and] more damages" as reasons for industry's failure to parry the class action bar's thrust.  (PX-1244.)  MacDonald urged the group to "[d]evelop an efficient action plan."  (PX-1244.)  Agenda

---

[16]  The other Issuing Banks in attendance were Chase, Capital One, First USA/Bank One, Household, and Providian.  (PX-7555.)

items included "Hallmarks of Abusive Class Actions" and "What Industry Might Do To Manage Class Actions Better." (PX-7556.)

In March 2001, settling Defendant Providian noticed cardholders that it would implement a class-action-barring arbitration clause the following month. (PX-8044; PX-8349.) A Providian representative had attended the initial May 25, 1999 meeting and the inaugural Consumer Companies' Class Action Working Group meeting. (PX-0032; PX-7555.)

On April 5, 2001, the Arbitration Coalition met at WilmerHale's New York office. (PX-1252.) MacDonald made "a special pitch for a large turnout" at the April meeting and characterized the Arbitration Coalition as "the only organization uniquely devoted to protecting industry use of arbitration of consumer disputes." (PX-1252.) MacDonald implored invitees to "help us keep the defense going," reminding them that "our adversaries are determined to bring industry to its knees" and "find weak links in our Defenses." (PX-1252.) The agenda noted "legislative developments" and "recent cases" as topics of discussion. (PX-8213.) No attendance list exists, but nine Issuing Banks were invited, including Amex (Heine), Citi (Kleinbaum and Silverwood), and Discover (Daily).[17] (PX-1252.)

On May 30, 2001, the Class Action Working Group met for the second and final time at Chase's headquarters in New York. (PX-0351.) Nine Issuing Banks

---

[17] The other Issuing Banks invited were Bank of America, Capital One, Chase, First USA/Bank One, Household, and MBNA.

attended, including Amex (MacDermott) and Citi (Tasheff).[18]  (PX-0351; PX-7555.)
MacDonald was there, along with Lipsett and Mogilnicki (WilmerHale), Kaplinsky
(Ballard), and a host of attorneys from major law firms, including Pepper Hamilton,
Morrison & Foerster, Sutherland, Weil, Hogan, Stroock, and Skadden.  Other attendees
included GE Capital, Ford, Toyota, Consumer Bankers Association, and Professor
George Priest from Yale Law School.  (PX-0351; PX-7555; PX-8607.)  Priest made a
presentation to the group about "class action abuse."  (PX-8607.)

   In the invitation to the May meeting, Harvey (Pepper Hamilton) noted that
the "consensus" from the prior meeting was that the group should not try to reinvent the
wheel but "work as much as we can through existing organizations and an informal
collaboration of inside and outside counsel."  (PX-7557.)  The invitation was signed by
an "organizing committee" comprised of Michael Barry (Capital One in-house counsel),
MacDonald, and a number of law firms including Lipsett and Mogilnicki (WilmerHale),
Kaplinsky (Ballard), and Harvey (Pepper Hamilton).  (PX-7557.)  According to a
summary that was circulated after the meeting, the Class Action Working Group focused
on how to advance "class action reform" and even considered "the possibility of
formalizing the Group's existence by incorporating a 501(c)(3) corporation."  (PX-8607.)
Barry (Capital One), James Condren (Chase), and Leonard Gail (Bank One in-house
counsel) "shared the experiences of their companies with the group."  (PX-8607.)  The
meeting ended with updates on class action litigation from outside law firms and an

---

[18]  The other Issuing Banks in attendance were Bank of America, Capital One, Chase,
First USA/Bank One, Household, MBNA, and Providian.

agreement "to focus on a set of discrete issues over the summer and meet again in the Fall." (PX-8607.)  However, the Class Action Working Group never convened another meeting.

An Arbitration Coalition meeting may also have occurred on May 30, 2001 in New York. (PX-6022).[19]  While it would have been odd to hold an Arbitration Coalition meeting on the same day as the Class Action Working Group meeting, a handwritten attendance list establishes that on some date around May 30 a meeting occurred among seven of the Issuing Banks including Discover (David Oppenheim),[20] as well as Kaplinsky (Ballard), Harvey (Pepper Hamilton), MacDonald, and others. (PX-6022.)

X.     The In-House Working Group

In preparation for the May 2001 Class Action Working Group meeting, Barry (Capital One) reached out to his in-house peers Tasheff (Citi), Condren (Chase), and Gail (Bank One) to lead a panel discussion. (PX-7561.)  Barry noted the special concerns of in-house counsel and the importance of sharing "practical ideas that in-house counsel could use." (PX-7561.)  After the May 30th meeting, Barry and Condren discussed with MacDermott (Amex) the need to organize another, smaller group of in-

---

[19]  At trial, this Court reserved decision on the admissibility of PX-6022.  PX-6022 is now received in evidence and this Court evaluates its probative value in view of questions about its authentication.

[20]  The other Issuing Banks in attendance were Capital One, Chase, First USA/Bank One, Household, MBNA, and Providian. (PX-6022.)

house counsel.  (PX-7565.)  They compiled names of in-house counsel to invite into "our little group," which they styled the "In-House Working Group."  (PX-7565.)

Thinking it best to limit such a group to financial services companies, Barry selected in-house counsel to participate in an inaugural conference call to take place on July 9, 2001.  (PX-7565.)  The "little group" consisted of Amex (MacDermott), Citi (Tasheff), Capital One (Barry), Bank One (Gail), MBNA (Mullen), Providian (Jamie Williams (in-house counsel)), Household (Susan Jewell and Mark Leopold(in-house counsel)), and Chase (Condren).  (PX-8616.)  Discover and Wells Fargo were not invited.

While the larger Class Action Working Group "has value," Barry noted a "few major shortcomings" including some obvious ones: "for in-house counsel in financial services companies, issues relating to non-financial issues are not as relevant;" "outside counsel, for all their worth, do not see the same internal issues that in-house counsel face;" and "the [class action working] group's focus can be more academic and theoretical, and less practical."  (PX-8616.)  In contrast, the In-House Working Group could serve as "a sounding board to share issues that impact [the financial services] industry."  (PX-8616.)  Topics proposed for the July 9, 2001 inaugural conference call included "[c]reating an informal 'information please' email network" and "[i]dentifying other means to protect our employers from the plaintiffs' network."  (PX-5313.) Guilelessly, the designated passcode for the conference call was "ARBITRATION." (PX-5314.)  And the call began with "the obligatory antitrust admonition."  (PX-5313.) Peculiarly, the call participants deny that arbitration was discussed.  No attendance lists, notes, or memos of this call exist.

On July 31, 2001, Barry (Capital One) reached out to Gail (Bank One) to ascertain whether Bank One permitted cardholders to opt-out of its arbitration provision, and "[i]f yes, was there a penalty (i.e. they had to close their accounts)?  And, what percentage of people opted out?"  (PX-7609.)  Gail forwarded Barry's email to Lepri (Bank One), noting that "Mike is one of these guys with whom I have a monthly call to chat about benchmarking and other issues."  (PX-7609.)

XI.  Citi Adopts an Arbitration Clause

In November 1998, Nelson recommended to Warrington (then General Counsel of Citi's U.S. Cards group) that Citi consider an arbitration provision.  (TT at 3854:11-3855:11).  That same day, Nelson requested information on arbitration from Kaplinsky.  (PX-7516.)  Warrington informed Bergeson of Nelson's recommendation. When Kleinbaum replaced Warrington in June 1999, Citi had not decided to adopt an arbitration clause.  (TT at 2460:7-20 (Kleinbaum).)  In February 2000, Kleinbaum, who received arbitration materials from Lipsett, formed an internal team led by Nelson and Bergeson to consider arbitration pros and cons.  (TT at 1704, 1707-08, 3505-08 (Nelson); PX-6078; TT at 2466-67, 3509, 3703-06 (Kleinbaum).)  Bergeson attended the March 2, 2000 Arbitration Coalition meeting.

While Nelson and Bergeson's team was studying arbitration during the summer of 2000, lawyers at Citigroup, Citi Card's corporate parent, independently began considering arbitration.  (PX-6082.)  On June 22, 2000, Michael Heyrich, a secunded Skadden associate in Citigroup's General Counsel's office, enthusiastically recommended arbitration for all Citigroup's consumer business lines to Charles Prince

(Citigroup's Chief Legal Officer and General Counsel).  (TT at 3822:20-3823:8 (Prince); TT at 3771:4-6 (Heyrich); PX-6082.)  At the time Heyrich wrote his memo, neither Heyrich nor Kleinbaum were aware that each of them was considering arbitration.  (TT at 3778:23-25 (Heyrich); TT at 3713:17-3714:2 (Kleinbaum).)  On July 6, 2000, Prince forwarded the Heyrich memo to a number of in-house attorneys, including Mike Ross (Deputy General Counsel to Citigroup's Global Consumer Group), who in turn alerted Kleinbaum and Nelson to Citigroup's determination that "arbitration should be used in our business unless there are strong countervailing considerations against our implementing it now."  (PX-6081; PX-6082; PX-6085; TT at 3713:3-6 (Kleinbaum); TT at 2523:3-5 (Mike Ross).)

After learning of the Heyrich memo, Kleinbaum recommended to Steve Freiberg(CEO of Citi Cards) that Citi Cards adopt a class-action-barring arbitration clause in September or October of 2000.  (TT at 2430:18-25, 2436:12-2437:2 (Freiberg); TT at 3729:6-14 (Kleinbaum).)  Freiberg accepted Kleinbaum's recommendation and Citi Cards implemented adoption of such a clause.  (TT at 2437:2 (Freiberg); PX-7540).  While Citi intended to notice cardholders by February 2001, operational issues delayed notification until May, June, October and November of 2001.  (PX-6086; PX-8179; PX-8180; PX-8181; PX 8350; TT at 3565:25-3567:3 (Nelson).)  The clauses became effective in July, November, and December of 2001.  (PX-8179; PX-8180; PX-8350.)

XII.   Additional Meetings of the In-House Working Group

The In-House Working Group convened conference calls on August 7 and September 4, 2001.  (PX-7567; PX-7635.)  The August call agenda noted the

"importance of benchmarking, sharing information on current cases and plaintiffs' claims" and called for each participant to be prepared to introduce two or three cases or issues that "may have implications for the rest of us" or "on which the member seeks input from the group." (PX-7567.)  Any remaining time would be opened for questions "so that we may be able to get some answers to the burning issues our business people keep raising." (PX-7567.)  The August call opened with an antitrust admonition.  (PX-7567.)  During the September call, participants planned to build on previously discussed topics, including "follow up on counsel issues" and "more on information sharing and benchmarking." (PX-7635.)  While Bank of America had missed the inaugural In-House Working Group call in July, Jan Aniel (Bank of America in-house counsel) joined the August and September calls.  (TT at 2323:1-9 (Aniel); PX-7567; PX-7635.)  Discover was not invited to participate.

On October 2, 2001, Mogilnicki (WilmerHale) invited Arbitration Coalition members to a meeting on October 24, 2001.  (PX-8144.)  Concurrently, Barry (Capital One) emailed the In-House Working Group seeking to schedule a conference call "this week or early next," and noting that Capital One "had a few developments on our end that might be worth discussing." (PX-6074.)  One such development was that Capital One had begun noticing cardholders that it had added an arbitration clause.  (PX-8072.)  Despite Barry's request, there is no evidence that any In-House Counsel Working Group call was held until November 6, 2001.

Mogilnicki invited nine Issuing Banks to the October 24, 2001 meeting of the Arbitration Coalition, including Amex (Heine), Citi (Kleinbaum, Silverwood,

Tasheff, and K. Jordan), and Discover (Daily).[21]  (PX-8144.)  But no attendance list or agenda exists.

On November 6, 2001, the In-House Working Group conference call occurred and included Amex (MacDermott), Citi (Tasheff), Bank of America (Aniel), Bank One (Gail), Chase (Condren), Household (Jewell and Leopold), and MBNA (Mullen).  (PX-7570.)  The group discussed "new cases and developments," some of which Barry gleaned from Lipsett's client-update email on class actions.  (PX-7570.) After participating in the conference call, Mullen (MBNA) emailed her colleagues that Chase has an arbitration clause under "active consideration."  (PX-6007.)  The information about Chase's arbitration clause was not publicly available.

On November 28, 2001, the Arbitration Coalition met at WilmerHale's Washington, D.C. office.  (PX-6061.)  Six Issuing Banks participated, including Amex (Heine) and Citi (Nelson and Tasheff).[22]  (PX-6062.)  Additional attendees included Chrysler, American Bankers Association, Ugly Duckling Corporation, May Department Stores, Ford, American Financial Services Association, Dollar Financial, GE Capital, Consumer Bankers Association, and the U. S. Chamber of Commerce.  (PX-6062.)  A phalanx of lawyers, including Lipsett and Mogilnicki (WilmerHale), Kaplinsky (Ballard), and others from Pepper Hamilton, Burr & Forman, and Troutman Sanders also attended. (PX-6062.)

---

[21]  The other Issuing Banks invited were Bank of America, Capital One, Chase, First USA/Bank One, Household, and MBNA.

[22]  The other Issuing Banks in attendance were Bank One/First USA, Capital One, Household, and MBNA.  (PX-6062.)

The following week, the In-House Working Group convened another conference call. (PX-7571.) The same Issuing Banks were invited, including Amex (MacDermott) and Citi (Tasheff). (PX-7571.) No attendance lists, agendas or notes exist.

XIII.   Arbitration Coalition Meetings in 2002

The Arbitration Coalition met in January and June 2002 at WilmerHale's New York offices. (PX-0019; PX-5122.) On January 31, 2002[23], four Issuing Banks attended, including Citi (Nelson).[24] (PX-0120.) Other attendees included GE Capital, May Department Stores, MONY Life Insurance, and American Financial Services Association. (PX-0120.) Lipsett and Mogilnicki (WilmerHale) and Kaplinsky (Ballard) also attended, as well as lawyers from Pepper Hamilton and other law firms. (PX-0120.) Arbitration Coalition members were asked to bring status reports on legislative developments relating to arbitration. (PX-0119.) AT&T's counsel made a presentation concerning Ting v. AT&T, 182 F. Supp. 2d 902 (N.D. Cal. 2002), aff'd in part, 319 F.3d 1126 (9th Cir. 2003), in which a federal district court struck down AT&T's arbitration provision. (PX-0119.)

---

[23]  There is also a handwritten attendance list for an Arbitration Coalition meeting on January 13, 2002. (PX-1262.) Because that was a Sunday, the date was likely recorded in error. This Court concludes, however, that an additional meeting did take place on an unknown date. Amex (Heine) attended, along with Chase (Siegel), Lipsett and Mogilnicki (WilmerHale), Kaplinsky (Ballard), and Duncan MacDonald. (PX-1262.) Representatives from Hangley Aronchick, Bradley Arant, American Financial Services Association, American Business Financial Services, and MONY Life Insurance were also present. (PX-1262.)

[24]  The other Issuing Banks in attendance were Bank One/First USA, Chase, and Household. (PX-0120).

In March 2002, settling Defendant Chase noticed cardholders it was implementing a class-action-barring arbitration clause. (PX-8067; PX-8265.) The clause became effective in May 2002. (PX-8067; PX-8265.)

On March 19, 2002, the In-House Working Group held its last conference call. Invitees included Amex (MacDermott) and Citi (Tasheff). The agenda included "[m]ethods for disclosing arbitration in solicitations." (PX-7573.) Barry suggested recent developments in arbitration-related case law as a topic, which could encompass "[a]ny recent useful decisions/orders involving any of your clients that are not published or widely reported." (PX-7573.) Several days later, Mullen (MBNA) emailed the In-House Working Group inquiring about interactions with cardholders attempting to amend their agreements unilaterally to add alternate arbitration fora. (PX-0049.) Aniel (Bank of America) and Williams (Providian) responded to Mullen's query. Williams commented that "[t]o date, our arbitration provision has been used sparingly." (PX-0049.)

On June 13, 2002 the Arbitration Coalition convened again. (PX-5122.) In the meeting notice, Mogilnicki highlighted "two issues on which it would be helpful if [the coalition] gathered information from our respective businesses," namely notices that consumers have elected to use the "Consumer Arbitration Forum" and reports on "the anti-arbitration press, legislation and judicial council developments" in California. (PX-5122.) Six Issuing Banks sent representatives, including Citi (Nelson and Tasheff).[25] (PX-6027; PX-8030.) Other institutions also participated, including GE Capital, Ford,

---

[25] The other Issuing Banks in attendance were Capital One, Chase, First USA/Bank One, Providian, and MBNA.

Chrysler, Dollar Financial, American Bankers Association, and Ugly Duckling. (PX-6027.) MacDonald, Lipsett and Mogilnicki (WilmerHale), and Kaplinsky (Ballard) also attended. (PX-6027.) Before the June meeting, Mogilnicki (WilmerHale) opined to a "core group of arbitration group members" including Amex (Heine and MacDermott), that "relatively few members of the arbitration group were committed to attending our last meeting and I think there's been a trend in that direction over the past year." (PX-5230.)

XIV.    Arbitration Coalition Meetings in 2003

The Arbitration Coalition did not meet again until April 22, 2003 at WilmerHale's Washington, D.C. office. (PX-5127; PX-8030.) Eight Issuing Banks attended, including Amex (Heine and Stuart Alderoty, Chief Litigation Counsel); Citi (Nelson and Tasheff), and Discover (Swift and Oppenheim).[26] (PX-5127.) In addition to Lipsett and Mogilnicki (WilmerHale) and Kaplinsky (Ballard), GE Capital, American Financial Services Association, Spotswood LLC, American Bankers Association, National Retail Federation, TCF Financial, and Consumer Bankers Association representatives also attended. (PX-5127; PX-8030.) Amex representatives and several others participated in a "field trip" to the Supreme Court to hear oral argument in Green Tree Financial Corp. v. Bazzle, 539 U.S. 444 (2003). (TT at 2904:17-22 (Lipsett); PX-5127; PX-5128). This was the last in-person meeting of the Arbitration Coalition. Two additional teleconferences were held in 2003, one on June 25 and another on October 16.

---

[26]  The other Issuing Banks in attendance were Capital One, Chase, First USA/Bank One, Providian, and MBNA.

(PX-6067; PX-8147.)  All of the Issuing Banks except Bank of America were invited to

participate in both conference calls, including Amex (Heine and MacDermott), Citi

(Kleinbaum, Nelson, Silverwood, Tasheff, and Jordan), and Discover (Daily).  (PX-6067;

PX-8147.)  No attendance sheets for these conference calls exist.

XV.    Discover's Opt-Out Provision

           In January 2003, Discover noticed cardholders regarding a new "opt out"

provision that allowed them to reject its arbitration clause by sending a rejection notice

by March 25, 2003.  (PX-8085.)  If Discover did not receive a rejection notice by that

date, the provision became final as to that cardholder.

XVI.   WilmerHale's and Kaplinsky's Representation of the Issuing Banks

           Before 2003, WilmerHale represented Amex, Citi, Bank of America, Bank

One/First USA, Capital One, Household, MBNA, and Providian.  (TT at 2944:15-

2946:17 (Lipsett).)  And at some point before 2005, Lipsett represented Chase. (TT at

2946:6-7, 2948:15-18 (Lipsett).)  He also represented MBNA in the Currency Conversion

multidistrict litigation regarding foreign currency exchange fees.  (TT at 2925:6-8

(Lipsett).)  Kaplinsky assisted Amex, Capital One, Citi, and Discover with their

arbitration clauses.  (TT at 1936:17-1937:14 (Swift); TT at 2177:7-99 (Barry); TT at

3443:3-13 (Heine); TT at 3565:12-21 (Nelson).)

XVII.  The Credit Card Industry Is Oligopolistic

           The Issuing Banks' collective market share of the general purpose credit

card market is very high.  In 1999, Amex, Citi, Discover, First USA, MBNA, Chase,

Bank of America, Household, Capital One, and Providian had a collective market share

of 82.91% as measured by transaction volume and 79.82% as measured by outstanding

balances. (PX-8539A; TT at 1411:8-1412:11, 1413:2-1414:13 (Tollison).) By 2005, this

percentage had risen to 86.53% measured by transaction volume and 87.64% measured

by outstanding balances, accounting for the acquisition of First USA by Chase and

MBNA by Bank of America. (PX-8539C; TT at 1415:19-1417:2 (Tollison).) In 2009,

these percentages dropped slightly, but the Issuing Banks still held a collective market

share of 81.9% as measured by transaction volume and 81.21% as measured by

outstanding balances, accounting for Providian's acquisition by Chase. (PX-8539D; TT

at 1417:4-23 (Tollison).)

   There are high barriers to entry into the general purpose credit card market

because it is difficult for a new bank to gain sufficient market share to compete with the

Issuing Banks. (TT at 1421:6-1422:9 (Tollison).) Because such a small number of firms

hold nearly 80% of the market share, the credit card market is highly concentrated and

oligopolistic. (TT at 1420:7-13 (Tollison).) Oligopolistic markets are characterized by

mutually independent behavior among firms, meaning that what is optimal for a firm

depends on the conduct of the firm's competitors. (TT at 1419:14-24 (Tollison).)

XVIII. Arbitration and Consumers

   The parties presented expert testimony on issues relating to consumer

attitudes about arbitration and the impact those attitudes could have on the claims at issue

in this lawsuit. This Court credits the testimony of these expert witnesses as described

below.

During the period of the alleged conspiracy (May 1999-October 2003),

arbitration clauses were not salient to consumers. (TT at 2727:21-25 (Bar-Gill); TT at

4132:15-4133:6 (Elzinga).) Salience describes the prominence to consumers of various

aspects of a multidimensional product. (TT at 2657:15-2658:3 (Bar-Gill).) Those

product aspects which are visible or meaningful to consumers are "salient." (TT at

2722:1-6 (Bar-Gill).) For example, the price of a can of soda is likely salient to

consumers, but the source of aluminum used to make the can may not be. Generally,

firms are expected to compete as to salient terms, but not as to non-salient terms. (TT at

2722:24-2723:4 (Bar-Gill).) The salience of any given term may change over time. (TT

at 2723:24-2724:1 (Bar-Gill).)

There are many examples of terms in the credit card and banking industry

rising to salience. For instance, Annual Percentage Rates ("APRs") were not salient until

the late 1980s or 1990s, late and over-the-limit fees were not salient until Citi and

Discover introduced cards without these fees, and foreign currency exchange fees were

not salient until issuers such as Capital One, Chase, and Amex advertised cards without

them in the wake of the Currency Conversion multidistrict litigation. (TT at 2724:6-

2726:4 (Bar-Gill).) Examples of emerging salience abound in other consumer contracts

and include ATM usage fees and early termination penalties in cellular telephone

contracts. (TT at 2726:5-2727:6 (Bar-Gill).)

There are generally two ways in which a non-salient term can become

salient. (TT at 2730:20-22 (Bar-Gill).) One is education by sellers, including advertising

campaigns that draw attention to particular product features. (TT at 2730:23-2731:1

-38-

(Bar-Gill).) Competitors often force obscure terms to salience in order to distinguish and market their products. (TT at 2744:10-12 (Bar-Gill).) For example, Capital One's "No Hassle Rewards" campaign drew attention to the fact that some of its competitors imposed conditions such as blackout dates that made redeeming rewards like frequent flyer miles difficult. (TT at 2744:13-21 (Bar-Gill).)

Learning by consumers is the other means by which a term can rise to salience. (TT at 2731:2-3 (Bar-Gill).) Consumer learning occurs in a number of contexts. First, a consumer may have a personal experience that makes a previously obscure term salient. (TT at 2733:18-19 (Bar-Gill).) For example, a consumer may try to return merchandise and find the merchant offers only store credit, not cash. As a result, return policies become salient to the consumer, who starts to consider them before making purchases. Consumers can also learn from the experiences of others, including through the media. (TT at 2733:19-25 (Bar-Gill).) Consumer groups and consumer advocates may facilitate a term's rise to salience, such as by alerting consumers to check their credit card statements for "hidden" charges. (TT at 2734:19-21 (Bar-Gill).)

It is often difficult to predict whether a term will become salient. (TT at 2735:8-10 (Bar-Gill).) Seller education remains under the control of sellers, and it is hard to know what will capture the attention of consumers, advocates, or regulators. (TT at 2735:8-18 (Bar-Gill).) Collusion can delay the rise to salience of product features that would normally become salient under competitive conditions. (TT at 2745:3-12 (Bar-Gill).) If Issuing Banks conspire to adopt a term that favors them, such as a hefty late-payment fee, that unlawful agreement would disincentivize those Issuing Banks from

attempting to gain a competitive advantage by distinguishing themselves from their co-conspirators on the basis of that term.  (TT at 2745:3-12 (Bar-Gill).)

Arbitration clauses continue to be largely non-salient to consumers.  But Plaintiffs point to some signs of incipient salience with respect to class-action-barring arbitration, such as publicity following the Minnesota Attorney General's action against the NAF and negative publicity accompanying Wells Fargo's introduction of class-action-barring arbitration clauses for bank account holders.  (TT at 2729:13-2730:3 (Bar-Gill).)

## CONCLUSIONS OF LAW

I.    <u>Jurisdiction</u>

This Court has jurisdiction pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331, 1337.

II.    <u>Plaintiffs' Standing to Bring Suit Against American Express</u>

As a threshold matter, Amex contends that Plaintiffs lack Article III standing to sue Amex because they face no actual or imminent injury-in-fact.  Amex also argues that Plaintiffs have failed to show an antitrust injury that can be redressed by the injunction they seek.  Discover joins Amex's challenge to antitrust standing.

To maintain this suit, Plaintiffs must have both Article III standing and antitrust standing.  It is well settled that "[t]he federal judicial power extends only to actual cases and controversies."  <u>E.I. Dupont de Nemours & Co. v. Invista B.V.</u>, 473 F.3d 44, 46 (2d Cir. 2006).  The "irreducible constitutional minimum" of Article III standing requires three elements:  (1) injury-in-fact; (2) causation; and (3) redressibility.  <u>Lujan v.</u>

Defenders of Wildlife, 504 U.S. 555, 560 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements" and each element must be "supported . . . with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 at 561. At this final stage in the litigation, Plaintiffs' Article III standing must therefore be "supported adequately by the evidence adduced at trial." Lujan, 504 U.S. at 561 (citing Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 115 n.31 (1979)). Further, in a class action, the named plaintiffs must themselves have standing to sue; it is not sufficient to show that "an injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Lewis v. Casey, 518 U.S. 343, 357 (1996) (citations and internal quotation marks omitted); see also Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 64 (2d Cir. 2012).

Courts only evaluate antitrust standing after Article III standing has been established. Ross v. Bank of America, N.A. (USA), 524 F.3d 217, 222 n.1 (2d Cir. 2008). Antitrust standing requires antitrust injury, which is "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). A court must also evaluate other factors relevant to standing, often referred to as the "efficient enforcer" factors, to ensure that the party stating the antitrust injury is a proper plaintiff. These factors are "(1) 'the directness or indirectness of the asserted injury;' (2) 'the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;' (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and

apportioning them among direct and indirect victims so as to avoid duplicative recoveries." Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 290-91 (2d Cir. 2006) (quoting Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55, 66 (2d Cir. 1988)).

A.   Article III Standing

Article III standing is a prerequisite to any consideration of the merits of a case or controversy. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). "First and foremost, there must be alleged (and ultimately proved) an injury-in-fact—a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." Steel Co., 523 U.S. at 103 (citations and internal quotation marks omitted). Plaintiffs identify four injuries in fact: (1) an increase in the "full price" that Plaintiffs must pay for credit card services; (2) a diminution in the quality of credit cards; (3) reduced consumer choice in credit card terms; and (4) a reduction in the quantity of credit cards without class-action-barring arbitration clauses. (Pls. Prop. Conclusions of Law, dated Mar. 19, 2013 (ECF No. 550) at 155.)

In 2006, the Defendants in Ross v. Bank of America, No. 05 Civ. 5116 (WHP) moved to dismiss Plaintiffs' claims for lack of Article III and antitrust standing. See In re Currency Conversion Fee Antitrust Litig., 2006 WL 2685082, at *1 (Sept. 20, 2006). Amex was not a defendant to that action. On appeal, the Second Circuit reversed this Court's dismissal for lack of standing and held that Plaintiffs alleged an Article III injury-in-fact. See Ross v. Bank of America, 524 F.3d at 223. Specifically, the Second Circuit concluded that Plaintiffs had alleged "antitrust injuries in fact" stemming from

"injuries to the market from the banks' alleged collusion to impose a mandatory term in cardholder agreements." Ross v. Bank of America, 524 F.3d at 223.  In addition to a reduction in consumer choice, the Second Circuit identified "at least two ways" in which the alleged conspiracy resulted in Plaintiffs "receiving objectively less valuable cards": the loss of the services of class action lawyers to monitor and challenge Issuing Bank behavior and the loss of the opportunity to go to court.  Ross v. Bank of America, 524 F.3d at 224 ("A card that limits the holder to arbitration is less valuable (all other factors being equal) than a card that offers the holder a choice between court action or arbitration.").

Amex argues that the Supreme Court's recent decision in Clapper v. Amnesty International USA clarifies that Article III injuries-in-fact must be "certainly impending" rather than "fears of hypothetical future harm." See 133 S. Ct. 1138, 1151 (2013).  From there, Amex maintains that the specter of abusive practices by the Issuing Banks is too ephemeral to confer standing.  But the Second Circuit squarely held that the injuries Plaintiffs alleged were "sufficiently 'actual or imminent,' as well as 'distinct and palpable,' to constitute Article III injury in fact." Ross v. Bank of America, 524 F.3d at 223.  Further, it indicated that loss of opportunities to file a lawsuit or participate in a class actions were concrete diminutions in card values even if no lawsuits were commenced.  "The harms claimed by the cardholders . . . are injuries to the market . . . not injuries to any individual cardholder from the possible invocation of an arbitration clause." Ross v. Bank of America, 524 F.3d at 223.  Thus, the reduction in choice and quality are distinct injuries to consumers, separate from the issue of whether any

individual may be wronged in the future by the Issuing Banks.  This reasoning
undergirded the Second Circuit's determination that standing exists even if the Issuing
Banks never invoked a mandatory arbitration clause against a particular cardholder.  See
Ross v. Bank of America, 524 F.3d at 223-24.

      The Second Circuit's focus on "injuries to the market" also defeats
Amex's assertion that no injury-in-fact exists because no named plaintiff is an Amex
cardholder.  Ross v. Bank of America, 524 F.3d at 223.  Amex advanced an identical
argument when it challenged Plaintiffs' antitrust standing on summary judgment in Ross
v. American Express, No. 04 Civ. 5723.  This Court determined that while Amex is
"differently situated in that Plaintiffs are not Amex cardholders," Plaintiffs "nevertheless
suffered reduced choice in the marketplace as a result of Amex's alleged collusion with
the Banks" and that "a jury could find that Amex's conduct caused injury to competition
in the credit card market."  In re Currency Conversion Fee Antitrust Litig., 773 F. Supp.
2d 351, 373 (S.D.N.Y. 2011).  The fact that Lead Plaintiff Ross does not hold an Amex
card and "would never do business with Amex again" is irrelevant in view of his broader
claim that the credit card market as a whole is tainted by collusion.  (TT at 39:22-40:3;
52:2-5 (Ross).)

      Based on the prior rulings of the Second Circuit and this Court, Plaintiffs
allege cognizable Article III injuries-in-fact.  That shifts the inquiry to whether they have
proven those injuries at trial.  See, e.g., Gladstone Realtors, 441 U.S. at 115 n.31
("Although standing generally is a matter dealt with at the earliest stages of litigation,
usually on the pleadings, it sometimes remains to be seen whether the factual allegations

of the complaint necessary for standing will be supported adequately by the evidence adduced at trial."). Plaintiffs offered evidence regarding abusive practices of certain Issuing Banks after their adoption of mandatory arbitration clauses. (PX-8646; PX-8647; PX-8678). They also showed that an individual cardholder would have little economic incentive to challenge such actions absent a class action. (TT at 2684:3-2685:3 (Bar-Gill).) That evidence was compelling.

But the threshold identified by the Second Circuit to demonstrate an injury-in-fact is far lower. The mere existence of the clauses diminishes the cards' value by foreclosing the opportunity for cardholders to go to court and address grievances through class action litigation. See Ross v. Bank of America, 524 F.3d at 224. It is undeniable that consumer choice was reduced when the seven Issuing Banks—who collectively held between 79-87% of the transaction volume and outstanding balances in the credit card market from 1999-2009—each adopted a class-action-barring clause. (PX-8539A; PX-8539C; PX-8539D.) Amex contends that Capital One, Chase, Bank of America, and HSBC—who account for about 36% of purchase volume and 41% of outstanding balances—no longer have arbitration clauses. (PX-8434.) But those Issuing Banks only deleted their class-action-barring arbitration clauses from cardholder agreements as part of settlements of these very actions. (See Consumer Financial Protection Bureau Arbitration Study Preliminary Results, dated 12/12/13 ("CFPB Study") at 19-20 (noting that the Ross v. Bank of America, No. 05 Civ. 7116 settlement removed

mandatory arbitration for 43% of credit card loans outstanding as of 2012).[27])  It would

be "absurd" to deny Plaintiffs' standing "merely because some of the alleged co-

conspirators have settled and agreed to remove their arbitration clauses."  In re Currency

---

[27]  This Court takes judicial notice of the CFPB Study pursuant to Rule 201.  Rule 201
allows this Court to take such notice "at any stage of the proceeding" if the judicially
noticed facts are "not subject to reasonable dispute," that is, they "can be accurately and
readily determined from sources whose accuracy cannot readily be questioned," Fed. R.
Evid. 201(b) and (d).  Defendants object on three grounds to this Court's consideration of
the CFPB Study:  the timeliness of Plaintiffs' request, the reliability of the CFPB Study,
and on hearsay grounds.  Defendants' objections are overruled:

> First, judicial notice may be taken "at any stage of the proceeding," including as
> late as on appeal.  See, e.g., United States v. Davis, 726 F.3d 357, 368 (2d Cir.
> 2013) (concluding that judicial notice during appeal is appropriate); Trigueroes v.
> Adams, 658 F.3d 983, 987 (9th Cir. 2011) (same).

> Second, Courts may take judicial notice of data contained in Government reports.
> See, e.g., Denius v. Dunlap, 330 F.3d 919, 926 (7th Cir. 2003) (concluding that a
> district court may take judicial notice of information on an official government
> website); Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (holding
> that district courts may take judicial notice of the contents of certain public
> records).  It is true that the CFPB Study results are "subject to revision . . . if
> further analysis so warrants."  (CFPB Study at 4.)  But it is telling that Defendants
> do not point out any errors in the report.  And extrapolation from Elzinga's
> market share charts, see PX-8539A; PX-8539B; PX-8539C; PX-8539D, reaches
> much the same result as the CFPB Study.

> Third, the CFPB Study is admissible as a hearsay rule exception because the
> report is a public record.  See Fed. R. Evid. 803(8).  This exception applies when
> the document is "a record or statement of a public office [that] sets out: (i) the
> office's activities; (ii) a matter observed while under a legal duty to report . . ."
> and "neither the source of information nor other circumstances indicate a lack of
> trustworthiness."  Fed. R. Evid. 803(8).  Section 1028(a) of the Dodd-Frank Act
> imposes on the CFPB the legal obligation to study the use of pre-dispute
> arbitration clauses in consumer financial products and services and report its
> findings to Congress.  12 U.S.C. § 5518(a).  Indisputably, the CFPB Study is the
> product of that legal mandate.

Conversion Fee Antitrust Litig., 773 F. Supp. 2d at 373. While there are more credit cards available today without arbitration clauses, 13 of the 20 largest Issuing Banks impose class-action-barring arbitration clauses. (CFPB Study at 21.) Had the settling defendants in these two lawsuits continued to impose class-action-barring arbitration clauses in cardholder agreements, nearly 94% of outstanding credit card loans would be subject to them.[28] (CFPB Report at 23.) As such, Plaintiffs have carried their burden to prove Article III injury-in-fact.

Causation is the next element of Article III standing. A plaintiff must prove "the existence of an immediate link between [the defendants' conduct] and the injury." See Pac. Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 350 (2d Cir. 2008). Here, there is no question that Amex and the other Issuing Banks' adoption of the class-action-barring arbitration clauses is linked immediately to the injuries-in-fact.

Finally, to show redressibility, Plaintiffs must prove a "non-speculative likelihood that the injury can be remedied by the requested relief." W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP, 549 F.3d 100, 106-07 (2d Cir. 2008) (citing Lujan, 504 U.S. at 561). Here again, Amex argues that Plaintiffs failed to prove redressibility because they do not hold Amex cards and would be unaffected by an injunction invalidating Amex's clause. But because the injuries-in-fact constitute "present market effects" stemming from adoption of the class-action-barring arbitration clauses, the elimination of Amex's clause would redress the identified injuries to the market even if it

---

[28] This Court credits Plaintiffs' compelling evidence that Discover's opt-out option—utilized by less than 0.1% of cardholders—did not meaningfully counteract any loss in consumer choice. (See generally TT at 2746:23-2763:5, 3205:14-3207:25 (Bar-Gill).)

did not directly affect any individual cardholder.  See In re Currency Conversion Fee Antitrust Litig., MDL No. 1409, 2009 WL 151168, at *3 (S.D.N.Y. Jan. 21, 2009).

B.      Antitrust Standing

Amex and Discover argue that Plaintiffs failed to prove statutory antitrust standing at trial.  To prove antitrust standing, Plaintiffs must demonstrate an antitrust injury.  "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect of the defendant's behavior."  Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990).

On remand from the Second Circuit, this Court determined that Plaintiffs in Ross v. Bank of America alleged antitrust standing.  While the Second Circuit only addressed Article III standing in remanding this case, the Court of Appeals "previewed its thinking" on antitrust standing, noting that "one form of antitrust injury is 'coercive activity that prevents its victims from making free choices between market alternatives.'"  In re Currency Conversion Fee Antitrust Litig., 2009 WL 151168, at *4 (citing Ross v. Bank of America, 524 F.3d at 223).  Thus, this Court concluded on remand that Plaintiffs' Article III injury-in-fact was also an antitrust injury resulting directly from the alleged collusion.  In re Currency Conversion Fee Antitrust Litig., 2009 WL 151168, at *4.

Subsequently, on summary judgment in Ross v. American Express, No. 04 Civ. 5723, American Express challenged Plaintiffs' antitrust standing because no Plaintiff was an American Express cardholder.  Again, this Court noted that "Article III injury-in-fact as determined by the Court of Appeals appears coextensive with antitrust injury in

-48-

fact." In re Currency Conversion Fee Antitrust Litig., 773 F. Supp. 2d at 372.  While the injuries-in-fact are the same, for antitrust standing these injuries must have been the product of competition-reducing collusion.  If the clauses were adopted independently, there is no injury "of the type the antitrust laws were intended to prevent."  Brunswick, 429 U.S. at 489.

The only way for Plaintiffs to prove antitrust injury is to demonstrate by a preponderance of the evidence that Defendants colluded in adopting and maintaining class-action-barring arbitration clauses.  For the reasons set forth below, this Court concludes that Plaintiffs' have not carried their burden to show that the adoption and maintenance of class-action-barring arbitration clauses was the product of collusion. Therefore, Plaintiffs have failed to prove an antitrust injury.

III.   Violation of Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.  Despite the expansive language of Section 1, the Supreme Court has recognized that Congress intended to outlaw only "unreasonable restraints" of trade or commerce.  State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).  Plaintiffs claim that Amex, Citi, and Discover violated Section 1 of the Sherman Act by agreeing with their competitors to implement and maintain mandatory class-action-barring arbitration clauses as a term or condition for holding their general purpose credit cards.  To succeed on their Section 1 claim, Plaintiffs must prove by a preponderance of the evidence "(1) a combination or some form of concerted action between at least two legally distinct

-49-

economic entities that (2) unreasonably restrains trade." Geneva Pharms. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 506 (2d Cir. 2004).

      A.    Concerted Action

      An antitrust conspiracy in violation of Section 1 of the Sherman Act requires proof of joint or concerted action as opposed to unilateral action. Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 183 (2d Cir. 2012). "'[T]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 553 (2007) (quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954)). The circumstances of the alleged conspiracy "must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984) (quoting Am. Tobacco Co. v. United States, 328 U.S. 781, 810 (1946)). No formal agreement is required to constitute an antitrust conspiracy. "The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words." Am. Tobacco Co., 328 U.S. at 809-10. It is enough that "concert of action is contemplated and . . . the defendants conformed to the arrangement." United States v. Paramount Pictures, 334 U.S. 131, 142 (1948).

      An unlawful agreement may be proved through direct or circumstantial evidence "that reasonably tends to prove that the [defendants] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."

Monsanto, 465 U.S. at 764. While Plaintiffs concede that they have no direct evidence of a conspiracy among the Issuing Banks, "conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with . . . precision." United States v. Snow, 462 F.3d 55, 68 (2d Cir. 2006); see also Anderson News, 680 F.3d at 183 ("conspiracies are rarely evidenced by explicit agreements"). Rather, conspiracies "nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'" Anderson News, 680 F.3d at 183 (quoting Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir. 1976)).

Nevertheless, antitrust law "limits the range of permissible inferences from ambiguous evidence in a [Section] 1 case" because the line between concerted action and permissible unilateral action will often be hard to discern. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986); see also In re Baby Food Antitrust Litig., 166 F.3d 112, 124 (3d Cir. 1999) ("in drawing favorable inferences from underlying facts, a court must remember that often a fine line separates unlawful concerted action from legitimate business practices"). Thus, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588. Rather, Plaintiffs must present evidence "that tends to exclude the possibility that the alleged conspirators acted independently." Matsushita, 475 U.S. at 588. "[O]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it." Apex Oil Co. v. DiMauro, 822 F.2d 246, 257 (2d Cir. 1987). Nevertheless, Plaintiffs must provide evidence "pertaining

to each defendant" to demonstrate that that defendant participated in the conspiracy. AD/SAT v. Associated Press, 181 F.3d 216, 234 (2d Cir. 1999).

### 1.    Parallel Conduct and "Plus Factors"

Where, as here, there is no direct evidence of an agreement, parallel conduct can be probative evidence of unlawful collusion.  Apex Oil, 822 F.2d at 253. But parallel conduct among competitors is not in itself sufficient to prove an antitrust conspiracy.  Indeed, parallel conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" as it is with the existence of an agreement.  Twombly, 550 U.S. at 554.  Even conscious parallelism, a process through which firms in a highly concentrated market may be able to "achieve cartel-like results simply by observing and following each other's market behavior," see 6 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1410b (3d ed. 2010), is "not in itself unlawful." Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993); see also Apex Oil, 822 F.2d at 253 ("[P]arallel conduct alone will not suffice as evidence of [an antitrust] conspiracy, even if the defendants knew the other defendant companies were doing likewise." (internal citations omitted)).

However, an agreement among competitors "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001); see also Apex Oil, 822 F.2d at 253 ("[A] plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in

conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy."). So-called "plus factors" may include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of inter-firm communications." Twombly v. Bell Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005) (internal citations omitted), rev'd on other grounds by Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

Such plus factors are "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might [lead a court to] infer the existence of an agreement." Mayor & City Council of Balt., Md. v. Citigroup, Inc., 709 F.3d 129, 136 n.6 (2d Cir. 2013). Rather, courts examine the existence of a conspiracy "as a whole" taking into consideration the totality of the evidence, as opposed to "dismembering it and viewing its separate parts." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962); see also In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 65 (2d Cir. 2012).

a)    Was there Parallel Conduct?

At the outset, this Court notes that the temporal connection between the meetings and the adoption of the clauses suggests parallel conduct. Together, the Issuing Banks participated in 28 meetings over a four-year period exploring avenues to displace class actions with arbitration of cardholder disputes. During that same approximate period, each Issuing Bank adopted a class-action-barring arbitration clause. While First USA implemented its class-action-barring arbitration clause more than a year before the first meeting, all of the other Issuing Banks noticed and implemented clauses within a

month of an Arbitration Coalition or In-House Working Group meeting attended by their

counsel. In May 2002, Chase was the last Issuing Bank to adopt such a clause. One

month later, the multi-year pattern of meeting nearly bimonthly dropped off. Indeed, the

Arbitration Coalition did not meet again for almost a year, and after two follow-up

conference calls, appeared to have disbanded.

   Further, this Court credits expert testimony indicating that the credit card

industry is an oligopoly in which conscious parallelism is the norm. For example, many

of the Issuing Banks encourage their employees to hand over for analysis any competitor

card member agreements or solicitations they receive by mail. (See, e.g., TT 3282:9-

3283:10 (Heine).) As described earlier, the Issuing Banks also reached out to third

parties, such as outside counsel or the National Arbitration Forum, for information on

which of their competitors were adopting arbitration clauses and when. (See, e.g., PX-

5300; PX-6005; PX-7533; PX-7696; PX-7697.)

   The Defendants contend that a four-and-a-half-year-long "slow motion

conspiracy" would defy both economic and common sense, as any benefit from collusive

adoption of the clauses is lost unless they are adopted close in time. But not all

conspiracies require swift, simultaneous parallelism. See, e.g., In re Northwest Airlines

Corp. Antitrust Litig., 208 F.R.D. 174, 198 (E.D. Mich. 2002) (rejecting the

"questionable premise" that a conspiracy "cannot be established absent a complete 'sea

change' in each [conspirator's] practices that results in a lock-step approach to [adopting

a policy]"). Unlike price fixing, which may quickly impose a negative toll on the first

firm to raise its price unless others soon follow, an agreement to impose and maintain

arbitration clauses would not require immediate, concerted action to be successful because arbitration was not salient to consumers at that time. The implementation of the clauses was multifaceted for each Issuing Bank and subject to unique delays and difficulties. Further, the evidence suggests that the ultimate goal of the Arbitration Coalition was to "change the tide" by establishing arbitration as the accepted industry standard for dispute resolution. This could not have been expected to happen overnight. In fact, a more studied and staggered approach would have made sense given uncertainty and evolving law on the issue.

Additionally, the Defendants argue that their decisions to adopt arbitration clauses were made independently of their participation in the Arbitration Coalition and other meetings. Amex points out that it made the decision to adopt an arbitration clause in late 1998 and that its arbitration provision became effective in April 1999, a month before the inaugural May 25, 1999 meeting. Thus, it could not have been a party to any agreement to jointly adopt the clauses. But courts have often permitted inferences of collusion in response to the familiar fact pattern of a 'price leader' announcing to a roomful of its rivals its 'independent' decision to raise prices as an implicit invitation to follow suit. See, e.g., United States v. Foley, 598 F.2d 1323, 1331-32 (4th Cir. 1979) (inferring conspiracy where realtor announced price increase to rivals who then subsequently raised prices). Indeed, interdependent parallel conduct may be simultaneous or sequential. See In re Plasma-Deriv. Protein Therapies Antitrust Litig., 764 F. Supp. 2d 991, 1000 (N.D. Ill 2011). Sequential parallelism occurs when one or

more firms engage in an action that becomes known to its rivals, who can then choose whether to imitate the move.[29] In re Plasma-Deriv., 764 F. Supp. 2d at 1000 n.8.

Here, Amex and First USA—the only two Issuing Banks that adopted arbitration clauses prior to the May 25, 1999 meeting—were the same two banks that were actively involved in planning the initial meeting of the Arbitration Coalition on July 28, 1999. According to Lipsett, "developing some sort of forum to talk about arbitration issues" was an "assignment" MacDonald received as a consultant for First USA. (TT at 2855:9-11 (Lipsett).) And while the May 25, 1999 meeting appears to have been a WilmerHale client development initiative, Heine lent more than Amex's passive co-sponsorship to the subsequent Arbitration Coalition meetings. Heine and MacDonald worked with WilmerHale to gather participants for the Coalition's inaugural meeting. (PX-5219.) Thereafter, Heine continued to participate in Coalition meetings for years. In addition to hosting the March 2, 2000 meeting at Amex's New York headquarters, Heine presented an Arbitration Overview internally at Amex on December 6, 1999, in which he noted that Amex had "helped pull together an ad hoc industry group . . . [which] may serve as a forum or conduit for industry-wide or other cooperative activities." (PX-8640.) Heine was also the contact person for an Arbitration Coalition "sub-group" tasked with developing "a concrete proposal on how a more organized public relations effort

_____

[29] Courts may draw an inference of interdependent parallelism more easily from simultaneous parallelism than sequential parallelism because concerted action in the absence of knowledge of or time to react to a competitor's action is improbable. See In re Digital Music Antitrust Litig., 592 F. Supp. 2d 435, 445 (2008) vacated on other grounds by Starr v. Sony BMG Music Entm't, 592 F.3d 314 (2d Cir. 2010). But that is not this case.

might benefit us all." (PX-5228.) This Court concludes that Heine's involvement in the Coalition was more than just a disinterested favor to Amex's outside counsel. In view of Heine's extensive participation in the Arbitration Coalition, Amex's approval of its arbitration clause prior to the May 25, 1999 meeting does not preclude a finding of parallel conduct between Amex and the other Issuing Banks.

Similarly, Discover noticed card members of its class-action-barring arbitration provision in July 1999, the same month as the first Arbitration Coalition meeting. Though Discover appears to have decided to adopt its arbitration clause in early 1999, the clause's implementation is close enough in time to the inauguration of the Arbitration Coalition for Discover to be considered a leader in sequential parallelism along with Amex and First USA. Like Heine, Discover's Daily was a prominent member of the Arbitration Coalition. He took the lead on the Coalition's FAQs and Self-Regulation projects, sharing Discover's internal work product and advice regarding arbitration. Given Daily's level of participation, the fact that Discover independently decided to adopt arbitration does not alter this Court's determination that its conduct was consciously parallel to that of the other Issuing Banks. See e.g., In re Northwest Airlines, 208 F.R.D. at 198 ("[E]ven if an Airline already had adopted [a policy] prior to the onset of the conspiracy alleged . . . this would not preclude the conclusion that this Airline nevertheless joined the conspiracy. . . .").

Citi, which did not implement arbitration clauses in its cards until July, November and December 2001, also argues that its decision to adopt arbitration was independent of its participation in the Arbitration Coalition meetings. Specifically, Citi

argues that Heyrich's June 2000 memo was the catalyst for Citi's adoption of an arbitration clause and that Heyrich was neither involved in nor aware of the Arbitration Coalition meetings.  But Heyrich's memo was forwarded to Citi Cards' counsel months before the decision to implement an arbitration clause and after Citi Cards' counsel had already attended at least five Arbitration Coalition meetings.  Ultimately, it was Citi Cards' in-house counsel who pitched the adoption of an arbitration clause to Freiberg, the final decision maker, in October 2000.  While Citi was less involved than Amex and Discover in the Arbitration Coalition meetings, sufficient evidence exists to show that Citi took its competitors' actions into account.  Warrington, Nelson's former boss, attended the May 25, 1999 meeting and the first two arbitration coalition meetings.  There, she shared Citi's "wait and see" plans with her competitor Siegel (Chase).  (PX-0110.)  Through her attendance at these meetings she was able to put Nelson in touch with GE Capital's Hufford to "compare notes" about arbitration.  (PX-7517.)  Nelson then attended the April 2000 Arbitration Coalition meeting as Citi was actively considering arbitration—despite having already received substantial legal advice on arbitration from the WilmerHale and Ballard firms.  (PX-7515; PX-7516; PX-8661; TT at 1703:15-20; 3634:3-16 (Nelson).)  And a memo from Nelson to Kleinbaum regarding arbitration, dated September 11, 2000, contains a chart listing whether each of the Issuing Banks had adopted a clause.  (PX-7529.)  Other Citi Cards personnel, including Silverwood, Tasheff, and Bergeson, attended a combination of Class Action Working Group and Arbitration Coalition meetings as well.

Finally, this Court notes that the alleged Sherman Act conspiracy encompasses both an agreement to impose arbitration clauses and an agreement to maintain them.  Even if Amex, Discover, and Citi's decision to adopt arbitration were made independent of any consideration of their competitors' actions, their enduring participation at the meetings over the years would still implicate them in any agreement to maintain their clauses and facilitate adoption by other Issuing Banks.

Viewing the evidence as a whole, this Court concludes that there was conscious parallel action in the adoption and maintenance of arbitration clauses among the Issuing Banks.  Sequential parallelism, however, requires no advance agreement among competitors to be effective.  Therefore, agreement is difficult to infer from sequential actions alone.  See In re Fla. Cement & Concrete Antitrust Litig., 746 F. Supp. 2d 1291, 1309-10 (S.D. Fla. 2010).  Without an agreement, there can be no antitrust liability.  The question thus becomes whether the Issuing Banks' parallel action revealed an agreement or simply conscious parallelism.  Accordingly, this Court turns to the analysis of "plus factors" to determine whether an agreement may be inferred.  See In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 903 (6th Cir. 2009) ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").

b)    Plus Factors

(i)    Motive to Collude

Courts may not infer a conspiracy where the defendants have no "rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations." AD/SAT, 181 F.3d at 233.  It is clear that the Issuing Banks had independent interests in adopting arbitration clauses to preclude costly class actions.  This plus factor speaks to whether they also had a "rational economic motive" to adopt those clauses jointly, as opposed to going it alone.  See Matsushita, 475 U.S. at 596-97.  The record amply demonstrates that the Issuing Banks were motivated to "work together to turn the tide" so that arbitration would be established as the "acceptable forum for resolving consumer debates." (PX-6125.)  But this evidence does not necessarily translate into a "rational economic motive" to collusively adopt the clauses.

The Issuing Banks harbored concerns "that using arbitration for credit cards could be perceived as anti-consumer." (PX-0110.)  An internal Citibank memo notes "that any arbitration program . . . will receive considerable public scrutiny and potential negative press," while an Amex memo recommends "assist[ing] in developing the PR / Consumer affairs strategy (e.g., can we turn this into a positive?)." (PX-6086; AX-9054.)  Discover was also "getting a lot of press, a lot of legislative inquiries [and] media inquiries as to whether we were going to adopt an arbitration clause" in 1998-99. (TT at 3951:13-16 (Swift).)  The Defendants maintain that they were not concerned about losing card members when they adopted arbitration clauses because arbitration was not salient to consumers at the time.  But Daily (Discover) reported to his superiors that most

-60-

of the consumer calls in response to Discover's clause were "hostile" and appeared to be "in response to articles or television programs about arbitration." (PX-8125). Even if most consumers were indifferent, this does not foreclose a motive to keep arbitration non-salient while issuers quietly adopted it across the board.

It is clear that the Issuing Banks also believed an "organized public relations effort might benefit us all." (PX-5228.) To that end, the Arbitration Coalition formed a sub-group to "discuss and develop initial response points to counter the various arguments being made to challenge arbitration clauses" and planned to use these FAQs "for government relations and media relations purposes." (PX-5034; PX-8125; TT at 811:7-14 (Daily); TT at 691:5-18, 3355:15-3356:2 (Heine).) The Coalition also explored the possibility of commissioning pro-arbitration research, which all agreed "might be very helpful for obvious reasons." (PX-5222.) And at the March 2000 Arbitration Coalition, a public relations expert from Burson-Marsteller gave a presentation on "some of the ways in which a public relations effort could alter perceptions about consumer arbitration." (PX-5228.) Indeed, "public relations," the "PR problem," "public discourse," and "anti-arbitration press, legislation and judicial council developments" appear as agenda items on at least four of the meetings for which agendas exist. (See, e.g., PX-0089; PX-0755; PX-5078; PX-5088.)

Finally, the Issuing Banks were concerned about protecting the enforceability of their clauses against "a rogue or unsophisticated player (not necessarily in our industry) who attempts to be heavy handed or unfair in the adoption or exercise of a clause such that it causes all businesses using consumer arbitration to be judged in an

unfavorable light." (PX-5034.)  If a competitor generated bad legal precedent with a poorly crafted clause, the ability of other banks to capitalize on the fruits of arbitration would be compromised.  Siegel (Chase) expressed a similar concern that First USA had created a "catch-22 situation" by mandating arbitration [with NAF] for debt collection, which had the byproduct of arbitration being "misperceived as anti-consumer."  (PX-0110).

Plaintiffs argue that the Issuing Banks' need to parry consumer backlash and temper any "rogue" players establish a motive to conspire in the adoption of arbitration clauses.  This Court agrees.  While arbitration was not salient to most consumers at the time of the alleged conspiracy, collusion would ensure that no Issuing Bank facilitated a rise to salience before arbitration was firmly entrenched as the industry norm.  As Kleinbaum (Citi) confirmed, it was "important that our card members not perceive us as engaging in actions that are harmful to them."  (TT at 3740:23-24 (Kleinbaum).)  Collusion would also help to ensure that each bank's clause was sufficient quality withstand legal challenges that could undermine the enforceability of every bank's clause.  On at least two occasions, members of the Coalition were instructed to bring copies of their arbitration clauses with them to the meetings.  (PX-5081; PX-6134.) Reaping the benefits of arbitration required that the Issuing Banks defeat legal challenges from the class action bar and minimize any media or regulatory backlash.  The Arbitration Coalition would be much more likely to succeed at this endeavor if each bank that implemented a clause maintained it and defended it.

A motive to conspire, however, does not mean that a conspiracy existed. While the collusive adoption and maintenance of arbitration clauses would have entrenched arbitration as an industry standard, this Court is convinced that the evidence is just as consistent with legitimate activity in furtherance of the Issuing Banks' independent self interests. Even absent a conspiracy to adopt and maintain arbitration clauses, the Issuing Banks would still be motivated to cooperate on efforts to sway public opinion and defend the legality of their clauses in the courts and legislatures. See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961) (publicity campaigns directed at lawmaking and law enforcement authorities are not actionable under the Sherman Act); Mercatus Grp., LLC v. Lake Forest Hosp., 641 F.3d 834, 851 (7th Cir. 2011) (communications to the public akin to advertising "are outside the reach of the antitrust laws"). Perceiving that class action attorneys would lobby and litigate to undermine the enforceability of arbitration clauses, the Issuing Banks networked to thwart the plaintiffs' bar. When the motive to cooperate is just as consistent with legitimate goals as non-legitimate goals, there can be no fair inference of collusion.

(ii)   Inter-firm Communications

There is no question that the Issuing Banks engaged in an unusually high amount of inter-firm communications regarding arbitration. Heine testified that "this particular grouping of people to discuss these issues was not something that . . . has happened in other contexts." (TT at 555:19-22 (Heine).) Testimony at trial indicated that the Issuing Banks were "fierce" and "vicious" competitors. (TT 542:1-17, 3400:17-3401:14 (Heine); TT at 3896:1 (Yob).) MacDonald described Amex as the "Darth

-63-

Vader" of the credit cards industry who "you just didn't talk to" because the "animosity was very, very strong." (TT at 1148:7-11 (MacDonald).) Yob (Discover) described Discover's relationship with other card issuers as "hostile" and characterized Visa and Mastercard issuers as trying to "kill the baby [Discover] at birth." (TT at 3922:7-11 (Yob).) Plaintiffs argue that, but for collusion, such staunch competitors would not have committed themselves to the Arbitration Coalition or joined together to establish an "informal 'information please' network" through the In-House Working Group.

   In determining whether an inference of collusion can be drawn from the Issuing Banks' inter-firm communications, this Court is mindful that "a mere showing of close relations or frequent meetings between the alleged conspirators . . . will not sustain a plaintiff's burden absent evidence which would permit the inference that these close ties led to an illegal agreement." H.L. Moore Drug Exch. v. Eli Lilly & Co., 662 F.2d 935, 941 (2d Cir. 1981); see also In re Baby Food, 166 F.3d at 126 ("[C]ommunications between competitors do not permit an inference of an agreement to fix prices unless those communications rise to the level of an agreement, tacit or otherwise.") (internal citations omitted); In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more."). While meetings among competitors undoubtedly provide opportunities to conspire, deeming those opportunities as proof of a conspiracy would condemn independent professional associations. Kreuzer v. Am. Academy of Periodontology, 735 F.2d 1479, 1488-89 (D.C. Cir. 1984).

*The May 25, 1999 Meeting*

This Court credits Lipsett that the May 25, 1999 meeting of senior in-house credit card counsel was a business development initiative on behalf of WilmerHale. Lipsett testified that the meeting "was our idea" and that "[n]one of [the Issuing Banks] approached us . . . . We reached out to try to get them to do it." (TT at 2828:15-16 (Lipsett).) While a private meeting among competing banks provided an opportunity to conspire, there is no evidence to suggest that a meeting of the minds to implement and maintain arbitration clauses actually took place. In fact, there is only scant evidence that arbitration was even discussed at this meeting. (TT at 139:5-15 (Birnbaum).)

*The Arbitration Coalition Meetings*

While sparked by the insatiable desire of law firms to develop new clients, the Arbitration Coalition meetings also involved significant organization and participation on the part of the Issuing Banks. Defendants analogize the meetings of the Arbitration Coalition to trade association meetings, CLE events, and client development pitches, none of which tend to raise antitrust concerns. There are similarities, but also striking differences.

The number of meetings over a sustained period devoted to the topic of arbitration far exceeds a level normally associated with client development pitches or CLEs. See, e.g., In re Northwest Airlines, 208 F.R.D. at 201 ("[I]t is somewhat striking that representatives of the [competing firms] found so many opportunities to at least 'compare notes' . . . where . . . cooperation among [the firms] was by no means necessary

-65-

for any individual [firm] to take effective action[.]").  The generation of joint work product, such as the FAQs project, is inconsistent with client development efforts because law firms do not generally parcel work assignments out to clients.  And potential client invitees are not usually called on to educate one another or share internal analysis.  Indeed, the significant level of cooperation among attendees was atypical of a CLE or client development pitch.  Any lawyer would agree that CLEs and client development pitches do not typically involve homework assignments, the formation of sub-groups, or the development of a public relations campaign.

On the other hand, notes and agendas from the meetings indicate that education on legal developments on arbitration and "legislative updates" were significant aspects of each meeting.  (See, e.g., PX-0358; PX-0768; PX-5078.)  While there is evidence that certain of the Issuing Banks shared some internal, non-public information, (see PX-0110), the bulk of the discussion centered on publicly available information—including the arbitration clauses themselves.  With the exception of the FAQs project, there is also little evidence that the Issuing Banks engaged in joint drafting projects.  While the banks were instructed to bring copies of their arbitration clauses to meetings, there is no evidence indicating what, if anything was done with them.  But among sophisticated counsel, this is hardly surprising.

Defendants' expert testified that the Arbitration Coalition meetings were not conducive to the formation of a cartel, because they were open to outsiders.  (TT at 4116:8-20 (Elzinga) (stating the guest list of conspiratorial meetings "is limited to people who are participating in the cartel activity itself").)  Though the Arbitration Coalition

meetings were not open to the public, attendance was not limited to the Issuing Banks or even the credit card industry. Aside from WilmerHale and Ballard, various other law firms attended. Representatives from public relations firms also attended several meetings, as did participants from other industries, like Sears and Toyota. At the second Arbitration Coalition meeting, attendees agreed that "participants in other industries will be solicited to join the effort" including "creditor groups, computer, . . . utilities, telephone companies [and health care networks]." (PX-0110.) "The presence of numerous uninvolved observers at such meetings tends to dispel any specter of illegality." In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust Litig., MDL No. 2121, 2012 WL 3637291, at *2 (S.D. Cal. Aug. 20, 2012). The inclusion of other industries and outside counsel resembles a trade association, and cuts against any inference that an express agreement to implement and maintain arbitration clauses was articulated at the Arbitration Coalition meetings. This, however, does not preclude a tacit meeting of the minds, or a "gentlemen's agreement" among the Issuing Banks.

Viewing the Arbitration Coalition meetings as a whole, this Court concludes that the evidence is ambiguous. The number of meetings and the level of cooperation and information-sharing among "fierce competitors" to "change the tide" on arbitration permit an inference of illegality. But inferences of legitimate activity are just as persuasive. The bulk of the Coalition's activities were akin to that of a fledgling special interest group cooperating to advance a mutually beneficial business initiative they felt was under siege by a well-networked enemy.

*The Class Action Working Group Meetings*

The two meetings of the Class Action Working Group were attended by a plethora of outsiders from other industries, trade associations, lawyers, and lobbyists. Conceived by MacDonald, the Class Action Working Group was an outgrowth of the Arbitration Coalition but appears to have had limited support from Coalition members, and met only twice. The meetings had the trappings of a trade association or special interest group. Other than providing MacDonald with another platform for his anti-class action crusade, the meetings accomplished little. While Plaintiffs characterize MacDonald's exhortations as the basis of a tacit agreement, the presence of invitees from other industries and law firms was not conducive to the formation of conspiracy among the Issuing Banks. The two meetings focused on global efforts to curtail class actions and spanned topics such as "discovery reform," "smarter, tougher certification challenges," and working for reform "in the judiciary" and "on the legislative side." (PX-7559.) At best, the Class Action Working Group can be viewed as an outgrowth of any conspiracy already established by the Arbitration Coalition. But viewed on its own this Court concludes that it does not support an inference of collusion.

*The In-House Working Group Conference Calls*

Of the three types of inter-firm meetings, the In-House Working Group, an "an informal 'information please' network," permits the strongest inference of an agreement. Its meetings were conducted without the participation or knowledge of any outsiders and with little evidence regarding their subject matter. That raises antitrust concerns. "[W]e expect competitors to meet together only minimally and to assemble

publicly for relatively open meetings conducted with a particular and justifiable purpose in mind. To the extent that rivals move away from this model, their activity becomes less consistent with normal competition and more consistent with a conspiracy to repress it." Areeda ¶ 1417b; cf. Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi., 641 F.2d 457, 477-78 (7th Cir. 1981) (fact finder may consider evidence of informal meetings by officers on numerous occasions to determine if the totality of the evidence warrants an inference of agreement). Barry acknowledged that "to imply organization to this group probably overstates it." (TT at 2165:11-13 (Barry).) Over time the group "fizzled" and "faded away" (TT at 2173:1-12 (Barry).)

### *"Side Conversations" and Sharing of Non-Public Information*

In addition to the meetings described above, Plaintiffs contend that "side conversations" among certain of the Issuing Banks permit an inference of collusion. At the September 29, 1999 Arbitration Coalition meeting, Siegel (Chase) initiated individual side conversations out of "the group setting" with Sears, GE Capital, Citi, Bank of America, Household, and First USA. (TT at 861:14-865:1 (Siegel); PX-0110.) Siegel testified credibly that she did not know much about arbitration and was "in an investigative fact-finding mode at the moment." (TT at 865:11-866:12 (Siegel).) The Coalition did not, however, "go around the table and say, well, what are you doing, what are you doing, what are you doing?" (TT at 863: 22-24 (Siegel).) While Siegel's communications may have been inappropriate in hindsight, her questioning of non-credit card counsel as well as her competitors indicates a general desire for information rather than an intent to initiate a conspiracy. Nevertheless, Siegel's conversations reveal an

unexpected willingness to cooperate with "fierce competitors." Plaintiffs also point to Warrington (Citi) putting her colleague Nelson in touch with Hufford (GE Capital) to "compare notes" on arbitration shortly after Warrington and Hufford met at the July 1999 Arbitration Coalition meeting. Because GE Capital is not an alleged co-conspirator, this Court draws no inference from that communication.

The In-House Working Group meetings appear to have spurred bilateral information exchanges as well. In another communication from July 2001, Gail (Bank One) instructed Lepri (Bank One) to respond to an inquiry from Barry (Capital One) as to whether Bank One permitted cardholders to opt out of arbitration and if so, what percentage of cardholders had done so. (PX-7609.) Both Gail and Barry were members of the In-House Working Group, which convened a conference call earlier that month. In October 2001, Capital One noticed cardholders that it was implementing an arbitration clause.

Plaintiffs point to other "side" communications, many of which involve First USA and MacDonald. Days after the September 1999 meeting, Larry Drexler (First USA in-house counsel) shared First USA's experience regarding the use of arbitration "both offensively (for collection actions) and defensively (for consumer complaints)" with Mullen (MBNA). (PX-6005.) About a month later, when he invited Lepri (Bank One) to the November 1999 Arbitration Coalition meeting, MacDonald told her that MBNA was "going to switch to arbitration soon" and that MBNA was going to join the Coalition. (PX-7587.)

MacDonald reached out to Stephen Whittaker (Providian) in January 2001 to inform him that he had told NAF that Providian was considering arbitration. (PX-7705.) MacDonald then put Providian in touch with NAF directly, stating "let me know if there is anything I can do to help move things along." (PX-7705.) As the first Issuing Bank to adopt arbitration, First USA's eagerness to share its experiences with its competitors is disconcerting—especially in view of the fact that it had assigned MacDonald to develop a "forum to talk about arbitration issues." (TT at 2855:9-10 (Lipsett).) MacDonald also furnished unsolicited updates to the Issuing Banks on competitors' plans. Further, he aggressively pursued the opportunity to push Providian and NAF together to "move things along." (PX-7705.)

Finally, Plaintiffs offer communications in which certain of the Issuing Banks attempted to obtain information about their competitors' plans regarding arbitration through third parties such as Kaplinsky (Ballard) or Curtis Brown (NAF). (See PX-5300; PX-6016; PX-7553; PX-7696; PX-7697.) But this sort of information-seeking is common in concentrated markets, and such behavior is consistent with conscious parallelism rather than collusion.

(iii)   Acts Contrary To Unilateral Self Interest

In order to distinguish concerted action from mere parallelism, courts look to whether firms would have engaged in acts contrary to their own self interest but for the existence of an illegal agreement. However, "[t]he concept of 'action against self-interest' is ambiguous and one of its meanings could merely constitute a restatement of interdependence." In re Baby Food, 166 F.3d at 122. Thus, "no conspiracy should be

inferred from ambiguous evidence or . . . mere parallelism when defendants' conduct can be explained by independent business reasons." In re Baby Food, 166 F.3d at 122.

Plaintiffs argue that the Issuing Banks acted against their unilateral self-interest in educating their competitors on the utility and use of class-action-barring arbitration clauses. They contend it is tantamount to sharing a valuable cost-saving measure. For example, they point to the Arbitration Coalition's cooperative revisions of Daily's FAQs following the October 1999 Arbitration Coalition meeting. They also note that Issuing Banks were asked to bring copies of their arbitration clauses to meetings.

The Defendants contend that meeting for educational and advocacy purposes is not against their self-interest even if they never adopted an arbitration provision. Given that arbitration was a relatively new development, each Defendant had an interest in staying abreast of the evolving legal and regulatory landscape. Each Defendant also had a unilateral self-interest in shaping the public discourse in favor of arbitration. And because the goal of establishing arbitration as an industry norm depended in part on courts and legislators accepting arbitration in the legal landscape, Defendants had an interest in educating their competitors on how to "get it right." While this Court finds that those meetings evidenced a degree of communication and collaboration beyond what one would expect from a CLE or a trade association, this Court does not find that participation in the meetings was so contrary to self-interest that an illegal agreement can be inferred from this "plus factor."

(iv)    Artificial Standardization

Another plus factor Plaintiffs urge this Court to consider is the artificial standardization of the arbitration clauses.  See E.I. du Pont de Nemours, 729 F.2d at 140 n.10; In re Currency Conversion Fee Antitrust Litig., No. 05 Civ. 7116 (WHP), 2012 WL 401113, at *7 (S.D.N.Y. Feb. 8, 2012).  Plaintiffs contend that the Issuing Banks' arbitration clauses were artificially standardized as a result of their illegal agreement to include class action waivers and to otherwise bar collective redress.  Plaintiffs point to the fact that when the alleged conspiracy began, the marketplace contained major participants who had neither arbitration clauses nor class action waivers.  After the Arbitration Coalition ceased meetings, all the Issuing Banks had similar clauses.  To infer an illegal agreement from artificial standardization, the uniformity in products cannot be the result of legitimate processes.  See In re Elevator Antitrust Litig., 502 F.3d 47, 51 (2d Cir. 2007) ("Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate); similar contract language can reflect the copying of documents that may not be secret; similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy[.]").

The evidence on this plus factor is ambiguous.  On the one hand, the Issuing Banks were asked to provide copies of their arbitration clauses for analysis and discussion at meetings and they intended to work together to share "best practices."  It is also undeniable that the Arbitration Coalition had a special interest in defeating class action lawsuits.  On the other hand, arbitration was becoming *au courant*—numerous legal publications were discussing arbitration as a means of preventing class action

litigation, and it continues to be a developing area of the law.  It is unsurprising that over time each of the Issuing Banks' arbitration clauses would morph to incorporate a class action waiver.  Because the evidence is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" this plus factor does not warrant an inference of illegal agreement.  See Twombly at 550 U.S. at 554.

(v)   <u>Issuing Bank Communications Concerning Foreign<br>Currency Exchange Fees</u>

Plaintiffs' antitrust claims in these actions grew out of discovery conducted in the multidistrict litigation—which was settled in October 2009 as to all defendants—alleging that the same Issuing Banks engaged in a conspiracy to fix foreign currency exchange ("F/X") fees.  See Order Approving Final Settlement, In re Currency Conversion Fee Antitrust Litig., MDL No. 1409 (WHP), Dock No. 755, dated Oct. 22, 2009.  Specifically, Plaintiffs alleged in that MDL litigation that the Issuing Banks conspired to fix uniform F/X fees and instructed one another on a legal strategy to avoid having to disclose that fee to cardholders through various meetings and bilateral communications.

Some of those communications involving F/X fees were close in time to the meetings at issue in these actions.  For example, in November 1998, Bergeson (Citi) shared her legal analysis on how to avoid disclosure of the F/X fee with Andrew Semmelman (Chase in-house counsel).  (PX-1030; TT at 3113:5-15, 3115:22-3116:1 (Semmelman).)  In February and March of 1999, Bergeson shared that information with Joanne Sundheim of First USA.  (TT at 243:23-257:3 (Sundheim).)  Sundheim's notes

-74-

from one of her calls with Bergeson indicate that the two shared details of their respective Issuing Banks' plans regarding F/X fees. (PX-0053.) On May 24, 1999, the day before the first meeting at issue in this case, Bergeson spoke with Ron Greene (WilmerHale) and Susan Barnes (Wells Fargo in-house counsel) regarding F/X fees. (PX-5256; TT at 365:9-23, 373:10-381:2 (Bergeson).) Barnes's notes from that meeting indicate that she learned Amex was not disclosing the F/X fee. (PX-5256.) And then, during the May 25, 1999 meeting at issue in this case, Amex's F/X fee non-disclosure practice was discussed again. (PX-0032; PX-5028; TT at 116:13-22 (Birnbaum); TT at 559:20-562:17, 588:23-589:3 (Heine).)

From June to October of 1999, Chase, First USA, Wells Fargo, and Bank of America engaged in various communications with each other regarding F/X fees. For example, in May or June of 1999, Sundheim (First USA) revealed to Birnbaum (Chase) that First USA's fee had not yet been implemented due to "operational difficulties." (TT at 117:19-119:10 (Birnbaum).) On June 23, 1999, a Chase executive asked Birnbaum and Semmelman for help in tracking down information on whether their competitors were charging 2% for foreign transaction fees, "hoping that maybe one of you may have better information . . . in talking to other attorneys." (PX-0680.) Birnbaum (Chase) spoke with John Lee (Wells Fargo in-house counsel) on September 17, 1999 regarding how F/X fees should be disclosed on billing statements. (PX-0686; TT at 113:11-17, 124:7-131:24 (Birnbaum).) And on October 5, 1999, Ronald Renaud (Bank of America in-house counsel) telephoned Sundheim (First USA), to discuss legal disclosure obligations regarding F/X fees. In a subsequent email, Sundheim informed other First

USA executives that she "got a call yesterday from a lawyer at BofA asking how we got comfortable with the new rate. I encouraged him to join us!" (PX-0052.)

Evidence of "[p]rior antitrust violations and the history of competition in a market" may be used to show the "intent, motive and method of a conspiracy under Section 1" so long as there is a "direct, logical relationship" between the collateral conspiracy and the instant conspiracy. U.S. Football League v. Nat'l Football League, 842 F.2d 1335, 1371 (2d Cir. 1988). Given the overlap in participants, meetings, and time frames, Plaintiffs argue that evidence of concerted action among the Issuing Banks with regard to F/X fees is probative of concerted action with respect to the class-action-barring arbitration clauses. In essence, Plaintiffs treat the F/X evidence as another "plus factor" permitting an inference of collusion in the absence of direct evidence. See, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig., 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (finding prior guilty pleas "support an inference of a conspiracy" regarding instant antitrust conspiracy). This evidence suggests Defendants' had the opportunity to conspire.

But even assuming a "direct, logical relationship" between the two alleged conspiracies, the F/X evidence does not permit an inference of collusion with respect to arbitration clauses. Unlike the authorities Plaintiffs cite, no prior judgment or guilty plea established the existence of an F/X conspiracy because the multidistrict litigation was settled. That settlement forecloses the possibility of inferring an illegal agreement to adopt arbitration clauses based on close connections to an established conspiracy to fix and conceal F/X fees. All this Court gleans from the F/X evidence is that the

communications between the Issuing Banks regarding both F/X fees and arbitration

clauses were similar:  The Issuing Banks paid close attention to their competitors'

actions, inquired directly of one another about prospective plans, and met and educated

each other on the issue at hand.  But the question is not whether the Issuing Banks tended

to communicate in this manner; it is whether an illegal agreement to implement and

maintain class-action-barring arbitration clauses can be inferred from such

communications.  As such, the collateral F/X evidence adds little to a record already

replete with relevant inter-firm communications regarding arbitration.[30]

(vi)   Paucity of Notes, Internal Work Product, and
Recollection Regarding Meetings

Plaintiffs do not specifically raise the paucity of notes, work product, and

witness recollection regarding the meetings as a plus factor, but they have used it to

suggest an inference of collusion throughout this litigation.  "In many contexts,

inferences from silence are perilous, and silence is often so ambiguous that it is of little

probative force, inviting a fact finder to speculate as to its meaning."  Murata Mfg. Co. v.

Bel Fuse, Inc., 422 F. Supp. 2d 934, 941 (N.D. Ill. 2006) (internal quotation marks and

citations omitted) (finding silence "unnatural" in context and therefore giving rise to

inference); see United States v. Hale, 422 U.S. 171, 176 (1975) ("In most circumstances

silence is so ambiguous that it is of little probative force.")  The context of this case—

_____

[30]  At trial, Plaintiffs seemed to argue that the F/X conspiracy provided a motive for the
arbitration conspiracy, i.e. to foreclose the possibility that the Issuing Banks could be
sued for failing to disclose F/X fees.  Plaintiffs appear to have abandoned that argument
in their post-trial briefing.  But to the extent they have not, this Court finds no evidence
of such a motive.

-77-

periodic meetings among busy lawyers covering a range of topics discussed many years ago—does not lead this Court to infer from a lack of notes and failing recollections that a conspiracy was afoot.

(vii)    Documentation of the Meetings

Contemporaneous notes survive from only 7 of the 28 meetings.  Other than three internal memos from the September 29, 1999 meeting, attendees generated little work product to inform their colleagues of what they learned at the meetings.  (See, e.g., PX-6140; PX-8640.)  And there is hardly any documentation regarding substance or even attendance for the In-House Working Group meetings.

Defendants respond that 151 trial exhibits relate to the meetings, including agendas, attendance lists, invitations, scheduling communications, and meeting summaries.  Defendants also point to an additional 84 contemporaneous documents, including communications previewing discussion topics for upcoming meetings and providing litigation updates between meetings.  (See, e.g., AX-9092; AX-9081; PX-5269.)  Defendants argue that Plaintiffs are wrong to expect that formal minutes would be generated at meetings like those at issue and note that discovery in these actions did not commence until four years after the last of the meetings took place.

Given the Issuing Banks' investment of attorney time and travel expense in attending a series of meetings over a period of years, it is odd they generated so little internal work product.  Many times when employers send representatives to industry meetings—especially those that are out-of-town and expensive to attend—some sort of work product memorializing the knowledge gained is expected in return.  However, this

Court finds that the documentation surrounding the meetings, or lack thereof, is not alarming. This Court would not expect formal minutes to be taken at a CLE or client development pitch.

There is a general pattern of attendance lists and agendas for the Arbitration Coalition meetings as well WilmerHale's summaries of the discussions. The handwritten notes are consistent with one another and WilmerHale's summaries. (Compare PX-0111, with PX-6135; compare PX-8248, with PX-7591, and PX-6146.) These notes reflect that permissible topics such as litigation developments and advocacy efforts were primary topics of discussion. And it is unremarkable that more handwritten notes did not survive.

While the In-House Working Group meetings did not generate attendance lists or notes, this Court would not expect extensive documentation to arise from "informal 'information please'" conference calls aimed at providing advice and updates among in-house counsel facing the same issues. (See, e.g., PX-5313.) And there is documentation in scheduling emails of at least some issues they hoped to discuss.

In sum, the evidence shows that entirely legitimate topics were discussed. Plaintiffs cannot construct an illegal conspiracy on the lack of documentation about illegitimate topics.

(viii)   Recollections of the Meetings

Many meeting attendees remembered very little about the substance of the meetings. At his February 2004 deposition, Heine, a "core" member of the Arbitration Coalition recalled that there "may have been less than five meetings" though he attended

at least eleven meetings over the course of three years. (TT at 517:7-12 (Heine).)
Tasheff (Citi) did not remember attending the May 30, 2001 Class Action Working
Group meeting even though she volunteered to lead the group's efforts on "PR and
Legislative Affairs" with MacDermott (Amex) and Barry (Capital One). (PX-8607; TT
at 2246:7-14 (Tasheff).) Tasheff was also a member of the In-House Working Group and
received numerous emails regarding its conference calls, but had only a "vague
recollection" of participating in a call. (TT at 2267:22-2268:12 (Tasheff).) Similarly,
Aniel (Bank of America), another member of the In-House Working Group, could not
remember anything about the calls except "a very general vague recollection that there
may have been one, maybe two phone calls that I listened to." (TT at 2336:11-16,
2344:17-2345:5 (Aniel).) Barry (Capital One) did not have a specific recollection of
attending either Class Action Working Group meeting and did not remember being part
of the organizing committee or leading a panel at the May 30, 2001 meeting. (PX-7561;
TT at 2148:23-2149:4, 2152:9-12; 2154:22-2155:20 (Barry).) Warrington (Citi) also had
no specific recollections of what was discussed at the May 25, July 28, or September 29,
1999 meetings, despite remembering that she "may have talked to Chris Lipsett or Ron
Greene about setting up such a meeting." (TT at 969:23-970:4, 971:2-6, 975:15-976:2,
980:14-16 (Warrington).)

 The witnesses Plaintiffs single out were deposed five to nine years after
the meetings took place. Their failures to specifically recall certain meetings are not
probative of a conspiracy; rather, they are understandable lapses in human memory.
Tasheff (Citi), Barry (Capital One), and Heine (Amex) testified credibly and openly

regarding those portions of meetings they recalled.  Many more witnesses testified

fulsomely about their involvement with the groups and their recollections of the

meetings.  The memory gaps of a few witnesses do not transmogrify an honest lack of

recollection into a conspiracy.  Overall, the record presented at trial is quite robust

considering the meetings that took place ten to fifteen years ago.

c)      Conclusion Regarding Parallel Conduct and Plus Factors

In weighing all the "plus factors" evidence, this Court finds that Plaintiffs

have failed to carry their burden to demonstrate an agreement among the Issuing Banks to

implement and maintain arbitration clauses.  While the extensive record of inter-firm

communications among competitors would give any court pause, this Court cannot infer

an illegal agreement based on the evidence marshalled at trial.  The opportunity to

collude does not translate into collusion.  See, e.g., Venture Tech., Inc. v. Nat'l Fuel Gas

Co., 685 F.2d 41, 47 (2d Cir. 1982) (noting an antitrust plaintiff must show "more than

the existence of a climate in which such a conspiracy may have been formed").

Especially where, as here, there is an oligopolistic market in which conscious parallelism

is the norm, Plaintiffs must show by a preponderance of the evidence that the Issuing

Banks' conduct "tends to exclude the possibility that the alleged conspirators acted

independently." Matsushita, 475 U.S. at 588 (internal quotation marks omitted).  Though

direct evidence of an agreement is neither expected nor required, the plus factors must do

more than leave this Court with "an equally plausible inference of mere interdependent

behavior, i.e., actions taken by market actors who are aware of and anticipate similar

-81-

actions taken by competitors, but which fall short of a tacit agreement." <u>Apex Oil</u>, 822 F.2d at 254.

      It is clear that the Issuing Banks had an agreement to explore collective advocacy efforts aimed at expanding the enforceability of arbitration clauses and to establish class-action-barring arbitration as an industry norm.  Direct evidence of this agreement abounds in meeting agendas, solicitations to fund amicus briefs and research, and willingness to explore joint action such as the FAQs project or self-regulation efforts. But Plaintiffs ask this Court to read evidence of that benign agreement as evidence of a separate, illegal agreement to collusively adopt and maintain class-action-barring arbitration clauses.  Because the policy undergirding antitrust condemns interference with lawful competitive behavior, Plaintiffs' theory is a bridge too far.

      This Court is especially hesitant to infer an illicit agreement from a record in which many of the Issuing Banks' communications resembled those of trade associations or lobbying groups.  "[M]embership and participation in a trade association alone does not give rise to a plausible inference of illegal agreement." <u>LaFlamme v. Societe Air France</u>, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010).  Further, many of the activities of the Arbitration Coalition are akin to legitimate activities protected under the <u>Noerr-Pennington</u> doctrine.  <u>See</u> <u>Noerr</u>, 365 U.S. at 136; <u>Mercatus Grp.</u>, 641 F.3d at 851. In fact, the record indicates that this was not the first time the Issuing Banks willingly set aside their differences to address common public relations problems:  Freiberg (Citi) noted that credit card companies had in the past met with one another six or seven times

in the presence of outside counsel as an "image council" chaired by MBNA to "focus on how to enhance the image of the card industry." (TT at 2455:12-2456:2 (Freiberg).)

Undoubtedly, avoiding class actions through arbitration was in each Issuing Banks' independent self interest, regardless of whether its competitors also adopted such a provision. Though an illegal agreement to collusively adopt arbitration would have given the Issuing Banks comfort on their journey to make arbitration an industry standard, they were just as likely to travel that road alone. Unlike some other cost-saving measures, the benefit of arbitration—avoiding class action litigation—was not diminished if competitors were in on the secret. In fact, absent any agreement to adopt arbitration, educating one's competitors on how to do so properly would have helped to maximize the benefits any one firm could realize. In this vein, Lipsett noted that the Arbitration Coalition was "trying to influence the state of the law relating to arbitration" because it "would be typically in the interests of firms like this to have arbitration provisions be enforceable, so these firms were interested in . . . influenc[ing] the result in litigation, to make sure it's well-litigated from the point of view of the side who wants the arbitration enforced." (TT at 2862:22-2863:7 (Lipsett).)

While the tenor of the meetings was heavily slanted in favor of arbitration, the record indicates that the final decision to adopt class-action-barring arbitration clauses was something the Issuing Banks hashed out individually and internally. Even MacDonald's aggressive communications to various Issuing Banks strike this Court as aimed at persuasion rather than collusion. While there is evidence the Issuing Banks tried to determine their competitors' plans and experiences regarding arbitration, as

would be expected in an oligopoly, this Court does not discern any concerted action arising from those inquiries. "Antitrust law is not intended to be as available as an over-the-counter cold remedy, because were its heavy power brought into play too readily it would not safeguard competition, but destroy it." Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 539 (2d Cir. 1993).

### B.     Unreasonable Restraint on Trade

While this Court's determination that Plaintiffs failed to carry their burden of showing a collusive agreement moots the issue of whether such an agreement would be an unreasonable restraint on trade, this Court nevertheless reaches that question for the sake of assisting appellate review.[31] Had Plaintiffs proved such an agreement, this Court would then analyze whether it was unlawful under the Sherman Act.

"For over 100 years, the courts have understood the Sherman Act only to prohibit 'unreasonable' restraints on trade." United States v. Visa U.S.A., Inc., 344 F.3d 229, 237-38 (2d Cir. 2003) (citing Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 342-43 (1982)). Courts generally evaluate unreasonable restraints on trade under two categories of analysis. Some conduct is prohibited because it is deemed unreasonable per se. State Oil, 522 U.S. at 10. Other conduct is outlawed only after evaluation under the so-called "rule of reason." State Oil, 522 U.S. at 10. Courts recognize a per se violation "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." Maricopa Cnty. Med. Soc'y, 457

---

[31] In doing so, this Court takes heed of Judge Leval's advice that "we should not disguise dictum, but should forthrightly label it as what it is." Pierre N. Leval, "Judging Under the Constitution: Dicta About Dicta." 81 NYU L. Rev. 1249, 1282 (2006).

U.S. at 344; see also State Oil, 522 U.S. at 10 (per se restraints "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful per se.").

But most antitrust claims are evaluated under the "rule of reason," "according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." State Oil, 522 U.S. at 10. In addition, courts have recognized an "intermediate inquiry" known as a "quick look" analysis, if the conduct is a "naked restriction." Bogan v. Hodgkins, 166 F.3d 509, 514 n.6 (2d Cir. 1999) (citing NCAA v. Bd. of Regents, 468 U.S. 85, 109 (1984)). The "quick look" analysis is appropriate where the restraint, though not subject to the per se standard, is one that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Cal. Dental Ass'n v. F.T.C., 526 U.S. 756, 770 (1999).

1.    Per Se Standard

Per se violations are "so plainly anticompetitive" that a Court can presume them to be unreasonable without further analysis. Broadcast Music Inc. v. CBS, Inc., 441 U.S. 1, 8 (1979). As such, per se violations are rare. The Supreme Court has expressed "reluctance to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately

obvious." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886-87 (2007). The Second Circuit has determined that a horizontal agreement to adopt arbitration provisions in employee contracts is not a per se violation. See Drayer v. Krasner, 572 F.2d 348, 353-55 (2d Cir. 1978), abrogation recognized by In re Crysen/Montenay Energy Co., 226 F.3d 160, 164 (2d Cir. 2000) (citing Cotton v. Slone, 4 F.3d 176 (2d Cir. 1993)). In Drayer, Judge Friendly recognized that "in a large part of our economy parties have become subject to a regime of arbitration when some might have preferred a judicial solution, and the development has been viewed as salutary." Drayer, 572 F.2d at 354. And, the Supreme Court has expanded the reach of consumer arbitration clauses in the past thirty years. See, e.g., Am. Express Co. v. Italian Colors Rest., 133 S. Ct. 2304, 2311 (2013) (enforcing a contractual waiver of class arbitration even when costs of individually arbitrating claim would exceed any recovery); CompuCredit Corp. v. Greenwood, 132 S. Ct. 665, 673 (2012) (arbitration agreements are not precluded in suits under the Credit Repair Organizations Act); AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1745-53 (2011) (invalidating a California rule that conditioned the enforceability of certain arbitration agreements on the availability of class arbitration procedures); Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772, 2776-81 (2010) (precluding court from reaching threshold question of unconscionability of an arbitration agreement as a whole where the agreement delegated that issue to the arbitrator); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25 (1991) (holding that contractually-required arbitration satisfies a statute's requirement that an injured person be able to sue in federal court); Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 217

(1985) (compelling arbitration of arbitrable claims even when complaint contains other,
nonarbitrable claims and splitting the two will result in piecemeal litigation); see also
Volt Info. Scis, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ., 489 U.S. 468,
476 (1989) ("[D]ue regard must be given to the federal policy favoring arbitration, and
ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of
arbitration."); Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24
(1983) (the Federal Arbitration Act reflects "a liberal federal policy favoring arbitration
agreements, notwithstanding any state substantive or procedural policies to the
contrary.").  As such, this Court cannot conclude that the alleged conspiracy was a per se
violation of the antitrust laws.

      2.    "Quick Look" and Rule of Reason Standard

      Plaintiffs contend that if the alleged conspiracy is not unlawful under the
per se standard, it should be analyzed under the "quick look" standard.  A "quick look"
analysis "allows the condemnation of a naked restraint on price or output without an
elaborate industry analysis." Cal. Dental, 526 U.S. at 763 (internal quotation marks
omitted).  It "carries the day when the great likelihood of anticompetitive effects can
easily be ascertained." Cal. Dental, 526 U.S. at 770.  Once a defendant has shown a
precompetitive justification, however, "the court must proceed to weigh the overall
reasonableness of the restraint using a full-scale rule of reason analysis." Bogan, 166
F.3d at 514 n.6 (internal quotation marks and citations omitted).  To prevail under the
rule of reason analysis, plaintiffs must show that the defendant conspirators "have
'market power' in a particular market for goods or services." Visa, 344 F.3d at 238.

Then, they must show that the challenged action "had an actual adverse effect on competition as a whole in the relevant market." Capital Imaging Assocs., 996 F.2d at 543. If this showing is satisfied, the burden shifts to defendants "to offer evidence of the pro-competitive 'redeeming virtues' of their combination." Capital Imaging Assocs., 996 F.2d at 543.

A "quick look" analysis is appropriate here. While consumer arbitration clauses are accepted with increasing frequency as a prerequisite of myriad consumer contracts, one would expect that development to be a byproduct of a market free from manipulation. In Ross v. Bank of America, the Second Circuit recognized harms stemming from "reduced choice and diminished quality of credit services" as a result of any "illegal collusion to constrict the options available to cardholders." 524 F.3d at 223. Thus, "no elaborate industry analysis is required to demonstrate the anticompetitive character" of any agreement to adopt and maintain arbitration clauses among Issuing Banks that together hold an 80% share of the market. NCAA, 468 U.S. at 109. In FTC v. Indiana Federation of Dentists, the Supreme Court held that a quick look analysis was appropriate in reviewing "an aggressive effort to hinder insurers' efforts to implement alternative benefits plans by enlisting member dentists to pledge not to submit x rays in conjunction with claim forms." 476 U.S. 447, 450 (1986). The Supreme Court explained:

> A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them. Absent some countervailing

> procompetitive virtue—such as, for example, the creation of
> efficiencies in the operation of a market or the provision of goods
> and services . . . such an agreement limiting consumer choice by
> impeding the ordinary give and take of the market place . . .
> cannot be sustained under the Rule of Reason.

Ind. Fed'n of Dentists, 476 U.S. at 459 (internal quotation marks and citations omitted),

cited in Ross v. Bank of America, 524 F.3d at 223.  The Supreme Court was unmoved by

the Seventh Circuit's finding that dentists did not actually compete over the service in

question.  See Ind. Fed'n of Dentists, 476 U.S. at 455-56; see also Drayer, 572 F.2d at

354 (hinting that while negotiated arbitration clauses in employment contracts were not

subject to a per se analysis, the situation could be different where "the plaintiff in opening

an account had no choice but to accept the arbitration stipulation").

       Thus, the inquiry shifts to whether the Defendants can provide any pro-

competitive justifications.  Here, Defendants failed to offer any such justifications for this

Court's consideration.  This Court therefore concludes that, under the "quick look"

analysis on the record presented in this case, the collusive adoption of mandatory class-

action-barring arbitration clauses, if proven, would have constituted an unreasonable

restraint on trade in violation of section 1 of the Sherman Act.  But this dicta should not

be read to suggest that there are no business justifications that might require analysis

under the rule of reason test.

CONCLUSION

These actions are the latest installment in multidistrict litigation that spanned more than a decade and raised a spate of novel issues. They offer a cautionary lesson to all lawyers who labor under inexorable pressure to generate new business. When outside counsel convene meetings of competitors in the hope of propelling themselves to the forefront of an emerging trend—in this case, class-action-barring consumer arbitration agreements—they do so at their professional peril.

When the first meeting convened, only two defendants had class-action-barring arbitration clauses in their card member agreements. By the time the last meeting concluded, all ten of the Issuing Banks, accounting for approximately 87% of all credit card transactions in the United States, had adopted class-action-barring arbitration clauses in their card member agreements. It was only by a slender reed that Plaintiffs failed to demonstrate that the lawyers who organized these meetings had spawned a Sherman Act conspiracy among their clients.

In retrospect, the Issuing Banks' short-term goal of lowering litigation costs eluded them. Undoubtedly, retaining some of the most esteemed antitrust lawyers in the nation to counter the extraordinary talents of Plaintiffs' counsel imposed a significant burden on the Issuing Banks. Only the passage of time will reveal whether the Issuing Banks' longer-term goal of avoiding the expense of class action lawsuits can be achieved.

For the foregoing reasons, this Court grants judgment to the Defendants dismissing Plaintiffs' antitrust claims in this action for injunctive relief invalidating the class-action-barring arbitration clauses.

Dated:  April 10, 2014
    New York, New York

         SO ORDERED:


         WILLIAM H. PAULEY III
           U.S.D.J.

*All Counsel of Record:*

Merrill G. Davidoff, Esq.
David A. Langer, Esq.
Charles P. Goodwin, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103

Christopher M. Burke, Esq.
SCOTT + SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
*Counsel for Plaintiffs*

Evan Chesler, Esq.
Gary Bornstein, Esq.
Rowan Wilson, Esq.
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
*Counsel for Defendants American Express*

Robert Y. Sperling, Esq.
Malcom Cox, Esq.
Ronald S. Betman, Esq.
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
*Counsel for Defendants Discover*

David Graham, Esq.
Theodore R Scarborough, Jr., Esq.
Patrick E. Croke, Esq.
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
*Counsel for Defendants Citigroup*